

**BC**



**FILED** CVK
1/12/2026
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

1:26-cv-00359
Judge Thomas M. Durkin
Magistrate Judge Gabriel A. Fuentes
RANDOM/Cat. 2

# EXHIBIT 1

| DEPARTMENT OF FINANCIAL AND PROFESSIONAL REGULATION of the State of Illinois, Complainant v. Jonathan G. Spero, M.D. License No. 036-108385, Respondent | ) ) ) ) ) ) | No. 2018-01038 |
|---|---|---|

## ORDER

This matter having come before the Director of the Division of Professional Regulation of the Department of Financial and Professional Regulation of the State of Illinois after a Notice of Intent to Refuse to Renew the Illinois Physician and Surgeon License No. 036-108385 of Respondent, Jonathan G. Spero, M.D. was served upon Respondent at his last known email address to the Department and Respondent failed to timely file a request for a hearing.

NOW, THEREFORE, I, CECILIA ABUNDIS, DIRECTOR OF THE DIVISION OF PROFESSIONAL REGULATION of the Department of Financial and Professional Regulation of the State of Illinois, find:

1. Respondent, Jonathan G. Spero, M.D. is a holder of Illinois Physician and Surgeon License No. 036-108385, which is presently in non-renewed status;

2. Information has come to the Department's attention that Respondent prescribed Schedule II Controlled Substances to F.C. without established physician-patient relationship or requisite assessments and/or evaluations which is a violation of 225 ILCS 60/22(A)(5) of the Illinois Medical Practice Act;

3. I have jurisdiction over the parties and subject matter herein pursuant to 20 ILCS 2105/2105-15 and 225 ILCS 60/22.



1

IT IS ORDERED that Jonathan G. Spero, M.D., Illinois Physician and Surgeon License No. 036-108385 SHALL BE PLACED IN REFUSED TO RENEW STATUS as of the date of this ORDER.

DATED THIS __29th__ DAY OF __June__ ,2022.

DEPARTMENT OF FINANCIAL AND PROFESSIONAL REGULATION of the State of Illinois
Mario Treto, Jr., Secretary
DIVISION OF PROFESSIONAL REGULATION

Cecilia Abundis
Director

REF:     License No. 036-108385/Case No. 2018-01038

# EXHIBIT 2




4-21-2023

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, DOMESTIC RELATIONS DIVISION

IN RE THE MARRIAGE OF:

Edward Engels,
    Petitioner,

and

Feliza Castro,
Respondent.

**ENTERED**
April 21, 2023
Iris Y. Martinez
Clerk of the Circuit Court
of Cook County, IL
DEPUTY CLERK _____

No: 2013 D 80356

## AGREED ORDER SUBMITTED BY ELECTRONIC MEANS

This cause coming to be heard on the Third Emergency Motion to Suspend Mother's parenting time, Judge Rosenberg hearing the case for Judge Loza, due to Judge Loza being unavailable today, Eddie and his counsel present, the Respondent and her counsel present, and the minor child by counsel, Pamela Kuzniar GAL, was not able to be present today, the Court being fully advised in the premises, **IT IS HEREBY ORDERED:**

1. The motion was found to be an Emergency, and the case is entered and continued until Tuesday, April 25, 2023, at 9:00 a.m. in front of Judge Loza, and shall proceed via zoom.

2. Feliza Castro's parenting time is suspended until Tuesday at 9:00 a.m. and until any further ruling is made by Judge Loza as to the Emergency Motion.

3. zoom 918 4716 4255  password 748872
   lindaepsteinlaw@gmail.com taradash@chicagodivorceatty.com
   kuzniar@kuzniarsimons.com kuzniar@heidtcich.com

*Neither Judge Loza nor GAL was present*

DATED: 4/21/2023

_____ 2271
JUDGE     Judge's No.

Attorney #58572
Law Office of Linda Epstein
Attorney for Respondent
722 W. Diversey Parkway, Ste. 101B
Chicago, IL 60614
312-259-8855
Email: lindaepsteinlaw@gmail.com

*Respondent's parenting time suspended due to positive cocaine test & fraudulent medical document*

# EXHIBIT 3

**FRAUD**



ID: 74186
4/3/2023
CASTRO, FELIZA M
DOB: 6/18/1987    Sex: F    Age: 35
Surgeon: MUSTOE, M.D., THOMAS D

# 900 NORTH MICHIGAN SURGICAL CENTER

## OPERATIVE/NURSING RECORD

ALLERGIES: PCN/Amoxicillin

| OPERATING ROOM 5 | PATIENT IN ROOM 11:48 | ANESTHESIA STARTED 11:48 | OPERATION STARTED 12:09 | OPERATION COMPLETED 1503 | PATIENT OUT 1506 |
|---|---|---|---|---|---|

| SURGEON: Mustoe M.D. | ASSISTANT: — M.D. | SCRUB: M. Curry | CIRCULATOR: M. Weiss |
|---|---|---|---|

**ANESTHESIA METHOD:** ☐ GENERAL  ☑ IV SEDATION  ☐ BLOCK/REGIONAL  ☐ NONE  ☐ LOCAL INFILTRATE  ☐ OTHER  ☐ SPINAL  ☐ EPIDURAL

ADMINISTERED BY: Carter    M.D.    RELIEF:

POSTOP DIAGNOSIS: same

WOUND CLASS: I II III IV N/A

OPERATION PERFORMED: _____

PATIENT POSITION: ☑ SUPINE  ☐ PRONE  ☐ JACKKNIFE  ☐ LATERAL  ☐ LITHOTOMY  ☐ OTHER   BY: Staff

ARMS R: armboard "  L: "

SAFETY STRAP

ADDITIONAL PADDING: pillow under knees & beyond

STIRRUPS:

OTHER:

COMPRESSION BOOTS/STOCKINGS: SN: on calve

TOURNIQUET #: n/a

SITE:

PRESSURE: _____ mmHg

TIME UP: _____ DOWN: _____

XRAY:

TECH:

URINARY CATHETER: ___ FR ___ cc BALLOON

STRAIGHT CATH:

BY:

OUTPUT:

DRAINS:

DRESSINGS: steris, 4×4s, paper tape, master, dressing, aquaplast

COUNTS: N/A

EQUIPMENT:
CAUTERY #: conmed
BIPOLAR 12 MONOPOLAR 35
BIPOLAR ___ MONOPOLAR ___
PAD SITE:
LASER: n/a
OPERATOR:
SAFETY CHECK:
SMOKE EVACUATOR:
ULTRASONIC LIPOSUCTION:
TYPE:
INSUFFLATOR #:
OTHER: hugger @ 36c

SKIN PREP SOLUTION:

IMPLANTS:
see log

LOG SHEETS COMPLETED:
IMPLANT: yes
LASER: n/a
HYSTEROSCOPY: n/a
ULTRASONIC LIPO: n/a

MEDICATIONS AND IRRIGATION: _____

SPECIMENS:

ID: 74186
4/3/2023
CASTRO, FELIZA M
DOB: 6/18/1987    Sex: F    Age: 35
Surgeon: MUSTOE, M.D., THOMAS D

| | SPONGES | SHARPS | MISC | INST. | BY |
|---|---|---|---|---|---|
| 1 | C | C | ✓ | | MC |
| 2 | C | C | ✓ | | MW |

SKIN INTEGRITY MAINTAINED: warm, dry, intact

NURSING NOTES: time out obtained

SIGNATURE: _____

FORM 1

# EXHIBIT – (Exhibit -DRO1)

Dr. James O'Donnell Court Appointed Pharmacologist Report Feliza Castro **"unfit to parent"**



# PHARMACONSULTANT INC.

## PHARMACOLOGY TOXICOLOGY CHEMISTRY PHARMACY NUTRITION

James T. O'Donnell PharmD MS FCP          James J. O'Donnell III MS PhD.

