

BC

RECEIVED

MPV

7/9/2026

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT



**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| EDWARD ENGELS, | |
| Plaintiff, | |
| v. | Case No. 1:26-cv-00359 |
| FELIZA CASTRO, ROSS MORREALE, PAMELA KUZNIAR, DR. DAVID FINN, THOMAS FIELD, JONATHAN STEELE | Hon. Georgia N. Alexakis, Judge Presiding. |
| Defendants. | |

**FIRST AMENDED COMPLAINT**

Plaintiff Edward Engels files this First Amended Complaint as a matter of right without leave of Court, pursuant to Federal Rule of Civil Procedure 15(a)(1)(B). This filing is timely because it is submitted within 21 days of the most recent motion under Rule 12(b) filed in this action — Defendant Pamela Kuzniar's Motion to Dismiss, filed June 18, 2026 (ECF No. 37). No leave of Court is required.

Plaintiff Edward Engels for his First Amended Complaint ("FAC") against Defendants Feliza Castro, Ross Morreale, Thomas Field Esq, Jonathan Steele Esq, Dr. David Finn, and Pamela Kuzniar hereby requests a trial by jury pursuant to Rule 38(b) and alleges as follows:

## I. INTRODUCTION

1. Plaintiff Edward Engels brings this action to redress ongoing violations of his constitutional rights arising from the extrajudicial conduct of Defendants Feliza Castro,

1

Ross Morreale, Pamela Kuzniar, Dr. David Finn, Thomas Field, and Jonathan Steele, occurring outside and independent of any state-court judicial decision-making.

2.      Plaintiff brings this action under 42 U.S.C. § 1983 to seek relief from past and on-going constitutional injuries arising from the conduct of judicial, quasi-judicial, and private actors who, through joint action under color of state law, deprived Plaintiff of the procedural protections guaranteed by the First and Fourteenth Amendments.

3.      Plaintiff does not seek review, reversal, modification, or interference with any order of the Circuit Court of Cook County. All such orders remain fully enforceable. This action concerns only unlawful conduct occurring outside legitimate judicial functions.

4.      Plaintiff brings this action in his individual capacity only.

5.      This is a plenary pleading under Federal Rule of Civil Procedure 8, seeking damages and declaratory relief for past and current constitutional violations. It is not a motion for a temporary restraining order under Federal Rule of Civil Procedure 65, and the Rule 19 necessary-party analysis applicable to injunctive relief does not govern which parties may properly be named as defendants in a damages action.

## II.      JURISDICTION AND VENUE

6.      This Court has subject-matter jurisdiction under 28 U.S.C. § 1331, as this action arises under 42 U.S.C. § 1983.

7.      Venue is proper under 28 U.S.C. § 1391(b) because each Defendant resides in or has sufficient contacts with this District, and a substantial part of the events giving rise to this action occurred here.

8       .Rooker-Feldman does not bar this action because Plaintiff is not a state-court loser and does not seek to modify any state-court judgment, but rather seeks redress for misconduct that took place outside the underlying custody docket.

9.      This action is also not barred by the abstention principles discussed in Woodard or Hadzi-Tanovic because Plaintiff does not seek to influence a custody determination.

2

10.     This action is not subject to Younger abstention because state coercive powers are not at issue.

11.     This action is not barred by the domestic relations exception because federal questions are raised and Plaintiff seeks no domestic-relations-style relief.

## III.     PARTIES

12.     Plaintiff Edward Engels is an adult resident of Cook County, Illinois, and the father of minor child E.R.E. He brings this action in his individual capacity to vindicate his own constitutional rights, including his liberty interest in the care, custody, and companionship of his daughter under the First, Fifth, and Fourteenth Amendments.

13.     Defendant Feliza Castro is an adult resident of Cook County, Illinois, sued in her individual capacity. Default has been entered against Defendant Castro. (ECF No. 53.)

14.     Defendant Ross Morreale is an adult resident of Miami, Florida, sued in his individual capacity. Default has been entered against Defendant Morreale. (ECF No. 53.)

15.     Defendant Pamela Kuzniar is an attorney licensed in Illinois who served as court-appointed Guardian ad Litem in the underlying state-court proceedings for over twelve years, sued in her individual capacity for conduct outside the scope of her appointment.

16.     Defendant Dr. David Finn is a psychologist and court-appointed evaluator, sued in his individual capacity for conduct outside the scope of his appointment.

17.     Defendant Thomas Field is an attorney with Beermann LLP, sued in his individual capacity. Field represented Defendant Castro from approximately 2013 through February 14, 2025.

18.     Defendant Jonathan Steele is an attorney with Beermann LLP, sued in his individual capacity.

## IV.     FACTUAL BACKGROUND

**A.      Overview**

19.      This action arises from more than twelve years of litigation in the Circuit Court of Cook County, Domestic Relations Division, Case No. 2013 D 080356, during which Plaintiff has been subjected to extrajudicial conduct by Defendants that is independent of, and separate from, any judicial ruling in that case.

20.      Plaintiff has served as the primary caregiver for E.R.E. for the majority of her life until the most recent litigation cycle starting in 2022. Defendant Castro has a documented history of drug intoxication, violence, criminal activity, instability, and noncompliance with court orders, as set forth below.

21.      On September 2, 2022, the state court reappointed Kuzniar as Guardian ad Litem. One week later, on September 9, 2022, the state court appointed Dr. Finn to conduct a Rule 215 evaluation of Plaintiff. Kuzniar recommended Finn's appointment.

**B.      Castro's Documented Drug Intoxication History and the Suppression of Evidence**

22.      On June 29, 2022, the Illinois Department of Financial and Professional Regulation placed the medical license of Dr. Jonathan Spero in refused-to-renew status after finding that he had prescribed Schedule II controlled substances to Defendant F.C. (Feliza Castro) without an established physician-patient relationship or required evaluation, in violation of 225 ILCS § 60/22(A)(5). **(Ex. 1, IDFPR Order.)**

23      .In text messages exchanged with Dr. Jonathan Spero on June 30 and July 1, 2016, recovered from a cellular phone previously used by Defendant Castro and later given by Castro to E.R.E., which had not been fully cleared of prior data, Spero told Castro she could use his prescription pad, which he stated was kept in a cabinet above his refrigerator, to write her own prescriptions, and offered to send her a sample of his signature to use for that purpose. Castro asked Spero for his DEA registration number; Spero provided it by text. The same exchange discusses dispensing quantities of Vicodin and Xanax.

24.      The text messages described above, together with evidence of prescription fraud, repeated   positive   drug   tests,   missed   court-ordered   drug   tests,   suspected

4

controlled-substance misuse, and other information bearing directly upon the safety and welfare of E.R.E., were provided to Defendant Pamela Kuzniar, in her capacity as Guardian ad Litem, and Defendant Dr. David Finn, in his capacity as the court-appointed custody evaluator. Plaintiff alleges that despite possessing this information, neither Defendant initiated additional protective measures, sought emergency court intervention, requested further investigation, or reported the conduct to any licensing, child-protection, or law-enforcement authority. Plaintiff further alleges that both Defendants continued to make recommendations and participate in the custody proceedings despite their knowledge of these matters.

25.    As the court-appointed Guardian ad Litem, Defendant Pamela Kuzniar owed a duty to independently investigate matters affecting the health, safety, and welfare of the minor child and to advocate for the child's best interests rather than the interests of either parent. Plaintiff alleges that, after receiving the information described above, Defendant Kuzniar possessed credible information concerning alleged prescription fraud, repeated positive drug tests, missed court-ordered drug tests, suspected controlled-substance misuse, and other matters bearing directly on E.R.E.'s safety. Plaintiff further alleges that, despite this information, Defendant Kuzniar failed to bring these matters to the Court's attention, failed to seek appropriate protective relief, failed to request additional investigation, and failed to take other action consistent with her court-appointed responsibilities. Plaintiff contends that these alleged omissions were inconsistent with the duties of a Guardian ad Litem under the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/506) and, to the extent applicable based on the facts ultimately established, with the reporting obligations recognized under the Illinois Abused and Neglected Child Reporting Act.

26.    As the court-appointed custody evaluator, Dr. David Finn was tasked with conducting a neutral, professional evaluation of the family dynamics to aid the court in determining the child's best interests. Plaintiff alleges that, upon receiving the information described above, Dr. Finn failed to uphold his duty of objectivity and thoroughness in his role. Plaintiff contends that Finn's alleged omissions and actions

were inconsistent with the professional duties imposed on court-appointed evaluators and licensed psychologists.

27. Under 750 ILCS 5/604.10, court-appointed custody evaluators are tasked with providing impartial and professional assessments to aid the court in determining the child's best interests. As a licensed psychologist, Dr. Finn is also governed by the Illinois Clinical Psychologist Licensing Act (225 ILCS 15/), which mandates ethical practice, objectivity, and protection from harm. Further, should circumstances arise indicating abuse or neglect, the Illinois Abused and Neglected Child Reporting Act (325 ILCS 5/) imposes mandatory reporting obligations on certain professionals. Plaintiff alleges that Dr. Finn, despite being aware of these concerning facts, failed to adhere to his professional and statutory duties by not adequately addressing the risks or reporting them.

28. Defendant Feliza Castro was ordered to submit to a court-ordered drug test no later than 5:00 p.m. on September 12, 2022. Castro failed to comply with the Court's deadline and did not appear for collection until the following day, September 13, 2022. On September 13, 2022, Plaintiff's counsel, Linda Epstein, immediately notified Defendant Pamela Kuzniar and Castro's counsel, Dean Taradash, that Castro had failed to comply with the Court's order and requested an explanation for the violation. Defendant Kuzniar acknowledged that Castro had appeared for testing on September 13 rather than September 12 and directed counsel to seek an explanation from Taradash. Despite contemporaneous notice that Castro had failed to comply with the Court's drug-testing order, Plaintiff alleges that Defendant Kuzniar neither reported the violation to the Court, sought enforcement of the Court's order, nor recommended any corrective action regarding Castro's noncompliance.