**Dr. James Thomas O'Donnell**

Associate Professor
of Pharmacology
Rush University
Medical Center

Diplomate-American Board
of Clinical Pharmacology

**Dr. James John O'Donnell**

Associate Professor
Rosalind Franklin University
of Medicine and Science

Member – American College
of Clinical Pharmacology

Member – American
Academy of Clinical
Toxicology



April 25, 2023

Pamela Kuzniar, GAL
HAID and TEICH
77 W. Wacker 45th Floor
Chicago, IL 60601

**RE: EDWARD ENGELS, Petitioner and FELIZA CASTRO, Respondent**
**No. 13 D 80356     Cal. 99**

GAL Kuzniar:

Pursuant to an Order of the Court, I conducted a medication management review of medical records, pharmacy records, and drug testing (urine and hair) for Mr. Engels and Ms. Castro.

I interviewed each of them in person in Barrington, IL on Monday, March 13, 2023 (Castro) and Tuesday, March 14, 2023 (Engels).

CONCLUSION: My opinions and conclusions are presented first (and repeated at the end of this report:

1.  Edward Engels is compliant with his testing and does not use prohibited substances. He takes his medications as directed for diagnosed conditions, for which his prescriptions and doses are appropriate. In my opinion, his medication use and avoidance of any drug abuse, from a medication management perspective, renders him fit to parent.

2.  Feliza Castro is poorly compliant with her testing and occasionally has used prohibited substances. She takes her medications, except for amphetamine, as directed for diagnosed conditions, for which her prescriptions and doses are appropriate. Her use of amphetamine, by her admission, is not daily, which is suggestive in the pharmacy records, and is "PRN," as evidenced in the urinalysis testing and psychiatric records. MRO findings 'give a pass' if a prescription has been issued in the past 12 months. In this parenting situation, I find episodic "PRN" / unauthorized medication use (Ketamine, tramadol, hydrocodone) to create a risk of impairment and intoxication, and thus create a risk to the minor child in her custody. Ms. Castro is dependent on marijuana, and with her readily available supply (works for a marijuana dispensary), is at risk of using marijuana while the minor child is in her custody. Even if she abstains, withdrawal effects cause behavioral toxicity, potentially placing the minor at risk. In my opinion, based upon the above findings and discussions, her medication use and drug abuse, from a medication management perspective, renders her unfit to parent.

117 S. Cook St. #353, Barrington, IL 60010 |

p: 847-304-0333 | c: 847-769-2843

jim@pharmaconsultantinc.com | www.pharmaconsultantinc.com | www.jamestodonnell.com



EDWARD ENGELS

Mr. Engels is prescribed and routinely taking two medications:

Amphetamine Salts (generic Adderall) 30MG  One daily. Prescribed for ADHD

Trazadone 100mg;   1-3 at bedtime. Prescribed for insomnia

There is an entry of a physician visit (Dr. Megan Crisham) wherein he was verified as having an approved indication (fibromyalgia), which would allow him to apply for a Medical Marijuana (THC) card. Dr. Crisham emphasized in her note that this was NOT a prescription. I have inquired to Mr. Engels if he pursued/obtained a medical marijuana card. He advised that he did obtain a medical marijuana card but has never used  the card. Judging by his drug testing results (never a positive marijuana), he did not.

Engel's frequency of filling his prescriptions is consistent with compliance; review of the medical records is absent of any reports of toxicity to the medications. Direct clinical questioning of Mr. Engels failed to adduce any reports of medication induced toxicity.

Urine and hair drug testing results for Mr. Engels are consistently negative. He affirmatively stated that he has not and does not use alcohol or illegal drugs. He did admit to a remote use of cocaine - several years ago.

I have no safety concerns for the child related to Mr. Engels' use, toxicity, and effects of this prescribed medications or his ability to parent.


FELIZA CASTRO

Ms. Castro's history of prescriptions and indications (diagnoses) for the following medications:

Lamotrigine -  Bipolar disorder   (     Dr. McNeil and NP ABT)

Amphetamine – ADHD (Dr. McNeil and NP ABT) (dose increased from 10mg/day in 2021; now 40mg/day

Periods of "prn use;" reports toxic effects of too much anxiety; anger and rage

Propranolol -  anxiety    "prn"           Dr. McNeil and NP ABT)

Ketamine (infusions, lozenges, nasal spray)  - Major Depressive Disorder  (Dr. Patel – Midwest Ketamine)

Hydrocodone/Acetaminophen – analgesia (likely indication)    Dr. Mustoe / Plastic Surgery

Ms. Castro has a history of polysubstance abuse (alcohol, cannabis (marijuana),clonazepam), toxicity to benzodiazepines and SSRIs and a desire to / successfully discontinued use of marijuana. History of panic attack; psychotic break. The marijuana use eventually resumed (no mention in Dr. McNeil's records), resulting regular POSITIVE urine tests for this substance. Recent urine drug tests for COCAINE/COCAINE METABOLITES and HYDROCODONE/ HYDROMORPHONE were reported, followed by a NEGATIVE MRO report Cocaine and hydrocodone, including marijuana. Unknown (to me) surgery use of intranasal cocaine on April 3, 2023 (records subsequently provided) is the



obvious reason for the MRO's finding of NEGATIVE for all drugs. Perhaps the current legal status of marijuana in Illinois affected his ruling of NEGATIVE on the marijuana finding. I recommend a certified copy of the Dr. Mustoe's office records be obtained and reviewed. The MRO Subsequently amended his report to report marijuana POSITIVE.

CONCERNS RAISED IN REVIEWING THE DRUG TESTING AND INTERVIEW OF MS. CASTRO

A relatively recent (March 10, 2023) (head) HAIR test, which on initial reporting indicate POSITIVE/above threshold cutoffs for Tramadol and Ketamine. The MRO report on this test listed positive only for marijuana/cannabinoids. Concerned, I called the MRO office and asked for an explanation of the ruling, since there were no current prescriptions for Tramadol and Ketamine, I was advised that as long as a prescription had been issued within one year ("valid period of the prescription"), it is considered by the MRO as a negative, and thus no POSITIVE MRO RULING. Both drugs are Controlled Substances.[i] Ketamine is a Schedule III Controlled Substance.[ii] Tramadol is a Schedule IV Controlled Substance.[iii] Ketamine nasal spray is listed in the ILPMP as prescribed initially on 1/10/22 by Dr. Patel and the prescription is only listed as filled (refilled?) by Ashland Health Pharmacy on 7/13/22. No prescriptions for tramadol are listed on the ILPMP; thus, there is no explanation for the violative (prohibited) use of Tramadol. I will be requesting the prescription records for Ashland Health Pharmacy, and an updated list of any other pharmacies used by Ms. Castro since December 1, 2022. (Current production of pharmacy records were complete through 12/5/22).

Notwithstanding the MRO findings of negative, detection of ketamine and tramadol significantly remote from the prescribing dates is suggestive of a non-authorized use or abuse of these drugs. Ketamine's use is outside of the period of any clinical monitoring by the prescriber - none found in Patel's records. No (available/reviewed) medical or pharmacy records document prescribing or dispensing of Tramadol, a synthetic opioid-like medication. Tramadol is a CS IV, thus subject to abuse. It is important to note that the detection period for both ketamine (7 months[iv]) and tramadol (3 - 4 months[v]) does not include the time period of last authorized use.

Another recent urine drug test reported positive finding of hydrocodone (HC) and hydromorphone (metabolite) of HC. Again, because of the "one year prior" prescription, the MRO conclusion was NEGATIVE for the opioid hydrocodone.

Ms. Castro's use of amphetamine is not consistent with daily use, yet the pharmacy records indicated continuous monthly prescriptions, which suggest daily use. In our interview, Ms. Castro reported that Dr. McNeil/ Nurse Abt told her it was 'OK' to skip the amphetamine on weekends (while not in class). However, the frequent negative urine tests for amphetamine are inconsistent with such use. Those records describe longer intervals of non-use, with intermittent positive tests, which is evidence of episodic use of amphetamine, which is not the proper frequency of use, and therefore suggests a "PRN" use of this Schedule II Controlled Substance. In this method, the amphetamine is used as a stimulant or "pick me up" instead of therapeutic for an ADHD diagnosis. I consider this use of amphetamine to be an ABUSE OF AMPHETAMINE.