29 .Respondent Feliza Castro tested positive for ketamine and other substances on the drug test collected on September 13, 2022, after failing to comply with the Court's September 12, 2022 drug-testing deadline.

30. Plaintiff's counsel, Linda Epstein, through repeated emails to the GAL and opposing counsel Dean Taradash, sought an explanation for Respondent's positive ketamine result, and those requests remained unanswered.

31. On January 20, 2023, the next court-ordered drug-testing protocol was prepared by Guardian ad Litem Pamela Kuzniar, and ketamine was removed from the court-ordered drug-testing panel despite Respondent's earlier positive ketamine result. The revised protocol was submitted directly to the Court for entry, without first being circulated to counsel for review and comment, contrary to the parties' customary practice.

32. The omission described above is not a discretionary judgment call falling within the scope of Defendant Kuzniar's appointment as Guardian ad Litem. It is a specific, documented act of exclusion, made after Kuzniar had received direct written notice identifying the very substance later omitted, and it is therefore conduct outside the scope of her appointment for purposes of the immunity analysis in Cooney v. Rossiter, 986 N.E.2d 1131 (Ill. App. Ct. 2013).

33. On April 19, 2023, Defendant Castro tested positive for cocaine during her parenting time with E.R.E. Judge Joy Rosenberg, sitting temporarily on the matter, found a genuine emergency and suspended Castro's parenting time after rejecting a document submitted by Taradash, then Castro's counsel, purporting to explain the result as medically administered.

34. In response to Respondent Castro's April 19, 2023 positive cocaine test, Castro's then-counsel, Dean Taradash, submitted an operative record from Respondent Castro's April 3, 2023 surgical procedure, asserting that the positive cocaine result was attributable to medications administered during that procedure.

35. The April 3, 2023 operative record submitted by Dean Taradash to Judge Joy Rosenberg states that the medications administered during Respondent Feliza Castro's surgical procedure included: Breast Mix; 320 mL injectable saline; 30 mL of 1% lidocaine; 3 mL sodium bicarbonate; 0.3 mL epinephrine (local); 30 mL of 0.25% Marcaine with epinephrine; 40 mg of cocaine administered intranasally; and Afrin administered intranasally.

36. Judge Rosenberg rejected the document on this basis and found a genuine emergency.

37.     The medications listed in the operative record do not support Taradash's explanation. Cocaine and lidocaine are not complementary drugs — they are alternative choices for the same clinical purpose, topical nasal anesthesia and vasoconstriction, and combining them is recognized to increase the risk of severe toxicity, including seizures, cardiac complications, and methemoglobinemia, because both act on the same physiological pathways. Lidocaine is nowadays used as a safer alternative to cocaine. A legitimate surgical protocol would not call for administering both agents, along with breast mix, Marcaine and epinephrine as still further local anesthetics, in the same procedure. Respondent's explanation accordingly asks the Court to accept not merely that cocaine was administered, but that it was administered in a redundant and clinically hazardous combination for no discernible medical reason — a coincidence conspicuously convenient to the timing of a positive drug test, and one that warrants scrutiny rather than acceptance at face value.

38.     Rather than allow the underlying medical records from the procedure to be sent directly to court-appointed pharmacologist Dr. James O'Donnell, Taradash redacted the records before producing them to him, a practice Defendant Kuzniar, as Guardian ad Litem, supported, further limiting O'Donnell's ability to independently verify Respondent's explanation.

39.     Between September 2022 and February 2024, Defendant Castro tested positive for controlled substances on approximately **thirty-five consecutive** court-ordered drug screens, and never produced a negative hair or urine drug test.

40.     Despite this history, the Guardian ad Litem later recommended that Respondent's court-ordered drug testing be discontinued over Plaintiff's objection. Plaintiff alleges that the recommendation to terminate Respondent's drug testing occurred notwithstanding Respondent's repeated positive drug test results and ongoing concerns regarding controlled substance use.

41.     Between September 2022 and February 2024, Respondent Castro failed to comply with the court-ordered drug-testing protocol on 17 of 26 required call-in dates, as reflected in the Drug Testing Call Log. Plaintiff further alleges that, despite these

repeated failures to comply with the Court's testing protocol, Guardian ad Litem Pamela Kuzniar did not seek enforcement of the testing requirements and did not recommend that Respondent be held accountable for the repeated missed call-ins.

42. Plaintiff alleges that Respondent Castro recorded and posted videos depicting herself using controlled substances while the parties' minor child was seated in the back seat of the vehicle. Plaintiff further alleges that these videos were provided to Guardian ad Litem Pamela Kuzniar and Dr. David Finn but did not result in any request for additional investigation or protective action concerning the child's safety.

43. On April 25, 2023, court-appointed pharmacologist Dr. James O'Donnell, retained at Kuzniar's insistence, issued a report finding Castro "unfit to parent" based on drug-testing positives, prescription drug abuse, missed tests, and signs of chemical dependency.

44. On June 15, 2023, Plaintiff's counsel, Linda Epstein, sent a strongly worded email to Guardian ad Litem Pamela Kuzniar and Respondent's counsel, Dean Taradash, objecting that they appeared before Judge Loza and discussed the case after counsel had advised them she could not appear. In the email, Attorney Epstein stated that neither Kuzniar nor Taradash notified her of their intended appearance, questioned whether they represented to the Court that she had consented, objected to their discussing the case outside her presence and without her authorization, and demanded answers regarding what occurred during the meeting. Plaintiff alleges that the appearance resulted in the entry of an order that restricted further discovery into Respondent Castro's April 3, 2023 medical procedure following her April 19, 2023 positive cocaine test, thereby limiting further investigation into the medical records and medications administered during that procedure.

45. Per a March 10, 2023 letter from Pamela Rak, LCSW, the court-appointed parenting coach, addressed to Guardian ad Litem Pamela Kuzniar and court-appointed custody evaluator Dr. David Finn, Rak documents Respondent Feliza Castro's repeated failure to participate in court-ordered parenting coaching despite scheduling accommodations, reminders, and confirmations.

### C.    Castro's Documented Violent History and the Suppression of Evidence

46.         Police reports document a 2008 aggravated/felonious domestic assault investigation in which Respondent Feliza Castro was investigated for allegedly assaulting her own brother. The reports identify the offense as Aggravated/Felonious Assault – Family – Other Weapon (Domestic) involving an umbrella as the alleged weapon.

47         .Dr. Jonathan Spero's text messages to Plaintiff Edward Engels, dated Sunday, May 10, 2015, in which Dr. Spero asked Plaintiff to retrieve Respondent Feliza Castro's belongings from his unlocked vehicle parked outside Gilt Bar, reported that Respondent Castro "was violent" and that he left because of her conduct, and advised that he had given Respondent Castro and the parties' minor child access to his residence. Plaintiff offers this exhibit as contemporaneous evidence of Dr. Spero's own description of Respondent Castro's alleged violent behavior during their relationship.

48.         Police reports, criminal case records, and video evidence document a June 23, 2018 incident at the Allstate Arena in Rosemont, Illinois involving Respondent Feliza Castro, including booking/holding-cell video depicting Respondent Castro while in police custody following the incident.

49         .In 2018, Respondent's then-boyfriend, Ross Morreale, sought and received judicial protection alleging repeated domestic violence, threats, illegal drug-related conduct involving mushrooms, and ongoing safety concerns. Plaintiff contends these contemporaneous allegations are relevant to Respondent's alleged history of violent behavior, substance-related concerns, and credibility.

### D.    Text Messages from Minor Child ERE

50. Text messages exchanged on March 18, 2023, between court-appointed custody evaluator Dr. David Finn and the parties' minor child, ERE. The message visible in the screenshot reads:

> ERE: "Sorry Dr. Finn I was at class. I just hate being here.
> I don't want to leave my room. I don't want to see or talk
> to them and they don't want to either. I hate them. I'm so

sick of all of this. This isn't fair. Why am I being made to live here in a house that I hate" "When is this going to be over? I hate this. I hate this so so so much."

51. May 12, 2023 text messages between Plaintiff and ERE, sent shortly after ERE was picked up from school early:

ERE: "Dad they picked me up for early dismissal now I'm in my room I hate it here so much I'm so miserable I dont want to be here dad I really dont." "I can't stop crying it's horrible." "I hate Pam I hate Finn Why are they helping the worse mom in the world? Why dad? Why??? They just picked me up so I can sit in my room and do nothing they don't want me here and I don't want to be here..."

52. On April 2, 2023, text messages between the parties' minor child, ERE, and Respondent Feliza Castro, while both were present in the same residence, in which ERE repeatedly expressed distress regarding Ross Morreale's conduct:

ERE: "I hate you." "I hate you, Ross says that I'm acting like a crazy person and asks me what's wrong with me." "I hate you so much." "You're the worst." "You never do anything." "I hate you, my ears hurt so much, Ross is turning up his music all the way in the car; if he picks me up I'm not getting in the car with him."

**E.    Dr. Finn's Pattern of Bias**

53. Dr. Finn's evaluation of Plaintiff, conducted following his September 9, 2022 appointment, did not address or account for Dr. O'Donnell's April 25, 2023 findings, and did not address findings by court-appointed parenting coach Pamela Rak that were also favorable to Plaintiff.