A review of the *DRUGS.COM*[vi] interactions checker for lamotrigine, amphetamine, and ketamine provides the **warnings** below:

**Major**
**ketamine  lamoTRIgine**
Applies to: ketamine, Lamictal (lamotrigine)

MONITOR CLOSELY: Coadministration of ketamine with other central nervous system (CNS) depressants, including alcohol, may result in profound sedation, respiratory depression, coma, and death. In addition, opioid analgesics, barbiturates, and benzodiazepines may prolong the time to complete recovery from anesthesia.

MANAGEMENT: During concomitant use of ketamine with other CNS depressants, including alcohol, close monitoring of neurologic status and respiratory parameters, including respiratory rate and pulse oximetry, is recommended. Dosage adjustments should be considered according to the patient's clinical situation. Ambulatory patients should be counseled to avoid hazardous activities requiring mental alertness and motor coordination until they know how these agents affect them, and to notify their physician if they experience excessive or prolonged CNS effects that interfere with their normal activities.

**Moderate**
**ketamine  amphetamine**
Applies to: ketamine, Adderall (amphetamine / dextroamphetamine)

MONITOR: Ketamine can cause hemodynamic instability such as arrhythmias and transient increases or decreases in blood pressure, heart rate, and cardiac index. Coadministration of ketamine with direct or indirect acting sympathomimetics or vasopressin may enhance the sympathomimetic effects of ketamine leading to additive increases in blood pressure and heart rate.

MANAGEMENT: Close monitoring of vital signs, including blood pressure and heart rate is recommended whenever ketamine is used concomitantly with direct or indirect acting sympathomimetics or vasopressin. Dosage adjustments should be considered according to the patient's clinical situation.

**Major**
**ketamine  cannabis (Schedule I substance)**
Applies to: ketamine, cannabis

MONITOR CLOSELY: Coadministration of ketamine with other central nervous system (CNS) depressants, including alcohol, may result in profound sedation, respiratory depression, coma, and death. In addition, opioid analgesics, barbiturates, and benzodiazepines may prolong the time to complete recovery from anesthesia.

MANAGEMENT: During concomitant use of ketamine with other CNS depressants, including alcohol, close monitoring of neurologic status and respiratory parameters, including respiratory rate and pulse oximetry, is recommended. Dosage adjustments should be considered according to the patient's clinical situation. Ambulatory patients should be counseled to avoid hazardous activities requiring mental alertness and motor coordination until they know how these agents affect



them, and to notify their physician if they experience excessive or prolonged CNS effects that interfere with their normal activities.

**Moderate**
**lamoTRIgine cannabis (Schedule I substance)**
Applies to: Lamictal (lamotrigine), cannabis

MONITOR: Central nervous system- and/or respiratory-depressant effects may be additively or synergistically increased in patients taking multiple drugs that cause these effects, especially in elderly or debilitated patients. Sedation and impairment of attention, judgment, thinking, and psychomotor skills may increase.

MANAGEMENT: During concomitant use of these drugs, patients should be monitored for potentially excessive or prolonged CNS and respiratory depression. Cautious dosage titration may be required, particularly at treatment initiation. Ambulatory patients should be counseled to avoid hazardous activities requiring mental alertness and motor coordination until they know how these agents affect them, and to notify their physician if they experience excessive or prolonged CNS effects that interfere with their normal activities.

MARIJUANA

Ms. Castro admits to 'vaping' marijuana; the urine and drug tests consistently note the presence. Ms. Castro has assured me that she does not use marijuana when she has custody of the minor child. Given her consistent use, in my opinion, Ms. Castro is dependent[vii] on marijuana; abstention while dependent will result in signs of withdrawal (see discussion below), which can have behavioral consequences, and lead her to use again or use other drugs to relief signs of withdrawal. Her prior history documents marijuana dependency, and the need for other anxiolytic (anti-anxiety) medication (propranolol). Those records also note that high anxiety situations led her to use marijuana after she had successfully weaned herself off the marijuana.

Marijuana psycho-toxicity causes distorted perceptions of reality, makes memory formation difficult,[viii][ix] and alters the thought and deliberation processes of the marijuana intoxicated person. Marijuana is classified as a stimulant, sedative hallucinogen, and tranquilizer. It is used recreationally for its mood altering effects, euphoria, and relaxation. Marijuana produces alterations in motor behavior, perception, cognition, memory, learning, endocrine function, food intake, and regulation of body temperature.

Psychological: At recreational doses, effects include relaxation, euphoria, relaxed inhibitions, sense of well-being, disorientation, altered time and space/perception, lack of concentration, impaired learning and memory, alterations in thought formation and expression, drowsiness, sedation, mood changes and paranoia, and a more vivid sense of taste, sight, smell, and hearing. The most obvious short-term health effect of cannabis is intoxication marked by disturbances in the level of consciousness, cognition, perception, affect or behavior, and other psychophysiological functions and responses. The WHO describes short-term intoxicating effects of cannabis are possible causes of injuries, psychoses, suicidal behavior and adverse physical health effects.[x] Additional signs of marijuana intoxication include auditory, visual or tactile illusions, hallucinations with preserved orientation, suspiciousness or paranoid ideation, temporal showing (a sense that time is passing



very slowly) impaired judgement, impaired attention. Stronger doses intensify reactions and may cause fluctuating emotions, flights of fragmentary thoughts with disturbed associations, a dulling of attention, despite an illusion of heightened insight, image distortion, and psychosis.

Performance Effects: The short-term effects of marijuana use include problems with memory and learning, distorted perception, difficultly in thinking and problem-solving, and loss of coordination. Heavy users may have increased difficulty sustaining attention, shifting attention to meet the demands of changes in the environment, and in registering, processing and using information. In general, laboratory performance studies indicate that sensory functions are not highly impaired, but perceptual functions are significantly affected. The ability to concentrate and maintain attention are decreased during marijuana use, and impairment of hand-eye coordination is dose-related over a wide range of dosages. Impairment in reaction time and tracking, subjective sleepiness, distortion of time[xi] and distance, vigilance, and loss of coordination in divided attention tasks have been reported.

Dependency (addiction) and Withdrawal

Despite some contentious discussions regarding the addictiveness of marijuana, the evidence clearly indicates that long-term marijuana use can lead to addiction. Indeed, approximately 9% of those who experiment with marijuana will become addicted[xii]. (The number goes up to about 1 in 6 among those who start using marijuana as teenagers and to 25 to 50% among those who smoke marijuana daily.[xiii] There is also recognition of a bona fide cannabis withdrawal syndrome[xiv] (with symptoms that include irritability, sleeping difficulties, dysphoria, craving, and anxiety), which makes cessation difficult and contributes to relapse.

## CONCLUSIONS AND RECOMMENDATIONS

1. Edward Engels is compliant with his testing and does not use prohibited substances. He takes his medications as directed for diagnosed conditions, for which his prescriptions and doses are appropriate.  In my opinion, his medication use and avoidance of any drug abuse, from a medication management perspective, renders him fit to parent.

2. Feliza Castro  is poorly compliant with her testing and occasionally has used prohibited substances. She takes her medications, except for amphetamine, as directed for diagnosed conditions, for which her prescriptions and doses are appropriate. Her use of amphetamine, by her admission, is not daily, which is documented in the pharmacy records, and is "PRN," as evidenced in the urinalysis testing. MRO findings 'give a pass' if a prescription has been issued in the past 12 months. In this parenting situation, I find episodic "PRN" / unauthorized medication use (Ketamine, tramadol, hydrocodone) to create a risk of impairment and intoxication, and thus create a risk to the minor child in her custody. Ms. Castro is dependent on marijuana, and with her readily available supply (works for a marijuana dispensary), is at risk of using marijuana while the minor child is in her custody. Even if she abstains, withdrawal effects cause behavioral toxicity, potentially placing the minor at risk. In my opinion, based upon the above findings and discussions, her medication use and drug abuse, from a medication management perspective, renders her unfit to parent.