54. Plaintiff alleges that Defendant Dr. David Finn failed to meaningfully address Respondent Castro's documented history of drug intoxication, prior violent conduct, and the minor child's repeatedly expressed wishes and statements of emotional distress. Plaintiff further alleges that, despite the existence of this information, Defendant Finn's evaluation minimized or omitted these issues and instead reached recommendations that were inconsistent with the documented evidence presented to him.

55. On May 24, 2024, it was reported in an article that Dr. Finn admitted under oath, in a deposition in the underlying proceeding, that he had never issued a recommendation adverse to a client represented by Beermann LLP. **(Ex. 2, - Dr. David Finn's Deposition TestimonyFavoring Beermann LLP)**

56. In re Marriage of Lemke, the Illinois Appellate Court found that Dr. Finn's unsupported conclusion "called into question all of Dr. Finn's opinions," and that his conclusions were "completely unsupportable." **(Exhibit 3 - Illinois Appellate Court Opinion Criticising Dr. David Finn)**

**F. Timeliness of the Claims Against Defendant Finn**

57. Defendant Finn submitted his court-appointed custody evaluation on July 19, 2023. However, his involvement in this matter did not conclude with the submission of that report. Defendant Finn remained the court-appointed evaluator, continued to participate in the proceedings, and his opinions continued to influence the litigation through at least the March 5, 2024 agreed order.

58. This action is timely: a claim accrues when the plaintiff knows or has reason to know of the injury that is the basis of the action — not merely when the underlying event occurred, if the factual basis for the claim was not and could not reasonably have been known at that time.

59. Illinois' two-year personal-injury limitations period, borrowed for § 1983 claims, therefore began to run, at the earliest, on March 5, 2024. This action was received by the Court on January 29, 2026 — within two years of that date. Plaintiff's claims against Finn premised on the pattern-of-bias theory are therefore timely.

**G. The March 5, 2024 Agreement and the Beermann Defendants' Subsequent Conduct**

60. On March 5, 2024, Plaintiff, then represented by counsel, signed an agreed order after his counsel advised him that continuing to trial was not viable given the state of the proceedings. That order granted Defendant Castro decision-making authority over E.R.E.'s schooling, health, and activities.

61. Immediately following the March 5, 2024 hearing, Judge Loza and Defendant Kuzniar retreated to Judge Loza's chambers together and engaged in a concealed ex parte discussion, observed by Sheriff's Officer Sanchez and other court staff.

62 .On April 9, 2024, thirty-five days later, Castro — through counsel Jonathan Steele — filed a motion disclosing her intent to relocate E.R.E. to California, a plan not disclosed prior to the March 5 agreement.

63. On December 9, 2024, in Girard v. Village of Glencoe, No. 1:24-cv-06882 (N.D. Ill.), the plaintiff in that separate action alleged that Defendant Steele stated, "Oh, we have Scannicchio — we are good," in reference to Judge Scannicchio's assignment to a case involving Beermann LLP. **(Exhibit 4 - Beermann bribery of Judge Regina Scannicchio | Jonathan Steele.)**

64 .On December 17, 2024 — the same day the state court denied four of Plaintiff's pending motions without addressing the underlying evidence — the state court entered, at Steele's request, an order requiring Plaintiff to obtain leave of court before filing any future pleading. No reciprocal restriction was imposed on Castro or her counsel, who have filed without such a restriction throughout the case.

65. The proximity of the December 9, 2024 statement in Girard to the December 17, 2024 filing restriction — obtained by the same attorney, before the same judge, eight days apart — is offered on information and belief as evidence of the same posture described in Girard: an expectation, shared among Beermann attorneys appearing before Judge Scannicchio, that requested relief would be granted without regard to the merits of the request.

66. Throughout these proceedings, Guardian ad Litem Pamela Kuzniar appeared before Judges Rosanna Fernandez, Daniel Schuster, and Regina Scannicchio without informing the Court of Respondent Castro's documented history of drug intoxication, history of arrests and violence, orders of protection, or other evidence that Plaintiff contends was material to evaluating Respondent's parenting fitness and the best interests of the minor child.

13

**H.       The Procedural History of Transfers, Recusals, and Reassignments**

67.        Since mid-2024, this case has passed through an unusually irregular series of judicial transfers, recusals, vacated transfer orders, and a nunc pro tunc correction, summarized in the chronology below. Plaintiff raises this history not to relitigate any ruling, but because the pattern itself raises administrative concerns about how the matter has been assigned and handled, and because it bears on whether the proceedings have maintained the appearance and substance of impartiality: from Judge Pamela Loza to Judge Rosanna Fernandez on August 23, 2024; briefly transferred to Calendar 93 on October 23, 2024, based on an order the assigned judge later described as issued in error; vacated on November 4, 2024; and reassigned to Judge Regina Scannicchio on November 7, 2024, the same day Judge Fernandez recused.

**I.        The 2024–2025 Relocation Campaign and Continued Litigation Escalation**

68.        After nearly twelve years, Defendant Castro ended her long-standing attorney-client relationship with Beermann LLP following a dispute over fees. Despite representing Defendant Castro throughout multiple phases of this litigation and securing all favorable rulings on her behalf, the relationship ultimately deteriorated over fees, bringing to an end more than a decade of continuous representation.

69.        Following the termination of Beermann LLP's representation, Defendant Castro retained successive counsel, including attorney Matthew Farmer and later attorney Karen Conti. Each substitution of counsel was accompanied by renewed motion practice, increased litigation activity, and escalating attorneys' fees and costs, prolonging an already twelve-year dispute rather than moving the case toward resolution.

70.        On June 18, 2025, counsel Karen Conti filed a motion seeking to enroll E.R.E. in a European boarding school, a filing that would have removed the child from the jurisdiction of both the state and federal courts.

71.        On July 9, 2025, Conti filed a second, separate emergency motion seeking international relocation of E.R.E.

14

72.      On July 14, 2025, Judge Naomi Schuster, sitting in for Judge Scannicchio, denied Castro's emergency relocation motion, finding that no legitimate emergency existed. This was the second occasion on which a judge other than Judge Scannicchio evaluated an emergency motion brought by or against Castro and ruled against her.

73.      On October 24, 2025, Castro, through Conti, filed a Motion for Recusal or Disqualification of Judge Scannicchio, citing the appearance of impropriety involving Beermann LLP — the same concern underlying Plaintiff's own allegations above.

74.      On June 25, 2026, Defendant Kuzniar issued a supplemental Guardian ad Litem report recommending that E.R.E. be relocated internationally or enrolled at a school abroad, notwithstanding the record set forth above regarding Kuzniar's handling of evidence bearing on Castro's fitness. The report makes up dates and times of meetings with the minor child, along with quotes attributed to the minor child that are false.

## V.      CAUSES OF ACTION

*The allegations below amplify, and do not expand or alter, the joint-action theory of liability against Defendants Castro and Morreale set forth in the original Complaint (ECF No. 1), against whom default has been entered (ECF No. 53). Nothing in this First Amended Complaint increases the scope of relief sought against Castro or Morreale beyond that sought in the original Complaint.*

### COUNT I — Fourteenth Amendment Due Process, 42 U.S.C. § 1983
### (Against Kuzniar, Finn, Field, Steele, Castro, and Morreale)

75      Plaintiff realleges and incorporates by reference Paragraphs 1 through 74 of this First Amended Complaint as though fully set forth herein.

76.      Defendant Castro's relocation filings were not independent parental decisions but were coordinated with Defendant Kuzniar's conduct as Guardian ad Litem: each relocation attempt (¶¶62, 70–73) was followed or accompanied by a Kuzniar report or recommendation supporting the same outcome, culminating in Kuzniar's June 25, 2026 supplemental report recommending international relocation notwithstanding the record of

Castro's unfitness set forth above (¶74). This pattern of mutual reinforcement between Castro's filings and Kuzniar's recommendations constitutes willful joint participation in the deprivation of Plaintiff's rights.

77.. Defendant Ross Morreale did not merely reside with Defendant Castro during the period relevant to this action. Plaintiff alleges that Morreale actively participated in the underlying custody litigation, including by privately meeting with Guardian ad Litem Pamela Kuzniar, participating in or influencing the court-appointed custody evaluation conducted by Dr. David Finn, communicating with Respondent's counsel regarding matters involving the minor child, and otherwise assisting in the presentation of information to the court-appointed professionals whose recommendations are challenged in this action. Plaintiff alleges that Defendant Ross Morreale provided substantial financial support for Defendant Castro's custody litigation, funding or assisting in the funding of litigation expenses while also participating in matters involving the minor child and the underlying proceedings. Plaintiff further alleges that Morreale's financial support was accompanied by active participation in the custody litigation, including interactions with court-appointed professionals and coordination with Defendant Castro all named in this count.

78. Defendant Kuzniar, while acting under color of state law as court-appointed Guardian ad Litem, engaged in conduct outside the scope of that appointment with respect to ketamine testing for Castro: she submitted a drug-testing protocol that excluded ketamine, was specifically notified in writing by Plaintiff's counsel that the omission was objected to, and the protocol was not amended, as described above. This conduct was not a discretionary evaluative judgment; it was a documented, specific act of exclusion of a named substance, maintained even after written objection, and it falls outside the quasi-judicial immunity recognized in Cooney v. Rossiter, 986 N.E.2d 1131 (Ill. App. Ct. 2013), which protects a guardian ad litem's discretionary recommendations but not self-dealing or conduct beyond the scope of appointment.