RECOMMENDATIONS RELATED TO FELIZA CASTRO

1. Share this report with her psychiatrist.

2. In consultation with and direction of her psychiatrist, wean off marijuana. Discuss the need for amphetamines, and if needed, take as prescribed, not episodic.

3. Subpoena certified, un-redacted records from Dr. Mustoe's office

4. Request up to date Walgreens pharmacy records

5. Request full Ashland Health Pharmacy records.

6. Continue bi-weekly extended panel urine drug tests for Feliza Castro (including opiates, synthetic opioids, barbiturates, benzodiazepines, amphetamine, and cocaine/metabolites).

I reserve the right to amend or supplement this report based on any new information received.

Professionally,

James T. O'Donnell PharmD MS FCP ABCP FACN

---

i 720 ILCS 570_ Illinois Controlled Substances Act.
https://www.ilga.gov/legislation/ilcs/ilcs4.asp?DocName=072005700HArt%2E+IV&ActID=1941&ChapterID=53&SeqStart=5200000&SeqEnd=7900000



[ii] https://www.luc.edu/media/lucedu/ors/pdfsanddocs/research/FAQ_CS.pdf

[iii] https://www.deadiversion.usdoj.gov/drug_chem_info/tramadol.pdf

[iv] Larabi IA, Etting I, and Alvarez JC. The duration of ketamine detection in hair after treatment cessation: case study and review of the literature in forensic and clinical casework. Drug Test Anal. 2023, Jan 20 (online)

[v] Kintz P, Ameline A, and Raul J-S. Disappearance of Tramadol and THC-COOH in Hair After Discontinuation of Abuse. Two Different Profiles. J. Anal Toxicol 2020, Jan 7 44(1): 65-68.

[vi] https://www.drugs.com/interactions-check.php?drug_list=190-1645,1411-0,1430-848&types%5B%5D=major&types%5B%5D=minor&types%5B%5D=moderate&types%5B%5D=food&types%5B%5D=therapeutic_duplication&professional=1

[vii] O'Donnell JT, O'Donnell JJ, and Benjamin D. Marijuana Pharmacology, In O'Donnell JJ and O'Donnell JT, eds., *O'Donnell's Drug Injury*, Fourth Ed. L&J Publishing, Tucson, 2016.

[viii] O'Donnell JT, O'Donnell JJ, and Benjamin D. Marijuana Pharmacology, In O'Donnell JJ and O'Donnell JT, eds., *O'Donnell's Drug Injury*, Fourth Ed. L&J Publishing, Tucson, 2016.

[ix] Radhakrishnan R, Wilkinson ST, and D'Souza DC. Gone to pot – a review of the association between cannabis and psychosis. Frontiers in Psychiatry. May 2014, Vol 5, Article 54

[x] Anonymous. The health and social effects of nonmedical cannabis use. World Health Organization (WHO). 2016. ISBN 978 924 1510240.

[xi] Genen L. Cannabis-Related Disorders Clinical Presentation. *Medscape.* March 23, 2017

[xii] Lopez-Quintero C1, Pérez de los Cobos J, Hasin DS, Okuda M, Wang S, Grant BF, Blanco C.

Probability and predictors of transition from first use to dependence on nicotine, alcohol, cannabis, and cocaine: results of the National Epidemiologic Survey on Alcohol and Related Conditions (NESARC).

Drug Alcohol Depend. 2011 May 1;115(1-2):120-30. doi: 10.1016/j.drugalcdep.2010.11.004. Epub 2010 Dec 8.



[xiii] Hall W, Degenhardt L. Adverse health effects of non-medical cannabis use. Lancet 2009;374:1383-1391

[xiv] Gorelick DA, Levin KH, Copersino ML, et al. Diagnostic criteria for cannabis withdrawal syndrome. Drug Alcohol Depend 2012;123:141-147

# EXHIBIT - X2:

## July 13, 2023

- EE counsel Linda Epstein message that "there is no way I could have a fair trial"

JUNE 14 2023
LINDA EPSTEIN
TEXT TO EE





LINDA → 31 YEARS
PRACTICING ONLY
SOJD ONE TIME

SHE IS THE MOST
ETHICAL ATTORNEY
DEALING W/ UNETHICAL
ATTORNEYS

SOJ
LOZA

LINDA
DOESN'T
FILE THE
SOJ AS SHE
HAS OTHER
CASES W/
THIS JUDGE
"HER CAREER"

I have a Court Reporter
ready I actually want her to
hear it you know to be
honest I really do I think it's
just like the nail in the coffin
for the motion. Did you pay
Dr. Finn?

Listen, I have talked to like
800 people already and I do
you know what Eddie this is
what you needed to have
happen because this is our
ability to really say that
there's no way that you
believe you can have a fair
trial and I believed I was
taken advantage of, and you
know it's it's a good good
reason to do the SOJ

I was going to reach out and
say you know, I voted Court

Subject

+ iMessage

TALKED TO
800 PEOPLE

FAIR TRIAL
NOT
POSSIBLE



10:51

Epstein L

I was going to reach out and
say you know, I voted Court
Reporter could you tell us if
you're hearing the
emergency because she
always told us night before

There's absolutely no way I
will have a fair trial with this
court as my fate and Eliana's

# EXHIBIT – X3:

- **On April 9, 2024,** Respondent thru counsel Jonathon Steele files Motion **"Intent to Relocate" to California** nearly one month after entering the agreed upon.

FILED
4/9/2024 1:30 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2013D080356
Calendar, 99
27182588

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, DOMESTIC RELATIONS DIVISION

IN RE: THE MARRIAGE OF: )
)
EDWARD ENGLES, )
          Petitioner, )
)
and )
) No.: 2013 D 80356
)
FELIZA CASTRO, )
          Respondent. )

## NOTICE OF INTENDED RELOCATION

NOW COMES the Respondent, Feliza Castro ("Feliza"), by and through her attorneys, BEERMANN LLP, and pursuant to Section 609.2(c) of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/609.2(c)), hereby provides formal notification to the Petitioner, Edward Engles, of her intent to relocate with the parties' minor child.

1. By way of this Notice, Feliza declares her intention to relocate with the parties' minor child, Eliana, permanently, to the State of California.

2. <u>Date of Relocation:</u> June, 2024.

3. <u>Address of Intended New Residence:</u> Los Angeles, California (exact address unknown at this time).

4. <u>Length of Time of Relocation:</u> Permanent.

5. <u>Notice:</u> A copy of this Notice of Intended Relocation has been provided to Edward.

1

Respondent hereby requests that Petitioner sign this Notice, thereby allowing the relocation without court action pursuant to 750 ILCS 5/609.2(e).

**AGREED:**

_____
Edward Engles
Non-Relocating Parent

_____
Feliza Castro
Relocating Parent

Prepared by:

_____
One of Respondent's Attorneys

*Responded 4.11.24*

**BEERMANN LLP**
161 N. Clark St. Suite 3000
Chicago Illinois 60601
Tel: (312) 621-9700
jsteele@beermannlaw.com
Attorney No. 80095

2

# EXHIBIT X4

**On May 24, 2024**, an article was published that court appointed Custody Evaluator Dr. David Finn admitted in a deposition that he had **never** ruled against a Beermann Law Group client.

# Dr. David Finn favored Beermann LLP, according to a 2016 deposition

Dr. David Finn admitted he never went against them in this deposition.

 MICHAEL VOLPE
MAY 24, 2024

 5     1

Share



> **"My focus is concentrated on achieving the goals and objectives of my clients and helping form and execute a strategy that delivers those results."**



T: 312-621-9700
jbpinkus@beermannlaw.com
vCard

Jared Pinkus and I had an interesting conversation yesterday

Two entities I previously investigated in Illinois appear to have a mutually beneficia relationship.

In a 2016 deposition, Dr. David Finn acknowledged that when tasked with doing a custody evaluation for a case involving Beermann LLP he always did an evaluation which favored a Beermann client.

DAVID FINN

A. Yes. So she's also appointed me.

Q. Did your appointment result in you presenting testimony in a contested custody case in those two instances?

A. No.

Q. Have you ever testified in Will County before?

A. No.

Q. How many custody cases have you handled, sir?

A. Roughly about 280 cases.

Q. And that's where you got the percentage of 80/20 that you told me about before rough?

A. Yes.

Q. I'm not going to hold you to that.

Have you dealt with Mr. Pinkus's firm before?