79. Defendant Kuzniar's status as a private guardian ad litem does not, standing alone, defeat state action for purposes of § 1983. A guardian ad litem is not herself a state

16

actor, but may nonetheless be liable under § 1983 where she willfully participates in joint activity with a state actor to deprive a plaintiff of his rights. Immediately after the March 5, 2024 hearing at which the court granted Castro decision-making authority over E.R.E.'s schooling, Judge Loza and Defendant Kuzniar entered chambers together for a concealed, off-record discussion, observed by court staff and Sheriff's Officer Sanchez. That meeting — conducted outside the presence of Plaintiff or his counsel, immediately following a ruling favorable to the party whose position Kuzniar's recommendations consistently favored — is a specific, dated, witnessed fact of joint action between Kuzniar and a judicial officer, and distinguishes this claim from the conclusory "off-record coordination" allegation criticized in Defendant Kuzniar's own motion to dismiss (ECF No. 37).

80.     Defendant Finn's individual custody evaluation, performed pursuant to his court appointment, is not itself the basis for liability and is protected by quasi-judicial immunity as an evaluative act performed as an arm of the court. What is not immune is the pattern Finn's own May 24, 2024 sworn testimony revealed: a categorical practice, admitted under oath and not limited to this case, of never issuing a finding adverse to any client of a specific law firm. (Ex. 2.) Cooney itself distinguishes between immunized individual evaluative judgments and conspiracy allegations pled with the factual specificity Twombly and Iqbal require; Plaintiff's claim against Finn rests on the latter — a specific, admitted, non-conclusory fact establishing coordinated favoritism, not a bare disagreement with the substance of his 2023 evaluation.

81.     Defendants Field and Steele, private attorneys, are liable under § 1983 to the extent Plaintiff can show they reached an actual understanding with Kuzniar or another state actor to deprive him of his rights, and willfully participated in joint activity toward that end. The December 17, 2024 filing restriction, obtained by Steele the same day Plaintiff's motions were denied without engagement with the underlying evidence Kuzniar had omitted, is offered as circumstantial support for coordination between Steele and the suppression described above.

81A.    Defendants coordination with Kuzniar and Finn had the effect of manipulating the state court.

17

82.     As a direct and proximate result of the conduct described above, Plaintiff was deprived of a fundamentally fair process affecting his protected liberty interest in the care, custody, and companionship of E.R.E., in violation of the Fourteenth Amendment.

### COUNT II — Equal Protection, 42 U.S.C. § 1983
### (Against Kuzniar, Finn, Field, Steele, Castro, and Morreale)

83.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 82 of this First Amended Complaint as though fully set forth herein.

84.     Plaintiff and Defendant Castro were similarly situated litigants in the same proceeding, each subject to the same court's authority to impose filing conditions and to weigh evidence of parental fitness.

85     Defendants Kuzniar and Finn treated evidence bearing on each parent's fitness disparately: evidence bearing adversely on Castro was omitted or left unaddressed, while Finn's own sworn testimony confirms a categorical pattern of favorable treatment toward Beermann's clients across matters.

86     .On December 17, 2024, at Steele's request, the state court imposed a filing restriction on Plaintiff alone, requiring leave of court before any future filing, while Castro and her counsel have filed without any comparable restriction throughout the litigation. This differential treatment was not supported by any comparable conduct on Plaintiff's part identified in the record.

87.     This disparate treatment of similarly situated litigants, without a rational basis grounded in the record, violated Plaintiff's right to equal protection under the Fourteenth Amendment under a 'class of one' theory, which permits an equal-protection claim where a plaintiff, regardless of protected-class membership, alleges he was intentionally treated differently from others similarly situated and that there was no rational basis for the difference in treatment. Plaintiff identifies a specific similarly situated comparator (Castro) and specific, dated instances of differential treatment — not a bare assertion of unfairness.

87A. Defendants coordination with Kuzniar and Finn had the effect of manipulating the state court.

### COUNT III — Denial of Access to Courts, 42 U.S.C. § 1983
### (Against Field and Steele)

88 .Plaintiff realleges and incorporates by reference Paragraphs 1 through 87 of this First Amended Complaint as though fully set forth herein.

89. Plaintiff's filing of motions challenging Castro's fitness and Kuzniar's conduct as Guardian ad Litem constituted activity protected by the First Amendment right to petition and the Fourteenth Amendment right of access to the courts.

90. On December 17, 2024, the same day the state court denied four of Plaintiff's pending motions without addressing the underlying evidence, Steele requested and obtained an order requiring Plaintiff — and no other party — to obtain leave of court before filing any future pleading.

91. This filing restriction was retaliatory: it followed directly from Plaintiff's protected filings, was requested by counsel for the party whose fitness those filings challenged, and was not imposed reciprocally on Castro despite her comparable litigation conduct throughout the case.

92. The filing restriction has continued to impede Plaintiff's ability to bring matters before the state court, causing ongoing injury to his right of access to the courts.

92A. Defendants coordination with Kuzniar and Finn had the effect of manipulating the state court.

## VI. PRAYER FOR RELIEF

93. WHEREFORE, Plaintiff Edward Engels respectfully requests that this Court:

    A. Enter judgment in Plaintiff's favor on Counts I and II against Defendants Castro, Morreale, Kuzniar and Finn and on Counts I, II, and III against Field and Steele;

B. Award compensatory damages in an amount to be determined at trial;

C. Award punitive damages against Defendants Kuzniar, Finn, Castro, and Morreale on Counts I and II, and against Defendants Field and Steele on Counts I, II, and III, to the extent permitted by law;

D. Award fees under 42 U.S.C. § 1988;

E. Grant such other and further relief as this Court deems just and proper.

Respectfully submitted,

/s/ Edward Engels

Edward Engels
Plaintiff, Pro Se
509 N. Racine Ave., Suite 1S
Chicago, IL 60642
eddie@e2brands.net
(312) 961-0805

**CERTIFICATE OF SERVICE**

I hereby certify that on JULY 9, , 2026, I caused a true and correct copy of the foregoing First Amended Complaint to be filed with the Clerk of the Court using the Court's electronic filing system (CM/ECF) via the Northern District of Illinois pro se filing portal, which will send notification of such filing to all counsel of record, including counsel for Defendant Pamela Kuzniar, counsel for Defendant Dr. David Finn, counsel for Defendants Thomas Field and Jonathan Steele, and counsel who have appeared on behalf of Defendants Feliza Castro and Ross Morreale.

/s/ Edward Engels
Edward Engels
Plaintiff, Pro Se

# EXHIBIT 1

## IDFPR Order — Jonathan G. Spero, M.D.

License Placed in Refused-to-Renew Status

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

Edward Engels v. Feliza Castro, et al.
Case No. 1:26-cv-00359
Hon. Georgia N. Alexakis

**Document:**     Order, In re Jonathan G. Spero, M.D., IDFPR Case No. 2018-01038

**Issuing Agency:**     Illinois Dept. of Financial and Professional Regulation,
Division of Professional Regulation

**Date of Order:**     June 29, 2022

**License No.:**     036-108385 (Jonathan G. Spero, M.D., Physician & Surgeon)

**Signed By:**     Cecilia Abundis, Director, Division of Professional Regulation

**Finding:**

The Department found that Respondent prescribed Schedule II controlled substances to F.C. (Feliza Castro) without an established physician-patient relationship or requisite assessments/evaluations, in violation of 225 ILCS 60/22(A)(5) of the Illinois Medical Practice Act. Respondent's Illinois Physician and Surgeon License No. 036-108385 was accordingly placed in refused-to-renew status as of the date of the order.

**Cited in FAC:**     ¶ 26

*Exhibit 1 — Page 1 of 3 (cover page)*

**STATE OF ILLINOIS**
**DEPARTMENT OF FINANCIAL AND PROFESSIONAL REGULATION**
**DIVISION OF PROFESSIONAL REGULATION**

DEPARTMENT OF FINANCIAL AND PROFESSIONAL )
REGULATION of the State of Illinois, Complainant )
                  v. )   No. 2018-01038
Jonathan G. Spero, M.D. )
License No. 036-108385,        Respondent )

### ORDER

This matter having come before the Director of the Division of Professional Regulation of the Department of Financial and Professional Regulation of the State of Illinois after a Notice of Intent to Refuse to Renew the Illinois Physician and Surgeon License No. 036-108385 of Respondent, Jonathan G. Spero, M.D. was served upon Respondent at his last known email address to the Department and Respondent failed to timely file a request for a hearing.

NOW, THEREFORE, I, CECILIA ABUNDIS, DIRECTOR OF THE DIVISION OF PROFESSIONAL REGULATION of the Department of Financial and Professional Regulation of the State of Illinois, find:

1. Respondent, Jonathan G. Spero, M.D. is a holder of Illinois Physician and Surgeon License No. 036-108385, which is presently in non-renewed status;

2. Information has come to the Department's attention that Respondent prescribed Schedule II Controlled Substances to F.C. without established physician-patient relationship or requisite assessments and/or evaluations which is a violation of 225 ILCS 60/22(A)(5) of the Illinois Medical Practice Act;

3. I have jurisdiction over the parties and subject matter herein pursuant to 20 ILCS 2105/2105-15 and 225 ILCS 60/22.

1

IT IS ORDERED that Jonathan G. Spero, M.D., Illinois Physician and Surgeon License No. 036-108385 SHALL BE PLACED IN REFUSED TO RENEW STATUS as of the date of this ORDER.

DATED THIS ___29th___ DAY OF ___June___, 2022.