A. I have.

Q. On how many occasions?

A. I don't know.

Q. Well give me your best estimate.

A. Best estimate maybe 8 to 12 cases.

Q. And have they been as 604B or 604.5? I'm using the old terms because I know --

DAVID FINN

A. I understand.

You know, I believe a mix of both.

Q. How many times have you been selected by Mr. Pinkus's firm to be a selected expert, a 604.5?

A. You know, again, I'm just taking a guess here, but I would say four or five.

Q. On those four or five occasions have you ever recommended contrary to the position taken by his client?

A. You know, I don't believe so but, again, here I would have to go back to my records to verify that.

Q. But your recollection is right now you have not.

A. That's my recollection.

In the deposition, Dr. Finn acknowledged being on 8-12 cases which included a litigant represented by Beermann LLP. This included 4-5 custody evaluations.

"On those four or five occasions, have you ever recommended contrary to his client the lawyer asked Dr. Finn.

"You know, I don't believe so, but again here, I would have to go back to my records verify that." Dr. Finn responded.

Michael Volpe Investigates is a reader-supported publication. To receive new posts and support my work, consider becoming a free or paid subscriber.

Dr. Finn recommended custody for the Beermann client in the case involving this deposition as well. That was likely why he was asked the question.

The Pinkus referred to in the deposition is Jared Pinkus, who continues to be a Beermann lawyer currently.

I first did an exposé of Dr. David Finn in February 2024. That exposé included Sossamma Sebastin's story. Sossamma's daughter has disclosed that her father has molested her.

"Mostly to talk about my dad and how he abuses me," the teenager said to a forensi interviewer. "My dad raped me since I was four or five until I was like thirteen,"

"Per reporter, {the older daughter} states that George has raped her in the past. {The older daughter} has vague memory of George raping her and touching her back inappropriately." a Department of Children and Family Services (DCFS) report state

Dr. Finn, acting as an expert, concluded those accusations were manifestations of Sossamma's Munchhausen by proxy.

Q    Doctor Finn, can you discuss your opinion about Sossamma and Munchausen syndrome?

31

A    So Sossamma has contributed to this constellation of symptoms with Rene without any basis. And in doing so, you know, really has kind of, you know, placed this illness on Rene that Rene does not have. I believe that there is some secondary gain for Sossamma.

I think it has to do with her anger at Sebastin. I think it has to do with her possibly feeling more confident that she's the only person who could take care of Rene. That contributes to the problem because Rene has to be sick in order for Sossamma to have somebody to take care of, which I think is the reason that it's unlike people who are truly traumatized who figure out how to best deal with that trauma and move on.

Rene is kept in this perpetual state of illness, again, without any clear basis for her being ill other than, you know, these kind of, you know, vague

The judge in that case, Randie Bruno, granted the accused child molester, Sebastin George, temporary sole custody in November 2023, largely on the strength of Dr. Finn's testimony. A trial to determine permanent custody is occurring currently.

Sebastin's attorney, Michone Riewer, has tried twice unsuccessfully to subpoena me for that trial.

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
LAKE COUNTY, ILLINOIS

| | | |
|---|---|---|
| IN RE THE MARRIAGE OF:<br>SEBASTIN FRANCIS, | ) ) ) | |
| Petitioner,<br>and | ) ) ) | Case No. 2020 D 905 & 2023 OP 2596 |
| SOSSAMMA GEORGE SEBASTIN, | ) ) | |
| Respondent. | ) ) | |

**TRIAL SUBPOENA**

**To:**    Mr. Michael Volpe
      **Email:** mvolpe998@gmail.com

**YOU ARE COMMANDED** to appear **IN PERSON** in the above captioned case before the Honorable Judge Rhonda K. Bruno to give your testimony at 18 North County Street, Waukegan, Illinois 60085 **in Courtroom C-105, on May 14, 2024. Time of appearance: 9:00 a.m.**

**YOU ARE COMMANDED ALSO to bring the following:**

- **SEE ATTACHED RIDER**

**YOUR FAILURE TO APPEAR IN RESPONSE TO THIS SUBPOENA WILL SUBJECT YOU TO POSSIBLE PUNISHMENT FOR CONTEMPT OF THIS COURT.**

WITNESS, May 13, 2024

_Michone Riewer_
_____
Attorney for Petitioner

Michone J. Riewer/6231058
Strategic Divorce
900 N. Shore Drive, Ste. 220
Lake Bluff, Illinois 60044
847-234-4445
service@strategicdivorce.com

Dr. Finn also diagnosed Eddie Engels as a parent alienator, ignoring a history of dru abuse by his ex-girlfriend.

> Eddie Engels has been in ongoing litigation over custody of his daughter with hi ex-girlfriend Feliza Castro.
>
> Castro has failed multiple drug tests.
>
> One evaluation noted, "Feliza Castro is poorly compliant with her testing and occasionally has used prohibited substances."
>
> Finn didn't care, instead finding Engels guilty- so to speak- of parental alienatio
>
> His evaluation downplayed the drug test failures, and it recommended Castro ge custody.

Beermann LLP has also been the subject of multiple articles. I first exposed them la summer when two of their lawyers- Molly Carmody and Karen Paige- defended another suspected child molester, Jane Girard.





Molly Carmody at the top and Karen Paige and the bottom

More recently, the firm has represented Dr. Madison Sample, who appears to be hiding millions from his wife, Jackie Sample.

Michael Volpe Investigates Podcast The Impromptu: Episode 81 an Interview wi

Beermann represents Dr. Sample, despite previously consulting with Jackie about representing her. This is supposed to create a conflict, but the court has ignored it.

**Heather A. Ledger** | Legal Assistant *to*

*Candace L. Meyers, Karen V. Paige and Molly M. Carmody*

2275 Half Day Rd., Suite 350 | Bannockburn, IL 60015

Tel: 847.681.9600 | Fax: 847.681.0909

161 N Clark St., Suite 3000 | Chicago, IL 60601

Tel: 312.621.9700 | Fax: 312.621.0909

haledger@beermannlaw.com | www.beermannlaw.com



---

**From:** Candace L. Meyers <CLMeyers@beermannlaw.com>
**Sent:** Thursday, June 22, 2023 6:51 AM
**To:** May, Ryan <Ryan.May@ampf.com>; michael@michaelsmediation.com; Heather A. Ledger <HALedger@beermannlaw.com>
**Subject:** Re: Jackie Johnson Sample (for Candace)

Ryan and Michael,

This is extremely helpful! Thank you. My assistant, Heather will send the zoom information.

I appreciate your reaching out.

Thank you,

Candace.

Candace L. Meyers

Divorce and Family Law Partner

**BEERMANN LLP**

- Jackie had a lawyer previously, but they are parting ways. A motion was filed for Madison to keep the status quo, but he is not complying. Prior lawyer still has her file; Jackie filed a motion by herself to get her file back so she can share with her new lawyer.
- Jackie and Madison both completed the financial affadavit's, and Madison's was not accurate, as it drastically understated his income and it did not include any of their investment accounts.
- Madison is an anesthesiologist and had been making $12,000 **per week**. He listed $12,000 income **per month** on his financial affadvit. Jackie suggested he created an LLC that takes in his income and only pays him a small portion, thereby understating his income.
- Jackie is self-employed, earned decent funds. In the marriage Madison asked her to take a leave of absence to help build the house they currently live in. She still owns a salon where she rents space, bringing in $3,100/month.
- They have a $2.5M house that has a $1.5M mortgage on it. They both live in the house, Jackie refuses to leave, and Madison is purposely making noise while she sleeps trying to drive her out, and has insisted she turn over the full value of the house to him.
- Madison told Jackie he will only pay her alimony of $3,000/month for 3 years.
- They have an investment property that they are trying to sell. The realtor has suggested certain improvements before putting it on the market, Madison is not funding those improvements.
- Jackie is developing real estate with the intent to open a bar. Project is on-hold, and she is at risk of losing it, because she cannot access marital assets to keep project moving forward.
- Jackie just found out that Madison has not paid their home mortgage for the last 2 months; she believes he is willing to ruin all that they have built just to hurt her.
- Madison gives Jackie $2,000/month for living expenses, which is inadequate for her development work, let alone her monthly expenses.
- Madison reduced the credit limit on Jackie's credit card twice, so she cannot charge anything to make up for the inability to access marital funds.
- They have crypto accounts. Jackie doesn't know where they are. They have investment accounts. Jackie doesn't know where they are.