> DEPARTMENT OF FINANCIAL AND PROFESSIONAL
> REGULATION of the State of Illinois
> Mario Treto, Jr., Secretary
> DIVISION OF PROFESSIONAL REGULATION
>
> _____
> Cecilia Abundis
> Director

REF:     License No. 036-108385/Case No. 2018-01038

2

# EXHIBIT 2

---

### "Dr. David Finn Favored Beermann LLP, according to a 2016 Deposition"

Michael Volpe Investigates (Substack), May 24, 2024

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

Edward Engels v. Feliza Castro, et al.
Case No. 1:26-cv-00359
Hon. Georgia N. Alexakis

| | |
|---|---|
| **Author:** | Michael Volpe |
| **Publication Date:** | May 24, 2024 |
| **Source:** | michaelvolpe.substack.com |
| **Underlying Record:** | Dr. Finn deposition transcript, pp. 7-8 |

**Summary:**

The article reports and reproduces excerpts of a 2016 deposition transcript in which Dr. David Finn, testifying under oath, acknowledged that he had handled multiple custody evaluations involving attorney Jared Pinkus's firm (Beermann LLP), and that he could not recall ever recommending an outcome contrary to the position of Beermann's client in any of them. The article separately reports that Dr. Finn diagnosed Plaintiff Edward Engels as a parent alienator in the underlying custody matter with Defendant Feliza Castro. Clean scans of deposition transcript pages 7-8, containing the quoted testimony, are attached following the article.

| | |
|---|---|
| **Cited in FAC:** | PP 60, 85 |

*Exhibit 2 — Page 1 of 17 (cover page)*

# Dr. David Finn favored Beermann LLP, according to a 2016 deposition

Dr. David Finn admitted he never went against them in this deposition.

**MICHAEL VOLPE**
MAY 24, 2024

♡ 5    💬    ⟳ 1        Share





"My focus is concentrated on achieving the goals and objectives of my clients and helping form and execute a strategy that delivers those results."

**in**

T: 312-621-9700
jbpinkus@beermannlaw.com
vCard

Jared Pinkus and I had an interesting conversation yesterday

Two entities I previously investigated in Illinois appear to have a mutually benefic[ial] relationship.

In a 2016 deposition, Dr. David Finn acknowledged that when tasked with doing a custody evaluation for a case involving Beermann LLP he always did an evaluation which favored a Beermann client.

In the deposition, Dr. Finn acknowledged being on 8-12 cases which included a litigant represented by Beermann LLP. This included 4-5 custody evaluations.

"On those four or five occasions, have you ever recommended contrary to his client the lawyer asked Dr. Finn.

"You know, I don't believe so, but again here, I would have to go back to my records verify that." Dr. Finn responded.

Michael Volpe Investigates is a reader-
supported publication. To receive new posts
and support my work, consider becoming a free
or paid subscriber.

Dr. Finn recommended custody for the Beermann client in the case involving this deposition as well. That was likely why he was asked the question.

The Pinkus referred to in the deposition is Jared Pinkus, who continues to be a Beermann lawyer currently.

I first did an exposé of Dr. David Finn in February 2024. That exposé included Sossamma Sebastin's story. Sossamma's daughter has disclosed that her father has molested her.

"Mostly to talk about my dad and how he abuses me," the teenager said to a forensi interviewer. "My dad raped me since I was four or five until I was like thirteen,"

"Per reporter, {the older daughter} states that George has raped her in the past. {The older daughter} has vague memory of George raping her and touching her back inappropriately." a Department of Children and Family Services (DCFS) report state

Dr. Finn, acting as an expert, concluded those accusations were manifestations of Sossamma's Munchhausen by proxy.

(6) Dr. David Finn favored Beermann LLP, according to a 2016 deposition

> Q Doctor Finn, can you discuss your opinion about Sossamma and Munchausen syndrome?

31

> A So Sossamma has contributed to this constellation of symptoms with Rene without any basis. And in doing so, you know, really has kind of, you know, placed this illness on Rene that Rene does not have. I believe that there is some secondary gain for Sossamma.
>
> I think it has to do with her anger at Sebastin. I think it has to do with her possibly feeling more confident that she's the only person who could take care of Rene. That contributes to the problem because Rene has to be sick in order for Sossamma to have somebody to take care of, which I think is the reason that it's unlike people who are truly traumatized who figure out how to best deal with that trauma and move on.
>
> Rene is kept in this perpetual state of illness, again, without any clear basis for her being ill other than, you know, these kind of, you know, vague

The judge in that case, Randie Bruno, granted the accused child molester, Sebastin George, temporary sole custody in November 2023, largely on the strength of Dr. Finn's testimony. A trial to determine permanent custody is occurring currently.

CASE: 1:26-cv-00359 Document #: 65 Filed: 07/09/26 Page 29 of 54 PageID #:794

1/16/25, 10:55 AM          (6) Dr. David Finn favored Beermann LLP, according to a 2016 deposition

Sebastin's attorney, Michone Riewer, has tried twice unsuccessfully to subpoena me
for that trial.

### IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
### LAKE COUNTY, ILLINOIS

| | |
|---|---|
| IN RE THE MARRIAGE OF:<br>SEBASTIN FRANCIS,<br><br>Petitioner,<br>and<br><br>SOSSAMMA GEORGE SEBASTIN,<br><br>Respondent. | )<br>)<br>)<br>)<br>)<br>)   Case No. 2020 D 905 & 2023 OP 2596<br>)<br>)<br>)<br>)<br>) |

**TRIAL SUBPOENA**

**To:** Mr. Michael Volpe
     **Email:** mvolpe998@gmail.com

**YOU ARE COMMANDED** to appear **IN PERSON** in the above captioned case before the Honorable Judge Rhonda K. Bruno to give your testimony at 18 North County Street, Waukegan, Illinois 60085 **in Courtroom C-105, on May 14, 2024. Time of appearance: 9:00 a.m.**

**YOU ARE COMMANDED ALSO to bring the following:**

- **SEE ATTACHED RIDER**

**YOUR FAILURE TO APPEAR IN RESPONSE TO THIS SUBPOENA WILL SUBJECT YOU TO POSSIBLE PUNISHMENT FOR CONTEMPT OF THIS COURT.**

WITNESS, May 13, 2024

*Michone Riewer*

_____
Attorney for Petitioner

Michone J. Riewer/6231058
Strategic Divorce
900 N. Shore Drive, Ste. 220
Lake Bluff, Illinois 60044
847-234-4445
service@strategicdivorce.com

https://michaelvolpe.substack.com/p/dr-david-finn-favored-the-beerman?triedRedirect=true      5/15

Dr. Finn also diagnosed Eddie Engels as a parent alienator, ignoring a history of dru abuse by his ex-girlfriend.

> Eddie Engels has been in ongoing litigation over custody of his daughter with hi ex-girlfriend Feliza Castro.
>
> Castro has failed multiple drug tests.
>
> One evaluation noted, "Feliza Castro is poorly compliant with her testing and occasionally has used prohibited substances."
>
> Finn didn't care, instead finding Engels guilty- so to speak- of parental alienatio
>
> His evaluation downplayed the drug test failures, and it recommended Castro ge custody.

Beermann LLP has also been the subject of multiple articles. I first exposed them la summer when two of their lawyers- Molly Carmody and Karen Paige- defended another suspected child molester, Jane Girard.

1/16/25, 10:35 AM                                    (6) Dr. David Finn favored Beermann LLP, according to a 2016 deposition



(6) Dr. David Finn favored Beermann LLP, according to a 2016 deposition



Molly Carmody at the top and Karen Paige and the bottom

More recently, the firm has represented Dr. Madison Sample, who appears to be hiding millions from his wife, Jackie Sample.

(6) Dr. David Finn favored Beermann LLP, according to a 2016 deposition

Michael Volpe Investigates Podcast The Impromptu: Episode 81 an Interview wi



Beermann represents Dr. Sample, despite previously consulting with Jackie about representing her. This is supposed to create a conflict, but the court has ignored it.

(6) Dr. David Finn favored Beermann LLP, according to a 2016 deposition

**Heather A. Ledger** | Legal Assistant *to*

*Candace L. Meyers, Karen V. Paige and Molly M. Carmody*

2275 Half Day Rd., Suite 350 | Bannockburn, IL 60015

Tel: 847.681.9600 | Fax: 847.681.0909

161 N Clark St., Suite 3000 | Chicago, IL 60601

Tel: 312.621.9700 | Fax: 312.621.0909

haledger@beermannlaw.com | www.beermannlaw.com



---

**From:** Candace L. Meyers <CLMeyers@beermannlaw.com>
**Sent:** Thursday, June 22, 2023 6:51 AM
**To:** May, Ryan <Ryan.May@ampf.com>; michael@michaelsmediation.com; Heather A. Ledger <HALedger@beermannlaw.com>
**Subject:** Re: Jackie Johnson Sample (for Candace)

Ryan and Michael,

This is extremely helpful! Thank you. My assistant, Heather will send the zoom information.

I appreciate your reaching out.

Thank you,

Candace.

Candace L. Meyers

Divorce and Family Law Partner

**BEERMANN LLP**

1/16/25, 10:55 AM                    (6) Dr. David Finn favored Beermann LLP, according to a 2016 deposition

- Jackie had a lawyer previously, but they are parting ways. A motion was filed for Madison to keep the status quo, but he is not complying. Prior lawyer still has her file; Jackie filed a motion by herself to get her file back so she can share with her new lawyer.
- Jackie and Madison both completed the financial affadvit's, and Madison's was not accurate, as it drastically understated his income and it did not include any of their investment accounts.
- Madison is an anesthesiologist and had been making $12,000 **per week**. He listed $12,000 income **per month** on his financial affadvit. Jackie suggested he created an LLC that takes in his income and only pays him a small portion, thereby understating his income.
- Jackie is self-employed, earned decent funds. In the marriage Madison asked her to take a leave of absence to help build the house they currently live in. She still owns a salon where she rents space...bringing in $3,100/month.
- They have a $2.5M house that has a $1.5M mortgage on it. They both live in the house, Jackie refuses to leave, and Madison is purposely making noise while she sleeps trying to drive her out, and has insisted she turn over the full value of the house to him.
- Madison told Jackie he will only pay her alimony of $3,000/month for 3 years.
- They have an investment property that they are trying to sell. The realtor has suggested certain improvements before putting it on the market, Madison is not funding those improvements.
- Jackie is developing real estate with the intent to open a bar. Project is on-hold, and she is at risk of losing it, because she cannot access marital assets to keep project moving forward.
- Jackie just found out that Madison has not paid their home mortgage for the last 2 months, she believes he is willing to ruin all that they have built just to hurt her.
- Madison gives Jackie $2,000/month for living expenses, which is inadequate for her development work, let alone her monthly expenses.
- Madison reduced the credit limit on Jackie's credit card twice, so she cannot charge anything to make up for the inability to access marital funds.
- They have crypto accounts. Jackie doesn't know where they are. They have investment accounts. Jackie doesn't know where they are.