Michael Cohen

part of the communication between Jackie Sample and Beerman for the consultation. In this communication, Jackie talked about case strategy with Beerman. This is why the firm should not have then represented her husband, Dr. Madison Sample.

Sossamma's case is in Lake County, Eddie's in Cook County (so is Girard's case), Jackie's in DuPage County, while the deposition was in Will County. Both Dr. Finn Beermann are ubiquitous in the Chicagoland area.

Beermann's relationship with Dr. Finn extends beyond their mutually beneficial evaluations.

Dr. Finn was featured in a newsletter which Beermann put out. He was quoted in an article entitled, "Divorcing a narcissist."

As Seen in Forest and Bluff Magazine

As divorce attorneys at Beermann Pritikin Mirabelli Swerdlove LLP, we often find ourselves representing individuals who claim to have spouses with narcissistic characteristics.

If you are married to, or in a relationship with, a narcissist, take comfort in knowing that you are not alone and there is help. With the right tools, protection, resources and education, you can successfully navigate the turbulent waters of divorcing a narcissist.

As a starting point, consider this assessment from the world of psychology:

> "You cannot change others, you can only change your response and expectations."
>
> Psychologist Dr. David Finn, Psy.D'

Managing *your* expectations, not those of your narcissistic significant other, is a critical aspect of successfully divorcing a narcissist. A fundamental mistake we see in representing individuals, is their desire to seek ways to change the narcissist's behavior instead of modifying his or her own expectations and reactions. This often leads to additional problems for the person married to the narcissist, in the follow ways: 1) emotional unrest, 2) increased litigation costs/time and 3) familial discord.

In counseling our clients in this type of situation, we routinely recite the mantra "focus and work on only those things that *you* can control." Frequently, clients make the mistake of focusing on what the narcissist demands, even though such demands often can never be satisfied. Focusing on the mantra is a small step toward taking back control of *your* life, and resolving *your* divorce successfully and on *your* terms.

With greater knowledge into the mind of a narcissistic personality, you will have a better chance of mitigating the stress caused by irrational and abusive behavior.

## Is My Spouse a Narcissist?

Answering this threshold question is a necessary first step in trying to manage your strategy and expectations throughout the divorce process. So, who is a narcissist? The DSM-V defines Narcissistic Personality Disorder as follows:

"A pervasive pattern of grandiosity (in fantasy or behavior), need for admiration, and lack of empathy, beginning by early adulthood and present in a variety of contexts, as indicated by five (or more) of the following:

1. Has a grandiose sense of self-importance (e.g., exaggerates achievements and talents, expects to be recognized as superior without commensurate achievements).

2. Is preoccupied with fantasies of unlimited success, power, brilliance, beauty, or ideal love.

3. Believes that he or she is "special" and unique and can only be understood by, or should associate with, other special or high-status people (or institutions).

4. Requires excessive admiration.

5. Has a sense of entitlement (i.e., unreasonable expectations of especially favorable treatment or automatic compliance with his or her expectations).

6. Is interpersonally exploitative (i.e., takes advantage of others to achieve his or her own ends).

7. Lacks empathy: is unwilling to recognize or identify with the feelings and needs of others.

8. Is often envious of others or believes that others are envious of him or her.

9. Shows arrogant, haughty behaviors or attitudes."

jrosenberg@beermannlaw.com          jmquigley@beermannlaw.com



If you have identified five (5) or more of these factors as being applicable to your spouse, there is a reasonable likelihood you are married to a person with narcissistic tendencies. These self-centered characteristics only become more exaggerated in a divorce proceeding.

In the context of a divorce proceeding, Dr. Finn notes that "the narcissist experiences a deep wound from what they believe is rejection from their spouse." He relates that this theory is often referred to as a "Narcissistic Injury." Commentary on the DSM-V suggests that "there is a sense of fear [on the part of the narcissist] from having his or her imperfections or flaws revealed."

Put another way, Dr. Sol Rappaport[2] comments: "The feeling of rejection or criticism on the narcissist causes him or her to react negatively – most times with anger or rage. Spouses of narcissists feel as though they have to constantly cater to them, build them up and 'tip-toe' around what they say and how they interact with the narcissist, as they are fearful of the anger and repercussions that may follow." In an article by Rhonda Feinberg, she describes the "classic" issue with narcissists in relationships as "[they] tend to blame others for any relationship problems and *attempt to avoid looking at their own contribution.*" *The Intractable Client*, Rhonda Feinberg, July 1997. They assume that others will accept their point of view, and will not hesitate to use gross or subtle coercion to achieve their goals. Id.

## How Did I Get Here?

counsel. Having a mental health professional in your corner is essential to managing the stress of any divorce proceeding, let alone the chaos associated with divorcing a narcissist.

3. Educate yourself about Personality Disorders and Narcissism so you can better understand the personality and behavioral patterns of your spouse.

4. Temper your expectations in divorcing a narcissist. What may seem logical, rational or even practical will not always enter into the narcissist's mind. This often times results in protracted, costly and acrimonious litigation. In the extreme, a narcissist may engage in a *"scorched earth"* strategy to punish the other spouse even though such a strategy may be financially and emotionally devastating for the entire family.

5. Do not measure your success by the outcome as determined by the narcissist. Dr. Finn says "you are not going to fix [the narcissist] and it's a trap for any spouse to become angry that the narcissist is not changing."

6. In communicating with a narcissist during a divorce process, Dr. Rappaport suggest that you "begin sentences with 'I' rather than 'you,' and, if you have children, start your discussion focused on the children, so as to keep the focus off of the narcissist. Try to avoid or minimize the concept of win-lose." Dr. Rappaport suggests there are several self-help books that may be useful, including *BIFF: Quick Responses to High-Conflict People, their Personal Attacks, Hostile Email and Social Media Meltdowns*, by Bill Eddy.

Representing and favoring narcissists in divorce and child custody cases can be big business for unscrupulous lawyers and psychologists like Beermann and Dr. Finn.

Narcissists often love court and see it as another form of abuse- legal abuse- of their ex-partner.

Giving people like this favorable evaluations- as Dr. Finn is known to do- gives them power which they use to fuel more litigation.

Beermann and Dr. Finn also participated in the same family law seminar in 2022. Dr Finn made a presentation on reunification therapy, the practice which has recently been outlawed in Arizona.

**Understanding Reunification Therapy**

*(0.75 Professional Responsibility, pending approval)*

Reunification therapy is an often misunderstood and sometimes maligned approach to intervening in a parent-child relationship that has become estranged. Dr. Finn will discuss myths and facts surrounding reunification therapy, the importance of finding good and competent therapists to intervene in these difficult cases, and the paramet for Court Orders to promote success in treatment.

**Dr. David Finn, Psy.D.**, *Associates in Human Development Counseling, LLC*, Palatine

I left a voicemail for Dr. Finn which he did not return. I did reach Jared Pinkus at h Beermann office by phone.

Mr. Pinkus repeatedly said that he had no comment.

At other points, he also denied that Dr. Finn was a hired gun for Beermann. He fina told me not to call him again.

Beermann loves me, which is why their email system has blocked my email.



**Message blocked**

Your message to **jbpinkus@beermannlaw.com** has been blocked. See technical details below for more information.



**Message blocked**

Your message to **mmcarmody@beermannlaw.com** has been blocked. See technical details below for more information.



**Message blocked**

Your message to **kpaige@beermannlaw.com** has been blocked. See technical details below for more information.