Michael Cohen

part of the communication between Jackie Sample and Beerman for the consultation. In this communication, Jackie talked about case strategy with Beerman. This is why the firm should not have then represented her husband, Dr. Madison Sample.

Sossamma's case is in Lake County, Eddie's in Cook County (so is Girard's case), Jackie's in DuPage County, while the deposition was in Will County. Both Dr. Finn Beermann are ubiquitous in the Chicagoland area.

Beermann's relationship with Dr. Finn extends beyond their mutually beneficial evaluations.

Dr. Finn was featured in a newsletter which Beermann put out. He was quoted in an article entitled, "Divorcing a narcissist."

(6) Dr. David Finn favored Beermann LLP, according to a 2016 deposition

## As Seen in Forest and Bluff Magazine

As divorce attorneys at Beermann Pritikin Mirabelli Swerdlove LLP, we often find ourselves representing individuals who claim to have spouses with narcissistic characteristics.

If you are married to, or in a relationship with, a narcissist, take comfort in knowing that you are not alone and there is help. With the right tools, protection, resources and education, you can successfully navigate the turbulent waters of divorcing a narcissist.

As a starting point, consider this assessment from the world of psychology:

> **"You cannot change others, you can only change your response and expectations."**
>
> *Psychologist Dr. David Finn, Psy.D[1]*

Managing **your** expectations, not those of your narcissistic significant other, is a critical aspect of successfully divorcing a narcissist. A fundamental mistake we see in representing individuals, is their desire to seek ways to change the narcissist's behavior instead of modifying his or her own expectations and reactions. This often leads to additional problems for the person married to the narcissist, in the follow ways: 1) emotional unrest, 2) increased litigation costs/time and 3) familial discord.

In counseling our clients in this type of situation, we routinely recite the mantra "focus and work on only those things that **you** can control." Frequently, clients make the mistake of focusing on what the narcissist demands, even though such demands often can never be satisfied. Focusing on the mantra is a small step toward taking back control of **your** life, and resolving **your** divorce successfully and on **your** terms.

With greater knowledge into the mind of a narcissistic personality, you will have a better chance of mitigating the stress caused by irrational and abusive behavior.

## Is My Spouse a Narcissist?

Answering this threshold question is a necessary first step in trying to manage your strategy and expectations throughout the divorce process. So, who is a narcissist? The DSM-V defines Narcissistic Personality Disorder as follows:

"A pervasive pattern of grandiosity (in fantasy or behavior), need for admiration, and lack of empathy, beginning by early adulthood and present in a variety of contexts, as indicated by five (or more) of the following:

1. Has a grandiose sense of self-importance (e.g., exaggerates achievements and talents, expects to be recognized as superior without commensurate achievements).

2. Is preoccupied with fantasies of unlimited success, power, brilliance, beauty, or ideal love.

3. Believes that he or she is "special" and unique and can only be understood by, or should associate with, other special or high-status people (or institutions).

4. Requires excessive admiration.

5. Has a sense of entitlement (i.e., unreasonable expectations of especially favorable treatment or automatic compliance with his or her expectations).

6. Is interpersonally exploitative (i.e., takes advantage of others to achieve his or her own ends).

7. Lacks empathy: is unwilling to recognize or identify with the feelings and needs of others.

8. Is often envious of others or believes that others are envious of him or her.

9. Shows arrogant, haughty behaviors or attitudes."

jrosenberg@beermannlaw.com          jmquigley@beermannlaw.com



1/16/25, 10:55 AM                    (6) Dr. David Finn favored Beermann LLP, according to a 2016 deposition

If you have identified five (5) or more of these factors as being applicable to your spouse, there is a reasonable likelihood you are married to a person with narcissistic tendencies. These self-centered characteristics only become more exaggerated in a divorce proceeding.

In the context of a divorce proceeding, Dr. Finn notes that "the narcissist experiences a deep wound from what they believe is rejection from their spouse." He relates that this theory is often referred to as a "Narcissistic Injury." Commentary on the DSM-V suggests that "there is a sense of fear [on the part of the narcissist] from having his or her imperfections or flaws revealed."

Put another way, Dr. Sol Rappaport[2] comments: "The feeling of rejection or criticism on the narcissist causes him or her to react negatively – most times with anger or rage. Spouses of narcissists feel as though they have to constantly cater to them, build them up and 'tip-toe' around what they say and how they interact with the narcissist, as they are fearful of the anger and repercussions that may follow." In an article by Rhonda Feinberg, she describes the "classic" issue with narcissists in relationships as "[they] tend to blame others for any relationship problems and _attempt to avoid looking at their own contribution._" _The Intractable Client_, Rhonda Feinberg, July 1997. They assume that others will accept their point of view, and will not hesitate to use gross or subtle coercion to achieve their goals. Id.

## How Did I Get Here?

counsel. Having a mental health professional in your corner is essential to managing the stress of any divorce proceeding, let alone the chaos associated with divorcing a narcissist.

3. Educate yourself about Personality Disorders and Narcissism so you can better understand the personality and behavioral patterns of your spouse.

4. Temper your expectations in divorcing a narcissist. What may seem logical, rational or even practical will not always enter into the narcissist's mind. This often times results in protracted, costly and acrimonious litigation. In the extreme, a narcissist may engage in a _"scorched earth"_ strategy to punish the other spouse even though such a strategy may be financially and emotionally devastating for the entire family.

5. Do not measure your success by the outcome as determined by the narcissist. Dr. Finn says "you are not going to fix [the narcissist] and it's a trap for any spouse to become angry that the narcissist is not changing."

6. In communicating with a narcissist during a divorce process, Dr. Rappaport suggest that you "begin sentences with 'I' rather than 'you,' and, if you have children, start your discussion focused on the children, so as to keep the focus off of the narcissist. Try to avoid or minimize the concept of win-lose." Dr. Rappaport suggests there are several self-help books that may be useful, including _BIFF: Quick Responses to High-Conflict People, their Personal Attacks, Hostile Email and Social Media Meltdowns,_ by Bill Eddy.

Representing and favoring narcissists in divorce and child custody cases can be big business for unscrupulous lawyers and psychologists like Beermann and Dr. Finn.

Narcissists often love court and see it as another form of abuse- legal abuse- of their ex-partner.

Giving people like this favorable evaluations- as Dr. Finn is known to do- gives them power which they use to fuel more litigation.

Beermann and Dr. Finn also participated in the same family law seminar in 2022. Dr. Finn made a presentation on reunification therapy, the practice which has recently been outlawed in Arizona.

**Understanding Reunification Therapy**
_(0.75 Professional Responsibility, pending approval)_
Reunification therapy is an often misunderstood and sometimes maligned approach to intervening in a parent-child relationship that has become estranged. Dr. Finn will discuss myths and facts surrounding reunification therapy, the importance of finding good and competent therapists to intervene in these difficult cases, and the paramet for Court Orders to promote success in treatment.
**Dr. David Finn, Psy.D.,** _Associates in Human Development Counseling, LLC,_ Palatine

(6) Dr. David Finn favored Beermann LLP, according to a 2016 deposition

I left a voicemail for Dr. Finn which he did not return. I did reach Jared Pinkus at h

Beermann office by phone.

Mr. Pinkus repeatedly said that he had no comment.

At other points, he also denied that Dr. Finn was a hired gun for Beermann. He fina

told me not to call him again.

Beermann loves me, which is why their email system has blocked my email.



**Message blocked**

Your message to **jbpinkus@beermannlaw.com** has been
blocked. See technical details below for more information.



**Message blocked**

Your message to **mmcarmody@beermannlaw.com** has been
blocked. See technical details below for more information.



**Message blocked**

Your message to **kpaige@beermannlaw.com** has been blocked.
See technical details below for more information.

1/16/25, 10:55 AM

(6) Dr. David Finn favored Beermann LLP, according to a 2016 deposition



**Get more from Michael Volpe in the Substack app**

Available for iOS and Android

Get the app



5 Likes · 1 Restack

## Discussion about this post

Comments        Restacks



Write a comment...

© 2025 MIchael Volpe · Privacy · Terms · Collection notice

Substack is the home for great culture

7

DAVID FINN

A. Yes. So she's also appointed me.

Q. Did your appointment result in you presenting testimony in a contested custody case in those two instances?

A. No.

Q. Have you ever testified in Will County before?

A. No.

Q. How many custody cases have you handled, sir?

A. Roughly about 280 cases.

Q. And that's where you got the percentage of 80/20 that you told me about before rough?

A. Yes.

Q. I'm not going to hold you to that.

Have you dealt with Mr. Pinkus's firm before?

A. I have.

Q. On how many occasions?

A. I don't know.

Q. Well give me your best estimate.

A. Best estimate maybe 8 to 12 cases.

Q. And have they been as 604B or 604.5? I'm using the old terms because I know --

George E. Rydman & Assoc., Joliet, Illinois (815) 727-4363

8

DAVID FINN

A.   I understand.

You know, I believe a mix of both.