**Get more from Michael Volpe in the Substack app**
Available for iOS and Android

Get the app

 5 Likes · 1 Restack

# Discussion about this post

**Comments**   **Restacks**

 Write a comment...

© 2025 MIchael Volpe · Privacy · Terms · Collection notice
Substack is the home for great culture

# EXHIBIT – X8

- October 10, 2024 - Per Judge
  Fernandez's order she transfers the case
  back to Judge Loza in the Third District
  to hear Petitioner EE) Motion to
  Reallocate Fees and to Rehear
  Proceedings due To Medical Condition
  of Practitioner to be heard.

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, DOMESTIC RELATIONS DIVISION

IN RE: THE MARRIAGE OF:                    )
                                           )
EDWARD ENGLES,                             )
                    Petitioner,            )
                                           )
and                                        )    No.: 2013 D 80356
                                           )
FELIZA CASTRO,                             )
                    Respondent.            )

> **ENTERED**
> Judge Rossana P. Fernandez-2141
> **OCT 1 0 2024**
> IRIS Y. MARTINEZ
> CLERK OF THE CIRCUIT COURT
> OF COOK COUNTY

## ORDER

This matter coming on to be heard upon the *EMERGENCY MOTION TO SUSPEND RESPONDENT'S PARENTING TIME AND TO MODIFY THE CHILD CUSTODY JUDGMENT AND PARENTING AGREEMENT ENTERED ON MARCH 5. 2024* ("Motion") filed by the Petitioner, Respondent appearing through counsel and Petitioner appearing in open court, and the Court being fully advised;

**It is hereby ordered:**

1. Petitioner's Motion is not an emergency and is denied as such. By separate order entered contemporaneously herewith, this matter is transferred to the Presiding Judge to be transferred to Judge Loza for hearing.

Entered: 10-10-24

_Judge_ #2141

BEERMANN LLP
Attorneys for Respondent
161 N. Clark St. Suite 3000
Chicago Illinois 60601
Tel: (312) 621-9700
jsteele@beermannlaw.com
Attorney No. 80095

Pro se Petitioner: eddie@e2brands.net
GAL: kuzniar@haidteich.com

1



# EXHIBIT – X9

**October23, 2024 per** Judge Scannicchio's order the case is transferred back to Pamela Loza in the Third District to hear the Petitioner's (EE) Motion To Reconsider.

(Rev. 02/04/16) CCDR 0014

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT, DOMESTIC RELATIONS DIVISION

IN RE:  ☐ Marriage ☐ Civil Union ☐ Legal Separation ☐ Allocation of Parental Responsibilities
☐ Visitation (Non-Parent) ☐ Support ☐ Parentage of:

EDWARD ENGELS
Petitioner

No.: 2013D 060366

and

FELIZA CASTRO
Respondent

Calendar: 01

**ENTERED**
PRESIDING JUDGE REENA KAMINI #2059 - 2024
Oct. 23, 2024
Iris Y. Martinez
Clerk of the Circuit Court
of Cook County, IL

### ORDERS OF TRANSFER, ASSIGNMENT AND REASSIGNMENT

This Cause being properly before the Court, and the Court being advised in the premises:

**I.   TRANSFERS (Temporary)**

☐ That this cause is transferred to the 4852 ☐ Reconciliation Calendar 4853 ☐ Military Calendar all existing orders shall remain in full force and effect except _____

4282 ☑ That this cause be returned from the 4752 ☐ Reconciliation Calendar 4753 ☐ Military Calendar. IT IS ORDERED that the above entitled cause is transferred to Judge LOZA Calendar 93 for PETITIONER'S MOTION TO RECONSIDER

☐ PRETRIAL ☐ CONTESTED MOTION for _____ all other matters being retained by the Preliminary Judge.

4201 ☐ IT IS ORDERED that this cause is returned to Judge _____ Calendar _____ for further proceedings, the transferred matter being concluded.

**II.   ASSIGNMENT (Trial)**

☐ IT IS ORDERED that:

4295 ☐ Discovery is closed as of _____.

4482 ☐ This cause is set for Trial before Judge _____ Calendar _____

INSTANTER. ALL PARTIES OR THEIR COUNSEL SHALL PROCEED IMMEDIATELY TO COURTROOM _____

NOTE: CASES SET FOR TRIAL CAN ONLY BE CONTINUED FOR CAUSE, ON MOTION PURSUANT TO SUPREME COURT RULE AND DOMESTIC RELATIONS GENERAL ORDER 86 D-1.

**III.   REASSIGNMENTS TO OR FROM PRESIDING JUDGE**

8282 ☑ THIS CAUSE coming before the court for reassignment, IT IS HEREBY ORDERED that this is assigned to the Presiding Judge for: ☐ Hearing; ☐ Consolidation within the Division: Case Number _____ Calendar _____; or ☑ Other PETITIONER'S MOTION TO RECONSIDER.

8201 ☐ Clerk for the Circuit Court for random electronic assignment to a calendar ☐ Preliminary ☐ Individual

☐ Post-Judgment ☐ Expedited Child Support ☐ Excluding Calendar(s) _____

Atty. No.: _____

Name: _____

Atty. for: ORDER OF COURT

Address: _____

City/State/Zip: _____

Telephone: _____

Primary Email: _____

Secondary Email: _____

Tertiary Email: _____

ENTERED:

Dated: _____

_____ # 2059
Judge                          Judge's No.

## IRIS Y. MARTINEZ, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
Page 1 of 1

# EXHIBIT X10

November 04, 2024,

- Per Judge Scannicchio's order: The October 23, 2024, Transfer Order to Calendar 93 (Judge Loza) was in error because the pending Motion To Reconsider was filed in response to the Order entered by Judge Rosanna Fernandez.

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, DOMESTIC RELATIONS DIVISION

In re the Parentage of:                          )
                                                 )
Edward Engels,                                   )
                        Petitioner,              )     Case No. 2013D080356
                                                 )
and                                              )
                                                 )
Feliza Castro,                                   )
                        Respondent.              )

ENTERED
PRESIDING JUDGE REGINA SCANNICCHIO - 2059
Nov. 4, 2024
Iris Y. Martinez
Clerk of the Circuit Court
of Cook County, IL

DEPUTY CLERK _____

## ORDER

THIS CAUSE coming to be heard on the Court's own motion; the matter having been initiated by the filing of a Petition to Establish Parentage on August 19, 2013, an initial Allocation Judgment having been entered on April 8, 2016, and most recently modified by agreement on March 5, 2024; on May 28, 2024, Petitioner filed a Motion to Reallocate GAL Fees; on September 5, 2024, Judge Rossana Fernandez denied Petitioner's Motion to Reallocate GAL Fees; on September 11, 2024, Petitioner filed a Motion to Reconsider, titled "Motion to Reallocation Fees and to Rehear Proceedings Due to Medical Condition of Practitioner, the denial of the Motion to Reallocate Fees; on October 2, 2024, Petitioner filed an Emergency Motion to Suspend Respondent's Parenting and to Modify the Child Custody Judgment and Parenting Agreement; on October 21, 2024, [Petition]er filed an Emergency Motion for In-Camera; on October 23, 2024, this matter was [transferr]ed to Calendar 93, Judge Pam Loza, for hearing on the Motion to Reconsider; and the [Court] being fully advised in the premises,

[COU]RT FINDS:

[On Oct]ober 23, 2024, Transfer Order to Calendar 93 was in error because the pending [Motion to] Reconsider was filed in response to the Order entered by Judge Rossana [Fernandez].

[IT IS] ORDERED:

[On October 2]3, 2024, Transfer Order is VACATED.