Q.   How many times have you been selected by Mr. Pinkus's firm to be a selected expert, a 604.5?

A.   You know, again, I'm just taking a guess here, but I would say four or five.

Q.   On those four or five occasions have you ever recommended contrary to the position taken by his client?

A.   You know, I don't believe so but, again, here I would have to go back to my records to verify that.

Q.   But your recollection is right now you have not.

A.   That's my recollection.

Q.   Okay.  That's fine.

Now, you were served with a couple of subpoenas in this case.  One was originally for your records and then of course the subpoena for the deposition today; is that correct?

A.   That is correct.

Q.   I think you actually got a supplemental subpoena at one point in time because we asked you

George E. Rydman & Assoc., Joliet, Illinois (815) 727-43

# EXHIBIT 3

---

## In re Marriage of Lemke

Appellate Findings on Dr. David Finn

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

Edward Engels v. Feliza Castro, et al.
Case No. 1:26-cv-00359
Hon. Georgia N. Alexakis

**Document:**    In re Marriage of Lemke, 2016 IL App (2d) 160264-U

**Court:**       Appellate Court of Illinois, Second District

**Date:**        October 24, 2016

**Excerpted:**   PP 19-21, 30

**Summary:**

The circuit court found several of Dr. David Finn's custody-evaluation conclusions 'inherently flawed' and 'completely unsupportable,' specifically his findings on physical violence/threat of violence and ongoing abuse, stating that his unsupported conclusion 'calls into question all of Dr. Finn's opinions.' The Appellate Court affirmed, holding the trial court 'appropriately explained its reasons for rejecting Dr. Finn's recommendations.' This is an unpublished Rule 23 order and may not be cited as precedent except as permitted under Rule 23(e)(1); it is offered here as evidence of Dr. Finn's pattern of conduct, not as binding authority.

**Cited in FAC:**    P 61

*Exhibit 3 — Page 1 of 5 (cover page)*

**EXCERPT FROM LEMKE APPELLATE OPINION**

**(Dr. David Finn — Custody Evaluator Findings)**

2016 IL App (2d) 160264-U

No. 2-16-0264

Order filed October 24, 2016

*NOTICE: This order was filed under Supreme Court Rule 23 and may not be cited as precedent*

*by any party except in the limited circumstances allowed under Rule 23(e)(1).*

**IN THE APPELLATE COURT OF ILLINOIS**

**SECOND DISTRICT**

In re MARRIAGE OF HAROLD C. LEMKE, III, Petitioner-Appellee, and KAYLIE L.

LEMKE, Respondent-Appellant.

Appeal from the Circuit Court of McHenry County. No. 13-DV-941. Honorable Kevin G.

Costello, Judge, Presiding.

KAYLIE L. LEMKE, Third-Party Plaintiff-Appellant, v. HAROLD LEMKE, JR, Third-Party

Defendant-Appellee.

Appeal from the Circuit Court of McHenry County. No. 13-DV-941. Honorable Kevin G.

Costello, Judge, Presiding.

JUSTICE ZENOFF delivered the judgment of the court.

Justice Jorgensen concurred in the judgment.

Justice Hutchinson concurred in part and dissented in part.

**EXCERPTED PARAGRAPHS ¶¶ 19-21**

**(Circuit Court's Findings on Dr. Finn, as Recounted on Appeal)**

¶ 19 On December 29, 2015, the court issued both a judgment for dissolution of marriage and a memorandum decision detailing its findings. The court explained in its memorandum decision that "several of Dr. Finn's conclusions strike the Court as inherently flawed, most notably his conclusions as to factors 6 and 7" (physical violence/threat of physical violence and the occurrence of ongoing or repeated abuse). According to the court, Dr. Finn's opinion that Kaylie did not commit domestic violence when she battered Hal "suggests a lack of fundamental understanding of the Illinois Domestic Violence Act and the definitions therein." Specifically, the court emphasized, there was no requirement in the Domestic Violence Act for a perpetrator's behavior to be "controlling" or for abuse to be "ongoing." Instead, the "ongoing" element comes from section 602(a)(7) of the Dissolution Act. Thus, even a single instance of domestic violence may be considered under section 602(a)(6) of the Dissolution Act, although 602(a)(7) takes into consideration "ongoing or repeated abuse." 750 ILCS 5/602(a)(7) (West 2014). The court found that "Kaylie's criminal battery upon Hal is by any reasonable definition domestic violence," and Dr. Finn's conclusion regarding factor 6 was "completely unsupportable."

¶ 20 Dr. Finn's opinions regarding factor 7 were "equally troublesome" to the court, because he downplayed Kaylie's domestic battery conviction and "ignore[d] a wealth of evidence that demonstrated that her abuse of Hal was ongoing." Additionally, although Dr. Finn believed that Hal had abused Kaylie on an ongoing basis, the court noted that Kaylie never sought an order of protection against Hal. Furthermore, the court rejected Dr. Finn's suggestion that Kaylie's domestic battery was an isolated incident, emphasizing both Hal's reports of other incidents of physical abuse and the "plethora of texts, phone calls, voicemails, etc." that demonstrated that

Kaylie had harassed Hal on an ongoing basis. The court indicated that Dr. Finn's unsupported conclusion regarding factor 7 "calls into question all of Dr. Finn's opinions."

¶ 21 With respect to statutory factor 5 (the mental and physical health of the parties), the court found it troubling that Dr. Finn "hyper-focus[ed] on Hal's distant past involvement with alcohol and marijuana" while "minimizing *** Kaylie's psychological issues." Furthermore, the court explained, Dr. Finn glossed over Kaylie's "alarming anger management issues," which were demonstrated not only by the pediatrician's records but by "the hundreds of texts Kaylie sent to Hal which displayed a level of vitriol remarkable even in the arena of contested divorces."

**EXCERPTED PARAGRAPH ¶ 30**
**(Appellate Court's Affirmance)**

¶ 30 Reasonable minds could reach different conclusions about which parent should have custody. Indeed, the guardian ad litem and the custody evaluator had very different impressions about the dynamics of the parties' relationship. The trial court appropriately explained its reasons for rejecting Dr. Finn's recommendations. After having thoroughly reviewed the record, we cannot say that such ruling was against the manifest weight of the evidence.

*Citation: In re Marriage of Lemke, 2016 IL App (2d) 160264-U, ¶¶ 19-21, 30 (Ill. App. Ct. 2d Dist. Oct. 24, 2016) (unpublished order under Ill. S. Ct. R. 23).*

***NOTE: This is a Rule 23 order and may not be cited as precedent except as permitted under Rule 23(e)(1).***

## EXHIBIT 4
### Girard v. Village of Glencoe — First Amended Complaint

### Beermann Attorney Jonathan Steele's "We Have Scannicchio" Admission

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION
Edward Engels v. Feliza Castro, et al.
Case No. 1:26-cv-00359
Hon. Georgia N. Alexakis

**Document:**

Kenton Girard, Minor Child Gw, and Minor Child Gr v. Village of Glencoe, Illinois, et al., First Amended Complaint and Jury Demand, Case No. 1:24-cv-06882 (N.D. Ill.), ECF No. 73

**Filed:**

December 9, 2024

**Court / Judge:**

U.S. District Court, N.D. Illinois, Eastern Division — Hon. Rebecca Pallmeyer

**Relevant Defendants:**

Beermann LLP; John M. D'Arco Esq.; James M. Quigley Esq.; Enrico J. Mirabelli Esq.; Judge William S. Boyd; Judge Renee G. Goldfarb

**Summary:**

The First Amended Complaint alleges a long-running bribery scheme by Beermann LLP against Cook County Domestic Relations judges, including Judge Regina Scannicchio, described as having been "on their payroll" since at least 2015–2016. Per ¶52, Beermann attorney Jonathan Steele — then representing client Leann Stevens in a proceeding before Judge Scannicchio — is alleged to have remarked at the onset of that representation, around 2016, "Oh, we have Scannicchio – we are good!" and to have known the outcome was preordained because Judge Scannicchio was on Beermann LLP's payroll. Per ¶116, Steele is separately alleged to have "material knowledge of the bribery of Judge Scannicchio." Paragraphs 4 and 9 similarly allege that Beermann LLP "owns" the Domestic Relations judicial officers "from Presiding Judge Scannicchio on down," and paragraphs 53–56 detail Scannicchio's September 2022 promotion to Presiding Judge and related contacts between Beermann LLP and her chambers.

**Note:**

This exhibit reproduces the caption page and the specific pages of the Girard First Amended Complaint referencing Judge Scannicchio and/or Attorney Steele. The allegations are drawn from a separate, pending federal case (filed by a different pro se plaintiff) and are unproven allegations, not adjudicated facts. Offered here as context regarding Judge Scannicchio and Beermann LLP, both connected to the

underlying state court proceeding and to the December 17, 2024 filing restriction imposed on Plaintiff.