ENTERED: ___Novmeber 4, 2024___

_Scannicchio # 2059_
Hon. Regina A. Scannicchio

Page 1 of 1

# EXHIBIT X11

November 7, 2024
EE received another copy of the same order as on November 4, 2024 with the addition of "Nunc Pro Tune"

In re the Parentage of:

Edward Engels,

    Petitioner,

and

Feliza Castro,

    Respondent,

Case No. 2013D080356

**ENTERED**
Presiding Judge Regina A. Scannicchio
NOV 0 7 2024
CIRCUIT COURT - 2059
IRIS Y MARTINEZ
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL

## ORDER

THIS CAUSE coming to be heard on the Court's own motion; the matter having been initiated by the filing of a Petition to Establish Parentage on August 19, 2013, an initial Allocation Judgment having been entered on April 8, 2016, and most recently modified by agreement on March 5, 2024; on May 28, 2024, Petitioner filed a Motion to Reallocate GAL Fees; on September 5, 2024, Judge Rossana Fernandez denied Petitioner's Motion to Reallocate GAL Fees; on September 11, 2024, Petitioner filed a Motion to Reconsider, titled "Motion to Reallocation Fees and to Rehear Proceedings Due to Medical Condition of Practitioner, the denial of the Motion to Reallocate Fees; on October 2, 2024, Petitioner filed an Emergency Motion to Suspend Respondent's Parenting Time and to Modify the Child Custody Judgment and Parenting Agreement; on October 21, 2024, Petitioner filed an Emergency Motion for In-Camera; on October 23, 2024, this matter was transferred to Calendar 93, Judge Pam Loza, for hearing on the Motion to Reconsider; and the Court now being fully advised in the premises,

**THE COURT FINDS:**

1. The October 23, 2024, Transfer Order to Calendar 93 was in error because the pending Motion to Reconsider was filed in response to the Order entered by Judge Rossana Fernandez.

**IT HEREBY ORDERED:**

The October 23, 2024, Transfer Order is VACATED.

*Nunc Pro Tunc*

ENTERED: _Novmeber 1, 2024_

_Scannicchio # 2059_

Hon. Regina A. Scannicchio

Page 1 of 1

# EXHIBIT X13

## November 11, 2024

Dr. James O'Donnell Court Appointed Pharmacologist affidavit:
- FC's Drug concerns
- FC's mental health concerns
- Acceptance of Non-Court Appointed Report on rebuttal to DR. O'Donnell Report by GAL and Dr. David Finn
- Manipulation of fees by GAL

2013D080356

FILED
11/12/2024 12:00 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2013D080356
Rush
Calendar B
80144909

## AFFIDAVIT OF DR. JAMES T. O'DONNELL

I, Dr. James T. O'Donnell, submit this affidavit based on my role as a clinical pharmacologist and Associate Professor at the Rush University Medical Center and Rush Medical College, specializing in pharmacology. I was appointed by the court as a pharmacologist to objectively assess the substance use and parenting fitness of Feliza Castro and Edward Engels in the context of their care for the minor child Eliana. This affidavit supports a request for immediate protective measures due to the clear risks posed by Feliza's substance use and non-compliance with court-mandated drug testing, which compromises Eliana's safety.

As a pharmacologist with extensive expertise in the effects of narcotics, psychiatric medications, recreational and other substances on cognitive and behavioral health, I was appointed specifically to evaluate the implications of the parents' substance use and how it affects their capacity to provide safe and stable care for the minor child. This role was initiated at the request of GAL Pamela Kuzniar to provide an objective, court-sanctioned assessment.

The father, Edward Engels was not abusing his medications, was not taking any illegal substances, was transparent and compliant with providing all medical information history requested of him, thus I limited my report to acknowledging these findings with no further recommendations.

Through drug testing results and behavioral assessments, I found that Feliza has tested positive for a range of substances, each with specific risks that undermine her ability to care for Eliana safely and responsibly:

- **Cocaine and Other Narcotics**: Feliza's use of cocaine, opiates, ketamine, amphetamines, and chronic marijuana have clear, documented impairments on judgment, mood stability, and caregiving ability. These substances, taken alone or together, create a caregiving environment where attention to Eliana's basic safety needs cannot be assured.
- **Dependency on Marijuana**: The mother's habitual marijuana use, facilitated by her involvement in the marijuana business, creates a setting where access to the substance is both frequent and normalized. This dependency introduces concerns regarding the child's exposure to drug use, possible impairment in caregiving situations, and the associated risks, particularly when driving. The implications of this environment on the child's well-being and safety, both immediate and long term, should be evaluated, including any documented instances of impairment or adverse effects on the child.

- **Mental Health Concerns**: Feliza's potential misuse of medications prescribed for bipolar disorder or similar conditions could compound her erratic behavior, further compromising her fitness to parent. Combined with narcotics, these medications may lead to mood instability, aggression, and neglect.
- **Disregard for Objective Findings**: Despite multiple reports of Feliza's drug use, along with my recommendations for protective measures, GAL Kuzniar and the custody evaluator Dr. David Finn appeared to overlook the gravity of these findings, choosing to minimize or ignore safety recommendations. This lack of response reflects a troubling disregard for the objective, court-appointed process.
- **Acceptance of Non-Appointed Rebuttals**: GAL Kuzniar initially requested my involvement, emphasizing the need for an expert pharmacologist to assess substance use. Based on the totality of the information available and a personal interview, my finding was clearly stated that Feliza Castro was **UNFIT** to parent, and that the minor was at risk due to actual and potential substance use and adverse effects by Feliza. However, unbeknownst to me, GAL Kuzniar later accepted, and submitted a report from a non-appointed expert, Dr. Leikin, to counter my findings. Until recently, I was not aware that a rebuttal report was issued. This inconsistent behavior undermines the purpose of an objective court appointed role and suggests a willingness to prioritize certain narratives over child safety. To this day, I am not aware that my own report was ever submitted to the Court.

The observed actions—or lack of action—by the GAL and other professionals reflect potential misconduct in the oversight of this s case, with several actions standing out:

- **Ex Parte Communication and Improper Redactions**: GAL Kuzniar and Feliza's attorney, Dean Taradash, allegedly engaged in ex parte communication with Judge Loza to obtain approval for redacting critical information from a medical document that purportedly justified cocaine use. This action was conducted without neutral oversight, limiting my access to full information and undermining transparency.
- **Failure to Address the Substance Abuse Findings in Detail**: Despite evidence of cocaine, ketamine, opiates, amphetamines and copious amounts of marijuana in Feliza's system, there has been a marked reluctance by the GAL and custody evaluator to act upon these findings. This lack of intervention raises questions of misconduct and disregard for child safety protocols.
- **Manipulation of Costs and Fees**

  After the initial even deposit for my services, I followed a customary approach by preparing subsequent invoices reflecting the actual work and time spent on each client.

However, GAL Pamela Kuzniar intervened, contacting me to insist that the costs should continue to be split evenly, regardless of the specific work performed for each party. This approach diverges from standard billing practices, where fees typically correspond to the services provided to each client individually.

To ensure Eliana's safety, I urge the court to immediately implement the following protective measures:

- **Supervised Visitation Only**: I recommend that all visitation be strictly supervised by a neutral third party until Feliza complies with all documentation and drug testing requirements.
- **Temporary Suspension of Parenting Rights for Non-Compliance**: Should Feliza continue to miss drug tests or fail to provide requested medical records, a temporary suspension of her parenting time should be implemented.
- **Mandatory Drug Testing Protocols with Strict Accountability**: Regular drug testing, with unaltered results submitted directly to the court, as well as to a competent, independent pharmacologist, is essential to verify sobriety. Missed or tampered tests should result in immediate suspension of parenting time.
- **Unredacted Access to All Medical Records**: Complete, unaltered records of Feliza's substance use history should be provided, with oversight by an impartial third party to ensure transparency.

## Conclusion

In closing, I respectfully submit that the failure to enforce consistent safety measures, and lack of accountability among key professionals have exposed Eliana to preventable harm. To rectify these systemic failures and safeguard Eliana's welfare, immediate court intervention is essential. I certify that the above statements are true to the best of my knowledge and made in alignment with my duty to protect the best interests of the child.

James T. O'Donnell PharmD MS FCP ABCP FACN_11/9/24

*James O'Donnell*

STATE IL COUNTY Cook

SIGNED BEFORE ME 9 DAY Nov 24

Thomas Schaefer

OFFICIAL SEAL
THOMAS BENTON SCHAEFER
Notary Public, State of Illinois
Commission No 992470
My Commission Expires June 18 2028