**Cited in FAC: ¶ ___ (insert paragraph citation)**

*Exhibit 4 — Page 1 of 7 (cover page)*





FILED
12/9/2024
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

 MEN

**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| KENTON GIRARD,<br>MINOR CHILD GW, and<br>MINOR CHILD GR,<br><br>       Plaintiffs,<br><br>       v.<br><br>VILLAGE OF GLENCOE, ILLINOIS,<br>DETECTIVE RYAN MCENERNEY,<br>MARIA PAREDES,<br>KATHRYN CIESLA ESQ,<br>GWENN WALDMAN,<br>BREANNA TRAUB,<br>BEERMANN LLP,<br>JOHN M. D'ARCO ESQ,<br>JAMES M. QUIGLEY ESQ,<br>ENRICO J. MIRABELLI ESQ,<br>JUDGE WILLIAM S. BOYD, and<br>JUDGE RENEE G. GOLDFARB,<br><br>       Defendants. | Case No. 1:24-cv-06882<br><br>District Judge Rebecca Pallmeyer<br><br>Magistrate Jeanine Appenteng<br><br><u>First Amended Complaint and<br>Jury Demand</u><br><br>*featuring civil rights, RICO causes* |

Plaintiffs Kenton Girard, in pro se, and the minor children Gw. and Gr., via counsel, for their First Amended Complaint against Defendants **hereby request a trial by jury** pursuant to FRCP 38(b) and allege as follows:

**PRELIMINARY STATEMENT**

1.      A custody agreement was approved and entered between Kenton Girard and his ex-wife Jane F. Girard as to their minor children Gw and Gr on November 4 2015. The equilibrium under this agreement started to degrade almost immediately after the ink was dry on the judgment of marital dissolution whereupon Jane F. Girard implemented a pattern and practice

Relations Judge Regina Scannicchio – since 2022 the presiding judge of the entire Domestic Relations Division of Cook County – was on their payroll.

5. These circumstances are particularly outrageous because the minor children Gw and Gr have been living in a constant state of trauma and distress through the entirety of the underlying family court proceedings facing the very real prospect of being forced by court order to spend regular time in the home of their sex abuser, namely Jane F. Girard.

6. Moreover, the family court proceedings have dealt a heavy toll on the custom jewelry business which the minor children Gw and Gr they have been growing and operating for the last four years, White Lemon Creations. Because the proceedings have consumed now close to three years in which they have been working on achieving financial stability for the business, Gw and Gr have been hampered by the enormous time commitments of following along and attempting to advocate for their interests.

7. Those interests have been so grossly inadequately represented by the family law functionaries involved in those proceedings to date, that Gw and Gr have taken to studying the Illinois Code of Civil Procedure and reading voluminous case law and opinions handed down by the Illinois Appellate Court in an attempt to advocate for their interests.

8. Indeed, Gw and Gr are now capable of writing their own legal papers – an amazing accomplishment for the twin girls who are not yet even seventeen years of age. Besides the original pleading hereunder which was heavily contributed by Gw and Gr, the girls have also authored multiple legal letters to the family law functionaries and the supervising officers of the Cook County court system, as well as a Motion to Intervene[1] in the family court proceedings

---

[1] The Judicial Officer in the underlying family court proceeding heartlessly struck the girls' Motion to Intervene *because they are not represented by a child representative*. Indeed, their previous child representative Joel Levin resigned from his position in August 2024.

**3**                    *Girard v. Village of Glencoe – First Amended Complaint*

where they have been unconscionably left without a voice since August 2024 without any child representative in the case.

9.      Separately, Gw and Gr have been heavily involved in advocating for their interests under a separation emancipation action, currently pending in the Law Division and up on a Motion to Consolidate from Beermann LLP to move that litigation into the underlying family court proceeding where they "own" the judicial officers, from Presiding Judge Scannicchio on down. The whole world knows Gw and Gr are intelligent, hard-working, resourceful and wise beyond their years, yet Beermann LLP's illicit crusade for legal billings in a family court system which they own predominates and suffocates any independent concern for what Gw and Gr wish to make of their fast-developing lives and their fast-growing jewelry business White Lemon Creations.

10.      Beermann LLP has in recent years acquired a reputation as a truly unbeatable foe in the family law courts, owing to its track record of manipulated results before judges it has bribed in exchange for a never-ending flow of favorable rulings. The corruption of Beermann LLP has been quarterbacked by managing partner John M. D'Arco, son of the infamous former Illinois legislator and advocate for the Chicago Outfit John A. D'Arco[2] who was convicted under consecutive indictments in this District in the early 1990s for bribery under Operation GAMBAT and under his sentencing he was remanded to prison and permanently banned from accepting employment in any capacity for any state government in the entire United States.

11.      The scope of the racketeering goes beyond the mere bribing of the family law judges. Upon information and belief, Beermann LLP does not hesitate to barter its power to

---

[2] According to Wikipedia (John D'Arco Sr. - Wikipedia), John D'Arco Sr (the grandfather of Defendant John M. D'Arco) served in the role of First Ward Alderman in which capacity he allegedly advocated for the economic interests of the Chicago Outfit. During the 1970s, D'Arco Sr was investigated federally for his alleged involvement in an attempt to fix the 1977 murder trial of reputed hitman Harry Aleman, but he was never indicted. Additionally, John D'Arco Sr was known by the FBI to be involved in the prostitution and gambling rackets of the Chicago Outfit.

**4**                          *Girard v. Village of Glencoe – First Amended Complaint*

Scannicchio, a Cook County Resident Leann Stevens engaged Beermann LLP attorney Jonathan Steele in her domestic relations proceeding. Judge Scannicchio had a well-known reputation as being hard on women before her in her court. However, quixotically, when Leann Stevens was discussing case strategy with Attorney Steele at the onset of the representation on or around 2016, he remarked "Oh, we have Scannicchio – we are good!" Attorney Steele knew that the outcome was preordained: Judge Scannicchio would tender all rulings in his favor during the proceeding because she was on the payroll of Beermann LLP.

53.     Incidentally, Judge Scannichio was promoted to presiding judge of the Domestic Relations division of Cook County in September 2022 by Cook County Chief Judge Timothy Evans. The idea that she was on the payroll of Beermann LLP since at least on or around 2015 is downright frightening[11] as to the improper influence Beermann LLP *now wields over all family court proceedings* in Cook County.

54.     Similar to the shady circumstances of the scholarship established in the name of Judge Boyd, Judge Scannicchio is the 2022 recipient of the Judge Samuel S. Berger Award, given by the American Academy of Matrimonial Lawyers. Upon information and belief, one of the illicit purposes of the various awards bestowed by the American Academy of Matrimonial Lawyers (in specific, the Illinois Chapter thereof) is to create a legitimate reason to convene in-person meetings between attorney practitioners and the judges assigned to the family courts. Such meetings allow for frank *quid pro quo* conversations and transactions which would normally risk the threat of exposure under normal daily circumstances.

55.     Following this pattern, on August 27 2022 aboard the marine vessel "Anita Dee

---

[11] Incidentally, during a tense moment in the representation of Leann Stevens by Beermann LLP involving an emergency hearing, Justino Mirabelli – the son of Enrico Mirabelli – threatened Leann Stevens to say nothing but positive things about the history of the legal services provided to her by Beermann LLP. She left such encounter downright frightened not only for her case but for her life.

**14**                    *Girard v. Village of Glencoe – First Amended Complaint*

II" moored at DuSable Harbor, Judge Regina Scannicchio was being honored for her promotion by Cook County Chief Judge Timothy Evans to presiding over the entire Domestic Relations division of Cook County. At this nighttime gala, upon information and belief, Enrico Mirabelli delivered an envelope containing cash to Judge Boyd who was also present.

56. Enrico Mirabelli just today displayed an unscripted moment of candor which speaks volumes as to the ingrained nature of the bribery at Beermann LLP. To wit, on December 6 2024 in preparation for an upcoming hearing on Substitution of Judge directed at the current judicial officer presiding over the family court proceedings, Enrico J. Mirabelli took it upon himself to ask Jaime Barcas of the office of the Presiding Judge Scannicchio **"Please just let us know which Judge will be hearing the motion"** – presumably so he can arrange for a judicial payoff to ensure the outcome of the upcoming hearing is favorable to Beermann LLP.

## <u>CLIENTS WHO SPURNED BEERMANN ALSO HAVE TALES TO TELL</u>

57. On or around February 2020, a member of the Illinois Bar residing in Glencoe contacted Beermann LLP to discuss the possibility of their assistance in a contemplated divorce from her husband. This member of the Illinois Bar was asked very detailed questions about her spouse's background, profession, assets and financial condition.

58. Once the attorney taking the call at Beermann LLP flagged the case as an apparent high net worth scenario, after a few moments, Mr. Mirabelli connected and took over the telephone call. Without prompting, Mr. Mirabelli bragged that his firm would get her 100% full custody of their children and dissipate all of her husband's assets, leaving him totally dry, in fact would get "whatever her heart desired".

59. The prospective client commented that she was only contemplating mediation and the construction of an agreed order as to marital dissolution to be filed with the court. However,

115. The above-enumerated details of the bribery scheme are more than sufficient to establish the RICO enterprise, its goals and members, and how it worked, involving thousands of interstate mails and wires sent by Beermann LLP professionals in furtherance of the scheme.

116. Defendants Beermann, D'Arco, Quigley and Mirabelli are in the exclusive possession or have exclusive knowledge of many interstate mails and wires that were part of the scheme. Discovery will reveal these additional predicate acts. Beermann Attorney Jonathan Steele as noted *supra* also has material knowledge of the bribery of Judge Scannicchio.

117. The following are examples of certain interstate mails and wires sent as part of the scheme to extract excessive fee billings from family law proceedings before Beermann LLP bribed judges: (a) subpoenas sent to to out-of-state financial institutions, (b) discovery propounded in certain of the family law proceedings to parties residing in California, New York, Florida and Arizona, (c) email messages sent using the interstate wires by Enrico J. Maribelli (who operates substantially out of Florida) and the various family law functionaries involved in nearly all of such family law proceedings. For example, in the Girard family law proceeding, numerous email messages were sent using the interstate wires by the guardian ad litem Vanessa Hammer (who operates her business substantially out of Texas), by the successor child representative Joel Levin (who operates his business substantially out of Arizona), by the court-appointed therapists Gwenn Waldman and Breanna Traub, and by the 604(b) evaluator Phyllis Amabile MD.

118. These are just some examples of the interstate mails and wire used by Defendants Beermann LLP and John M. D'Arco.

*Girard v. Village of Glencoe – First Amended Complaint*