FILED
10/15/2026
THOMAS G BRUTON
CLERK, U.S. DISTRICT COURT
BC

Case No: 1:26-CV-00359

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| EDWARD ENGELS,<br><br>Plaintiff,<br><br>v.<br><br>FELIZA CASTRO, ROSS MORREALE, PAMELA KUZNIAR, DR. DAVID FINN, THOMAS T. FIELD, and JONATHAN D. STEELE,<br><br>Defendants. | Case No. 1:26-cv-00359<br><br>Hon. Georgia N. Alexakis<br><br>**JURY TRIAL DEMANDED**<br><br>**NATURE OF SUIT: CIVIL RIGHTS 42 U.S.C. § 1983** |

## SECOND AMENDED COMPLAINT

Plaintiff Edward Engels, pro se, for his Second Amended Complaint against Defendants Feliza Castro, Ross Morreale, Pamela Kuzniar, Dr. David Finn, Thomas T. Field, and Jonathan D. Steele, states as follows:

### I. NATURE OF ACTION AND § 1983 CONSTITUTIONAL CLAIMS

1. Plaintiff Edward Engels brings this civil-rights action in his individual capacity pursuant to 42 U.S.C. § 1983, alleging violations of rights secured by the First and Fourteenth Amendments to the United States Constitution. These include deprivation of procedural due process, interference with the fundamental liberty interest in the parent-child relationship and familial integrity, denial of equal protection, and interference with Plaintiff's First Amendment right to petition the courts for redress. Plaintiff alleges that the challenged conduct caused independent constitutional injuries through the specific actions and alleged joint participation of Defendants with state officials, as detailed herein. See *West v. Atkins*, 487 U.S. 42, 48 (1988); *Troxel v. Granville*, 530 U.S. 57, 65–66 (2000); *Dennis v. Sparks*, 449 U.S. 24, 27–28 (1980).

2. Defendants include private individuals, attorneys representing a party in the underlying domestic-relations proceedings, and court-appointed professionals. Plaintiff does not allege that any Defendant became a state actor merely by virtue of a private relationship, legal representation, court appointment, or participation in litigation. Rather, Plaintiff alleges that specific Defendants knowingly and willfully participated in joint action with identified state

judicial officials to deprive Plaintiff of constitutionally protected rights. Plaintiff further alleges that this conduct included the selective presentation, suppression, or misrepresentation of material evidence concerning the minor child's safety, wishes, and well-being, and interference with Plaintiff's parental relationship and access to judicial relief. Plaintiff relies upon the specific acts, communications, and circumstances pleaded herein to establish the required connection between each Defendant's conduct, state action, and the resulting constitutional injuries. See *Dennis v. Sparks*, 449 U.S. 24, 27–28 (1980); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970).

## II. JURISDICTION, VENUE, AND CASE POSTURE

3. This Court has original subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) because Plaintiff brings this civil-rights action under 42 U.S.C. § 1983, alleging violations of rights secured by the First and Fourteenth Amendments to the United States Constitution.

4. Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in Cook County, Illinois, within this judicial district.

5. The underlying proceedings arise from *Engels v. Castro*, Cook County Domestic Relations Case No. 2013 D 080356 (the "State Case"). Plaintiff does not seek a federal determination of custody, parenting time, schooling, or relocation, nor does Plaintiff request that this Court review, reverse, or vacate any state-court judgment. Rather, Plaintiff seeks relief for alleged independent constitutional injuries arising from Defendants' own conduct. See *Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, 544 U.S. 280, 284, 293 (2005); *Ankenbrandt v. Richards*, 504 U.S. 689, 703–04 (1992).

6. On September 28, 2026, this Court granted Plaintiff leave to amend, and Plaintiff filed his First Amended Complaint on October 1, 2026. Plaintiff submits this Second Amended Complaint pursuant to the Court's authorization, subject to the terms of the applicable order.

## III. PARTIES AND RELEVANT STATE ACTORS

7. Plaintiff Edward Engels resides in Cook County, Illinois. He is the father of E.R.E., a minor, and the Petitioner in the State Case. Plaintiff brings this action solely for alleged violations of his own constitutional rights.

8. Defendant Feliza Castro is E.R.E.'s mother and the Respondent in the State Case. She is sued in her individual capacity.

9. Defendant Ross Morreale is Castro's on-and-off paramour and is not a party to the State Case. He is sued in his individual capacity.

10. Defendant Pamela Kuzniar is an Illinois attorney who was appointed Guardian ad Litem in the State Case in 2015, reappointed in 2018, and appointed again in 2022. The orders documenting Kuzniar's recurring appointments are attached collectively as **(Exhibit 1)**. Kuzniar is sued in her individual capacity.

11. Defendant Dr. David Finn, Psy.D., was initially appointed on September 9, 2022 to conduct a Rule 215 mental examination of Plaintiff. On November 1, 2022, the Court changed and expanded Finn's role to a § 604.10(b) evaluation involving both parents and the minor child. The orders documenting Finn's initial appointment and subsequent change in role are attached collectively as **(Exhibit 2)**. Finn is sued in his individual capacity.

12. Defendant Thomas T. Field is an attorney with Beermann LLP who has represented Castro through multiple phases of the State Case. Field has characterized his involvement as spanning seven litigation cycles and has described the representation as achieving "excellent results" for Castro. Field is sued in his individual capacity. **(Exhibit 3)**

13. **Field's Relationship with Defendant Kuzniar.** On information and belief, Field and Kuzniar have a decades-long personal and family relationship predating their involvement together in the State Case. Plaintiff alleges that this longstanding relationship is relevant to the joint-action allegations below and to the circumstances surrounding Kuzniar's recurring appointments while Field represented Castro.

14. Defendant Jonathan D. Steele is an attorney with Beermann LLP who represented Castro in the State Case. He is sued in his individual capacity.

***Non-Parties***

15. **Non-Party Judges.** Judges Pamela E. Loza and Regina A. Scannicchio are the principal state officials relevant to Plaintiff's joint-action allegations. They are identified to plead the alleged state action underlying Plaintiff's § 1983 claims and are not Defendants in this action. Judicial immunity does not extend to private persons who act jointly with a judge. *Dennis*, 449 U.S. at 27–29.

16. **Non-Party Dr. James T. O'Donnell.** Dr. James T. O'Donnell is the court-appointed pharmacologist, whose appointment was advocated by GAL Pamela Kuzniar, to conduct a medication and drug-management review of both parents. His review addressed prescription and non-prescription drugs, alcohol, other intoxicants, drug-testing history, and their potential impact on parenting. **(Exhibit 4)**

17. **Non-Party Pamela Rak, LCSW.** Pamela Rak, LCSW, was court appointed as the parties' parenting coach during Finn's § 604.10(b) evaluation, at Finn's insistence or recommendation. On March 10, 2023, Rak reported to Kuzniar and Finn that Castro had failed to participate in parenting coaching while Plaintiff had participated and complied with assignments, and she withdrew from further participation. Rak is not a Defendant; she is identified as a court-appointed professional whose observations were available to Kuzniar and Finn.

## IV. FACTUAL ALLEGATIONS — CONTROLLED SUBSTANCES, COURT-ORDERED DRUG TESTING, AND DOCUMENTED NONCOMPLIANCE

### A. Dr. Jonathan Spero — Controlled-Substance Prescriptions to Feliza Castro and IDFPR Findings (Group Exhibit 5)

18. On June 29, 2022, the Illinois Department of Financial and Professional Regulation (“IDFPR”) refused to renew Dr. Jonathan Spero's medical license after finding, among other things, that he prescribed Schedule II controlled substances to “F.C.,” identified in this action as Feliza Castro, without an established physician-patient relationship or required assessments.

19. Communications between Spero and Castro further show Spero providing Castro access to his prescription pad, a sample of his signature, and his DEA registration number. Spero asked Castro, “U writing Vicodin?” and Castro responded concerning prescriptions she was writing.

20. Plaintiff provided the IDFPR disciplinary findings and the underlying Spero-Castro communications to Guardian ad Litem Pamela Kuzniar and court-appointed evaluator Dr. David Finn. Plaintiff alleges that these materials placed Kuzniar and Finn on actual notice of significant controlled-substance issues involving Castro before the subsequent court-ordered testing and evaluations described below. See 750 ILCS 5/506(a)(2).

**B. Feliza Castro — Positive Ketamine Test, Testing Noncompliance, and GAL Kuzniar's Omission of Ketamine (Group Exhibit 6)**

21. On September 9, 2022, the State Court ordered both parties to complete drug testing by September 12, 2022 at 5:00 p.m., with the results provided to GAL Pamela Kuzniar.

22. Castro did not submit to testing by the court-ordered September 12 deadline. She appeared for collection on September 13, 2022. The September 13 correspondence identifies TrueTest Labs' Michael Gammel as the laboratory contact. Attorney Linda Epstein stated, "The order said it was to be done by 5:00 p.m. yesterday," and asked whether Castro had tested the prior day. Kuzniar reported contacting Gammel and stated, "Both Eddie and Feliza submitted to hair testing. Eddie appeared yesterday and Feliza appeared this morning." Plaintiff further alleges that Kuzniar instructed Gammel not to mark Castro's test as late. (Exhibit 9.)

23. Castro's September 13, 2022 court-ordered hair specimen was subsequently reported POSITIVE, including ketamine at 622 pg/mg, norketamine at 626 pg/mg, and positive opiate-related findings, including hydrocodone and norhydrocodone.

24. On September 28, 2022, Plaintiff's then-counsel, Linda Epstein, directly raised the positive results with Kuzniar and Castro's counsel. Epstein specifically asked, "The issue I have is why is or was she using Ketamine?" She also questioned Castro's hydrocodone use and asked Kuzniar what the plan was for "ensuring the safety of Minor Child."

25. Epstein followed up again on September 29, 2022, demanding a response concerning the ketamine, hydrocodone, and child-safety issues. Plaintiff alleges these contemporaneous communications establish that Kuzniar had actual notice of the positive ketamine result and the specific safety concerns raised by Plaintiff's counsel.

26. On January 20, 2023, Kuzniar transmitted a proposed random-drug-testing order directly to Judge Loza's staff. The proposed testing panel did not expressly include ketamine,

despite Castro's September positive result and Epstein's prior written inquiries concerning that substance.

27. Epstein objected contemporaneously that she had not been provided the proposed order for review and specifically asked, "What about Ketamine." The order was thereafter entered without ketamine expressly included in the testing panel.

28. Plaintiff alleges that this sequence is material because the underlying documents establish: (1) a court-ordered positive ketamine result; (2) Kuzniar's actual notice of that result and specific child-safety concerns; and (3) the subsequent entry of a random-testing protocol that did not expressly include ketamine despite Epstein's immediate objection. Plaintiff relies on these facts, together with the subsequent events alleged below, as evidence concerning Kuzniar's handling of material safety information and Plaintiff's joint-action claims. See Ill. R. Prof'l Conduct (2010) R. 3.5(b).

### C. Castro's Cocaine-Positive Court-Ordered Drug Test During Parenting Time, Additional Positive Drug Results, Emergency Suspension of Parenting Time, and Subsequent Reinstatement (Group Exhibit 7)

29. On April 4, 2023, while E.R.E. was in Castro's care and during Castro's court-ordered parenting time, Castro submitted a court-ordered random urine specimen. The laboratory reported cocaine metabolite at 3,704 ng/mL, approximately thirty-seven times the confirmation cutoff, together with positive results for marijuana, amphetamine, hydrocodone, and hydromorphone.

30. Castro attributed the cocaine-positive result to a medical procedure performed the preceding day, April 3, 2023. The operative record from 900 North Michigan Surgical Center identifies multiple substances allegedly administered during the procedure, including breast mix, IV sedation, lidocaine with epinephrine, Marcaine, 4% cocaine, and Kenalog. The record states no amount for the cocaine and contains redacted or incomplete information concerning the procedure and dosages. Significantly, the surgical record does not account for the marijuana, amphetamine, hydrocodone, and hydromorphone also detected in Castro's April 4 court-ordered drug test.

31. In the Third Emergency Motion, filed April 19, 2023, Plaintiff's counsel Linda Epstein presented the positive cocaine result as part of a broader, ongoing child-safety concern. The motion identified the April 4 positive results for cocaine, marijuana, amphetamine,

hydrocodone, and hydromorphone; alleged that Castro's continued drug use endangered E.R.E.'s mental, physical, and emotional well-being; referenced contemporaneous text messages from E.R.E. expressing distress while in Castro's care; alleged that the professionals involved were not adequately addressing those communications; and requested immediate suspension of Castro's parenting time while the asserted medical explanation for the cocaine result was investigated.

32. At the April 21, 2023 emergency hearing, Castro's counsel relied on surgical discharge papers as an explanation for the positive cocaine result, representing that the records showed cocaine had been administered during Castro's procedure. The medical explanation did not resolve the emergency. Judge Geri Pinzur Rosenberg found the matter to constitute an emergency and suspended Castro's parenting time pending further hearing before Judge Loza on April 25, 2023.

33. On April 25, 2023, Judge Pamela Loza reinstated Castro's parenting time, four days after Judge Rosenberg had suspended it based on the cocaine-positive test.

**D. Dr. James T. O'Donnell — Court-Appointed Pharmacologist's Findings (Group Exhibit 8)**

34. Later on April 25, 2023, after Judge Loza had reinstated Castro's parenting time, court-appointed pharmacologist Dr. James T. O'Donnell issued his court-ordered report addressing the parties' medication management, drug-testing compliance, substance use, and fitness to parent from a medication-management perspective.

35. **Dr. O'Donnell's Findings as to Castro.** O'Donnell found Castro poorly compliant with court-ordered drug testing, identified concerns involving ketamine, tramadol, hydrocodone, marijuana dependency, and risks of impairment or intoxication, and concluded that Castro was "Not Fit to Parent" from a medication-management perspective. O'Donnell recommended safeguards based upon those findings.

36. **O'Donnell's Findings as to Engels.** In contrast, O'Donnell found Plaintiff Edward Engels compliant with court-ordered testing and Fit to Parent from a medication-management perspective.

37. **Fourth Emergency Motion Following O'Donnell's Findings.** On May 2, 2023, following O'Donnell's April 25 report, Plaintiff, through counsel Linda Epstein filed his Fourth Emergency Motion to Restrict Castro's Parenting Time and for Issuance of a Subpoena for Medical Records. The motion informed the State Court that O'Donnell had concluded Castro

was "unfit to parent," alleged continuing drug use and testing noncompliance, cited E.R.E.'s recurring communications expressing that she did not want to remain in Castro's care, and asserted that O'Donnell considered Castro's drug use and drug interactions a serious endangerment to the child while in Castro's care. Plaintiff requested restriction of Castro's parenting time and a subpoena for the complete medical records from the April 3 procedure that O'Donnell had requested for further review.

38. On May 9, 2023, Judge Pamela Loza determined that Plaintiff's Fourth Emergency Motion was not an emergency and continued the motion rather than restricting Castro's parenting time. At the same time, Judge Loza ordered that all pharmacological records requested from Castro by Dr. O'Donnell in his April 25, 2023 report be tendered directly to O'Donnell within seven days, confirming that O'Donnell's investigation and review of Castro's medication and substance history remained incomplete.

39. In the same May 9, 2023 order, GAL Kuzniar advised the court that she had received screenshots of text messages from E.R.E., a letter concerning Dr. O'Donnell's report, and messages directly from E.R.E. concerning the reasons she did not want to go to her mother's home. The order directed Kuzniar to provide the identified communications to counsel and Dr. Finn.

***Dr. James T. O'Donnell — November 9, 2024 Sworn Affidavit Regarding GAL Pamela Kuzniar and Dr. David Finn's Handling of His Court-Appointed Findings and Safety Recommendations***

40. In his November 9, 2024 notarized affidavit, court-appointed pharmacologist Dr. James T. O'Donnell addressed the handling of his April 25, 2023 medication-management findings and safety recommendations. O'Donnell stated that GAL Pamela Kuzniar and court-appointed evaluator Dr. David Finn appeared to overlook or minimize the gravity of his findings and recommendations concerning Feliza Castro.

41. O'Donnell further stated that he was not aware that a non-court-appointed rebuttal report by Dr. Jerrold B. Leikin had been accepted by Kuzniar and Finn to counter his findings, that he did not know whether his own court-appointed report had been submitted to the Court, and that the redaction of medical information offered to explain Castro's cocaine-positive test limited access to complete information and undermined transparency.

42. Plaintiff relies upon the affidavit as the sworn account of the court-appointed pharmacologist himself, corroborating the seriousness of his findings and documenting how they were handled by Kuzniar and Finn, rather than as an independent judicial finding of misconduct.

**E. Feliza Castro Court-Ordered Drug-Testing History And Call-In Noncompliance (Group Exhibit 9)**

43. **Drug-Testing Log.** TrueTest Labs' specimen history for Castro records 33 specimens collected between September 13, 2022 and February 8, 2024. The report reflects 28 reported positive results, two refusals—March 7 and April 24, 2023—and one cancelled test. Plaintiff relies on the underlying laboratory records, rather than the word "positive" alone, to establish which substances were detected and whether any particular result had a claimed medical explanation.

44. The TrueTest specimen-history summary reportedly lists Castro's September 13, 2022 hair specimen as "Negative," while the underlying laboratory report identifies positive findings, including ketamine at 622 pg/mg, norketamine at 626 pg/mg, and hydrocodone-related analytes. Plaintiff alleges the summary entry does not accurately reflect that specimen's underlying laboratory findings. The laboratory report, specimen identifier, and any amended report should be compared directly before asserting a revised count of positive tests. (Exhibit 9.)

45. Feliza Castro's Refusals and Failure to Timely Test. TrueTest's records include entries marked "Refusal" on March 7 and April 24, 2023. Castro also did not complete the September 12, 2022 court-ordered test by the specified deadline, appearing instead on September 13. Plaintiff's counsel raised this discrepancy with GAL Kuzniar, who identified Michael Gammel of TrueTest Labs as her testing contact. Plaintiff alleges that Kuzniar instructed Gammel not to classify Castro's September 13 appearance as late. The documented dates independently establish the timing issue. (Exhibit 9.)

46. **Feliza Castro's Call-In Noncompliance.** Feliza Castro's TrueTest call-in log covers January 23 through June 9, 2023 and identifies 40 required call-in dates but only 14 calls, reflecting 26 dates on which Castro did not call as required. The log repeatedly records "Did Not Call," documenting substantial noncompliance with the court-ordered random-testing protocol.

47. **Contemporaneous Notice to Kuzniar and the Court-Appointed Experts.** On March 8, 2023, Linda Epstein specifically notified GAL Kuzniar and Castro's counsel that

Castro had failed to make 17 of 26 required calls, contrasted that record with Plaintiff's compliance, and asked Kuzniar why the noncompliance was not being treated as an issue.

48. The compliance issue was also communicated directly to the court-appointed professionals. On February 8, 2023, TrueTest president Michael Gammel notified Kuzniar, counsel, Dr. Finn, and Dr. O'Donnell concerning a scheduled test and collection-site issue. Epstein objected that Castro "gets to DECIDE when she complies," and O'Donnell responded, "I'm noting this".

49. **Edward Engels's Drug-Testing History.** In contrast to Castro's testing and compliance history, Plaintiff Edward Engels's TrueTest Labs specimen history reflects 18 specimens collected between September 12, 2022 and September 28, 2023, all reported negative. The testing included blood, hair, and urine specimens and reflects no positive drug-test results and no refusals to test during the period shown.

**F. Feliza Castro — Parenting-Time Agreement Reversed Following Finn/Kuzniar Intervention (Group Exhibit 10)**

50. On or about May 10, 2023, Castro communicated with GAL Pamela Kuzniar concerning difficulties she was experiencing with E.R.E. According to the contemporaneous communications relayed by Plaintiff's counsel Linda Epstein, Castro told Kuzniar that living with E.R.E. was "hell." This communication preceded Castro's decision, through her counsel, to offer Plaintiff the remainder of Castro's scheduled parenting week.

51. Following Castro's communication with GAL Kuzniar, Castro's counsel Dean Taradash communicated directly with Plaintiff's counsel Linda Epstein and confirmed that E.R.E. could remain with Plaintiff for the remainder of Castro's parenting week. Taradash wrote: "[E.R.E.] can stay with Eddie for the remainder of the week. Please let him know." Epstein responded: "ok, Thank you. I will let him know. Is this until Monday?" Taradash confirmed: "Yes."

52. Plaintiff relied upon the agreement communicated by Taradash and rearranged his plans and schedule to care for E.R.E. through Monday. The parties' communications thereafter addressed arrangements for E.R.E. to retrieve her school backpack and rhythmic-gymnastics equipment from Castro's residence, further reflecting that the parties were proceeding under the agreed arrangement.

53. On May 11, 2023, after the parties had reached and begun acting upon that agreement, Castro spoke directly with Dr. David Finn concerning the parenting arrangement, and Finn and GAL Kuzniar became involved in whether E.R.E. would remain with Plaintiff. Taradash later confirmed the communication, stating: "Feliza spoke with Finn. Period. You and Eddie now know the court appointed 604's recommendation and Pam's. It's now up to Eddie."

54. Plaintiff's counsel Linda Epstein immediately objected to the reversal of the agreed parenting arrangement and Finn's involvement, writing: "Well Dean is the one who told me to tell Eddie he could keep her this week. He made arrangements and rearranged his plans based on this. So, she is not a ping pong ball either." Epstein further stated: "Dr. Finn does not get to tell us either what to do, we had an agreement at least until Monday. I do not agree."

55. Epstein also objected to being excluded from communications concerning Finn's recommendation, writing: "What is happening here? Why am I being excluded from information? You're both going to have to explain yourself to the judge on the record. I will make my record in this case." Epstein specifically questioned: "How does Dean know what doctor Finn is recommending."

56. Epstein expressly questioned Finn's role and direct involvement before completion of his §604.10(b) evaluation, writing: "I am also very confused with his role and his direct involvement like this. I have not ever had a 604 be so involved like this." Epstein further stated: "I think he is overstepping his role and his bounds."

57. Epstein further objected that Finn was making recommendations before completing his court-ordered evaluation, writing: "He is making recommendations or findings prior to his report." Epstein stated: "He is showing a bias without us having a basis to address his/her recommendations," and warned: "He is jeopardizing the report. He is no one's therapist. He is not her lawyer?" See 750 ILCS 5/604.10(b).

58. Epstein questioned why Finn had been asked to intervene after Castro and her counsel had already offered Plaintiff the additional parenting time, writing: "Who asked Dr.

Finn to opine on this, they should have done that before they made the offer not after. [E.R.E.] did not make this decision, Feliza and Dean did."

59. After the May 11 Finn/Kuzniar intervention, E.R.E. was picked up from school early on May 12, and the contemporaneous texts from E.R.E. to Plaintiff state: "Dad they picked me up for early dismissal now I'm in my room I hate it here so much I'm so miserable I don't want to be here dad I really dont." "I can't stop crying it's horrible." "I hate Pam I hate Finn Why are they helping the worse mom in the world? Why dad? Why???" "They just picked me up so I can sit in my room and do nothing they don't want me here and I don't want to be here…"

**G. Finn and Castro's Removal of E.R.E. From School During Plaintiff's Parenting Time (Group Exhibit 11)**

60. On May 17, 2023, during Plaintiff's scheduled parenting week, Castro went to Mark T. Skinner West Elementary School, removed E.R.E. from school before the end of the school day, and took her to Dr. David Finn's office in Hoffman Estates. Plaintiff alleges the removal occurred at Finn's recommendation and without prior notice to Plaintiff, Plaintiff's counsel, or the school that Plaintiff had authorized a change to his parenting time.

61. Plaintiff's counsel Linda Epstein immediately challenged the removal in contemporaneous communications to GAL Kuzniar and Castro's counsel, stating: "Feliza went to school and removed [E.R.E.] during Eddie's parenting time," reporting that the child was "hysterical," and asking, "Who authorized this? This is my client's parenting time. Who authorized this removal from school?"

62. At approximately 11:26 a.m., E.R.E., then ten years old, called 911 following her removal from school. According to the exhibit summary, she remained on the telephone with the dispatcher for approximately 25 minutes; the call was upgraded from a well-being check to "Kidnapping J/O," and Chicago Police were dispatched to the school. The exhibit states that E.R.E., crying, told the dispatcher that it was her father's parenting week and that her mother had removed her early from school, preventing her from exercising parenting time with Plaintiff.

63. The materials further identify a Chicago Police report concerning alleged custodial interference arising from Castro's removal of E.R.E. from Skinner West to take her to Finn during Plaintiff's parenting week.

64. Castro thereafter transported E.R.E. to Finn's office. The materials state that E.R.E. refused to exit Castro's vehicle when Finn approached. They further allege that Finn and Castro went inside Finn's office while E.R.E. remained outside in the vehicle and returned as Hoffman Estates police arrived. Plaintiff's counsel subsequently questioned Finn about leaving E.R.E. alone in the vehicle; according to the materials, Finn did not answer the inquiry.

65. Later that day, Finn emailed both parents and copied GAL Kuzniar. Finn wrote: "It is my understanding [E.R.E.] called 911 before leaving school today with Feliza. Can one of you ask your attorneys to subpoena the recording of that call? If there is a police report, please provide that as well." Finn further wrote: "After my brief interview with [E.R.E.] 4 police cars responded to my office and spoke with Feliza. Which one of you called the police and why? Please obtain the Hoffman Estates Police Report for my review."

66. Finn additionally directed the parties: "Please preserve all your text messages with [E.R.E.] beginning Sunday at 9AM (May 14, 2023) and send me copies of those texts between you and [E.R.E.] beginning on Sunday until the time that [E.R.E.] is transitioned to Eddie for his parenting time." Finn separately instructed Plaintiff: "Eddie, please also ask [E.R.E.] for her phone and send her messages to you, to Feliza and to Ross between Sunday and today as well."

67. Epstein thereafter challenged Kuzniar's handling of the incident, asking: "What are you doing to assist us in this case. I would ask that you either agree that we need to have a child representative or you explain what your role is." Epstein also asked, "How are you helping." She further wrote: "How could anybody think that she would not have reacted badly to be removed from school by her mother without any notice?" and reported that E.R.E. had "again spent a day crying and in trauma."

**H. Court-Appointed Parenting Coach Pamela Rak — Feliza Castro's Non-Compliance And Withdrawal From Parenting Coach (Group Exhibit 12)**

68. **Court Appointment of Pamela Rak.** During Dr. David Finn's §604.10(b) custody evaluation, Pamela Rak, LCSW, was appointed to serve as the parties' parenting coach. Plaintiff alleges that the parenting-coaching intervention was undertaken at Finn's insistence/recommendation as part of the ongoing evaluation process. Rak was therefore another court-appointed professional whose direct observations of each parent's participation and compliance were available to Finn and GAL Pamela Kuzniar before Finn completed his evaluation.

69. **Rak's Findings.** On March 10, 2023, Rak documented materially different levels of participation by the parties. Rak reported that "Feliza Castro has failed to attend a follow up Zoom session for Parenting Coaching," explaining that Castro had been "profoundly late" to the first session and was "today a no show." In contrast, Rak reported: "Eddie has participated in sessions and has complied with assignments I requested."

70. **Rak Withdraws.** Rak further documented "the level of disrespect and lack of cooperation Feliza has demonstrated for parenting coaching," concluded that "the current arrangement is not working and doesn't have the 'teeth' for being taken seriously," proposed a more structured therapeutic approach, and withdrew from further participation. Rak's communication was directed to Kuzniar and Finn, placing both court-appointed professionals on notice of her documented experience with the parties before Finn issued his July 19, 2023 report.

**I. Dr. David Finn — July 2023 Report and Suspension of Edward Engels's Parenting Time (Group Exhibit 13)**

71. On July 19, 2023, Dr. David Finn issued his §604.10(b) custody-evaluation report following the expanded appointment described above. Finn's report was issued after the court-appointed pharmacologist, Dr. O'Donnell, had found Castro "Not Fit to Parent" from a medication-management perspective and Plaintiff fit to parent from that perspective.

72. On July 19, 2023, at 4:06 p.m., within hours after Finn filed his § 604.10(b) report, Castro, through her counsel The Taradash Group, P.C., filed Respondent's Emergency Motion to Suspend Petitioner's Parenting Time/Decision-Making and for Other Relief pursuant to 750 ILCS 5/602.7 and 5/603.10.

73. On July 20, 2023, one day after Dr. Finn issued his §604.10(b) report, Judge Loza suspended Plaintiff's parenting time and prohibited contact with E.R.E. without first conducting an evidentiary hearing. No witness testimony was taken, Dr. Finn was not examined or cross-examined, and his report had not been admitted into evidence. Plaintiff was not afforded an opportunity to present evidence or meaningfully challenge Finn's conclusions before his parent-child relationship was suspended.

74. **Contemporaneous Due-Process and Constitutional Objections.** At the July 31, 2023 hearing, Plaintiff's counsel Linda Epstein placed on the record repeated objections to the procedure by which Plaintiff's parenting time and contact with his daughter had been suspended. Epstein stated that the July 20 order contained "no findings, no basis," questioned what sudden and unforeseen circumstance constituted an emergency, and emphasized that Plaintiff had not been afforded the same opportunity previously afforded Castro to investigate and challenge a court-appointed expert's conclusions. Epstein argued that Plaintiff had been denied the opportunity to investigate, subpoena witnesses and records, examine Finn's underlying file, and question Finn before Plaintiff's parenting relationship was restricted.

75. Epstein further emphasized that Finn's report "does not come into evidence," that no specific facts had been alleged establishing an emergency, and that Plaintiff had not been afforded the opportunity to investigate and present witnesses before his parenting time was completely suspended. She contrasted that treatment with O'Donnell's report finding Castro unfit, as to which the court had afforded Castro time to respond and depose O'Donnell.

76. Epstein argued that Plaintiff had been deprived of all contact with his daughter without an evidentiary hearing and stated that suspending his parenting time without an opportunity to subpoena Finn and his file or Kuzniar and her file was "violative of the law." She further argued that completely suspending Plaintiff's parenting time and contact "without a hearing with evidence" could not lawfully be accomplished on a summary basis where Finn's report had not been admitted into evidence. See 750 ILCS 5/603.10(a); *Stanley v. Illinois*, 405 U.S. 645, 651, 658 (1972); *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).

77. During the July 31 proceeding, GAL Kuzniar acknowledged that "this isn't truly an evidentiary hearing," but nevertheless urged Judge Loza to continue

restrictions on Plaintiff's parenting time based upon Finn's report. Finn was not present for examination, and Kuzniar acknowledged that Finn would be subject to cross-examination at a later hearing on the merits.

**J. Dr. David Finn — Beermann LLP Deposition Testimony and Alleged Bias (Group Exhibit 14)**

78. In sworn deposition testimony concerning his prior professional dealings with attorneys associated with Beermann LLP, Dr. David Finn estimated that he had worked on approximately eight to twelve matters involving the firm and had been selected as the evaluator or expert in approximately four or five matters.

79. Finn was specifically asked whether, in those four or five matters, he had ever made a recommendation contrary to the position taken by the Beermann client. Finn answered: "I don't believe so." Although Finn stated that he would need to review his records to verify his answer, when asked whether his present recollection was that he had not made such a contrary recommendation, Finn answered: "That's my recollection."

80. Plaintiff alleges that Finn's sworn testimony is relevant to evaluating his prior professional relationship and history with Beermann-related counsel, particularly when considered together with his subsequent appointment and recommendations in Plaintiff's case. Plaintiff relies upon Finn's actual sworn testimony, rather than later characterizations of that testimony.

**K. Dr. David Finn — Prior Judicial Findings Criticizing His Custody Evaluation (Group Exhibit 15)**

81. **In re Marriage of Lemke.** In re Marriage of Lemke, No. 2-16-0264 (Ill. App. Ct. Oct. 24, 2016), Dr. David Finn served as the court-appointed custody evaluator and recommended that the mother receive sole custody. The trial court rejected Finn's recommendation and identified substantial problems with his analysis.

82. The trial court found that "several of Dr. Finn's conclusions strike the Court as 'inherently flawed,'" particularly his treatment of domestic violence. The court determined that Finn's analysis reflected "a lack of fundamental understanding of the Illinois Domestic Violence Act" and characterized one of Finn's conclusions as "completely unsupportable."

83. The trial court further described Finn's opinions concerning ongoing or repeated abuse as "equally troublesome," finding that Finn had downplayed the mother's domestic-battery conviction and ignored substantial evidence of continuing abuse. The court concluded that Finn's unsupported analysis "calls into question all of Dr. Finn's opinions."

84. The trial court additionally criticized Finn for "hyper-focus[ing]" on the father's distant history involving alcohol and marijuana while minimizing the mother's psychological and anger-management issues, rejected Finn's recommendation, and awarded sole custody to the father. The Illinois Appellate Court affirmed, concluding that the trial court "appropriately explained its reasons for rejecting Dr. Finn's recommendations."

85. **Dr. Finn's Published Statement Regarding Custody-Evaluator Standards.** On July 12, 2004, Finn was quoted in a published article stating that "there are really no minimal standards for custody evaluators," and identified training in domestic violence and accurate investigation of abuse allegations as important evaluator standards—the very areas in which the Lemke court later found his work deficient.

### L. Ross Morreale — Non-Parent and Non-Party's Repeated Direct Involvement in the Family-Court Litigation, Parenting Disputes, and Alleged Abusive Litigation Against Plaintiff (Group Exhibits 16, 15)

86. Ross Morreale is Castro's on-and-off paramour but is not E.R.E.'s parent and was not a party to the underlying domestic-relations action. Nevertheless, Morreale repeatedly inserted himself into disputes concerning Plaintiff's parenting time, E.R.E., and the custody litigation.

87. Morreale's involvement dates to at least 2018. Communications from that period reflect Morreale directing threats of sustained litigation and financial pressure toward Plaintiff, including referring to Plaintiff as his "#1 project" and stating that Plaintiff should have "a lot of $$$ for lawyers."

88. **Morreale's Written Agreement to Stay Out of the Custody Proceedings.** On December 14, 2018, following separate litigation between Plaintiff and Morreale, Morreale personally countersigned an attorney-negotiated written agreement resolving Plaintiff's pending Civil No Contact/Stalking proceeding. In exchange for Plaintiff dismissing that proceeding, Morreale expressly agreed that he "will not contact your client, nor will he

inject himself in any way at all, into the child custody proceedings pending at this time." Morreale further agreed that he "will NOT testify in the pending child custody proceedings for either side, nor give an affidavit one way or the other on this matter." The agreement expressly provided that, if breached, either party could use the letter for any lawful purpose.

89. Four days after Morreale countersigned the agreement, his attorney again represented—with Morreale copied on and authorizing the communication—that Morreale had "no relationship with Feliza Castro or her daughter now, in the recent past or any plans to go back to her in the future," other than occasional business communications. The attorney represented that the countersigned agreement should resolve Plaintiff's concerns and result in dismissal of the pending petition.

90. **Morreale's Continued Involvement Following the Agreement.** Despite personally signing the December 14, 2018 agreement promising that he would not "inject himself in any way at all" into the pending child-custody proceedings, Morreale subsequently resumed involvement in disputes concerning Plaintiff, Castro, E.R.E., and the custody litigation. Plaintiff alleges that Morreale's subsequent conduct was inconsistent with the express written commitment upon which Plaintiff had agreed to dismiss his pending Civil No Contact/Stalking proceeding.

91. **Morreale's Litigation Across Multiple Courtrooms.** Morreale's subsequent involvement was not confined to the domestic-relations proceeding. He pursued separate litigation involving Plaintiff in multiple courtrooms while the custody dispute remained ongoing, requiring Plaintiff to simultaneously litigate proceedings involving Morreale in addition to the underlying parenting case.

92. Morreale's involvement extended directly into Dr. Finn's court-appointed custody evaluation. On July 18, 2023—one day before Finn issued his report—Finn documented that Morreale had paid funds toward the evaluation in excess of Castro's allocated share and that Morreale was to receive a refund after Plaintiff paid his own outstanding portion. GAL Kuzniar was copied on Finn's communication concerning the payment.

93. Thus, immediately before issuance of Finn's July 19 report, Finn and Kuzniar were aware that Morreale, a non-party with a documented history of direct involvement in the

parties' parenting disputes, had personally funded more than Castro's allocated portion of the court-appointed evaluation.

94. **Morreale's Sworn Testimony — Relationship and Domicile Inconsistencies.** In his February 19, 2024 sworn deposition, Morreale gave testimony concerning whether and to what extent he and Castro were together, their living arrangements, and his claimed domicile and residence. Plaintiff alleges that Morreale's testimony contains material inconsistencies concerning those subjects when compared with other contemporaneous records documenting his continuing relationship with Castro, participation in matters involving E.R.E., and connections to residences used by Castro and Morreale. Plaintiff relies upon Morreale's sworn deposition and the corresponding documentary records to establish those inconsistencies.

95. Morreale subsequently continued participating in parenting exchanges and child-related matters and later participated with Castro in planning concerning E.R.E.'s international schooling and relocation. Plaintiff alleges that this continuing course of conduct demonstrates that Morreale was not merely an uninvolved romantic partner, but remained an active participant in matters directly affecting Plaintiff's relationship with E.R.E.

**M. Jonathan Steele — Beermann LLP, The Girard Allegations, And Conduct In Plaintiff's Case (Group Exhibits 17, 25)**

96. Jonathan Steele represented Castro during portions of the underlying domestic-relations proceedings and was associated with Beermann LLP, the firm that had represented Castro during multiple periods of the parties' litigation. Steele participated in proceedings directly affecting Plaintiff's parental rights, including Castro's relocation efforts and the later request that resulted in restrictions upon Plaintiff's ability to file pleadings.

97. On December 9, 2024, a First Amended Complaint was filed in the Northern District of Illinois in Girard v. Village of Glencoe, Case No. 1:24-cv-06882 naming Beermann LLP among the defendants. The Girard complaint contains specific allegations concerning Steele and Judge Regina Scannicchio. Plaintiff identifies those allegations as allegations made in a separate federal proceeding and does not present them as adjudicated findings.

98. Specifically, paragraph 52 of the Girard complaint alleges that, during an unrelated Cook County domestic-relations representation before Judge Scannicchio, Steele told his client: "Oh, we have Scannicchio – we are good!" The Girard complaint further

alleges that Steele understood favorable rulings would follow because of an improper relationship between Beermann LLP and Judge Scannicchio.

99. Paragraph 116 of the Girard complaint separately alleges: "Beermann Attorney Jonathan Steele as noted supra also has material knowledge of the bribery of Judge Scannicchio." Plaintiff pleads the existence and content of this allegation because it concerns the same Beermann attorney and the same Cook County Domestic Relations judge who subsequently participated in Plaintiff's proceedings, while recognizing that the allegation itself is not a judicial finding.

100. In Plaintiff's own domestic-relations case, Steele subsequently acted as counsel for Castro in proceedings directly affecting Plaintiff's parental rights. On April 9, 2024, approximately thirty-five days after the March 5, 2024 agreed order, Castro, through Steele, filed a motion disclosing her intent to relocate E.R.E. to California, a relocation plan that Plaintiff alleges had not been disclosed before he entered into the March 5 agreement.

101. On December 17, 2024, after Plaintiff's case had been assigned to Judge Regina Scannicchio, the State Court entered, at Steele's request, an order requiring Plaintiff to obtain leave of court before filing future pleadings. Plaintiff alleges that no reciprocal pre-filing restriction was imposed upon Castro or her counsel, who remained permitted to file pleadings without first obtaining leave.

102. Plaintiff alleges that the December 17, 2024 filing restriction was particularly significant because it was sought by Steele before Judge Scannicchio, the same attorney and judge specifically referenced in the separate Girard allegations. Plaintiff pleads this overlap as relevant context concerning Steele's conduct in Plaintiff's proceedings, while recognizing that the allegations made in Girard have not themselves been adjudicated as true. See *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 741 (1983).

**N. Tom Field — Longstanding Representation, Spero/Abbed Proceedings, And Continuity With GAL Kuzniar**

103. Attorney Thomas "Tom" Field represented Feliza Castro across successive litigation cycles beginning with the earlier custody proceedings, remained her attorney of record after the parties' 2016 agreed resolution, and stayed involved as other Beermann LLP attorneys joined her representation. Plaintiff alleges that the relationship between Field and Kuzniar, and

the resulting concerns regarding Kuzniar's independence from Castro's counsel, trace to the 2015–2016 litigation, resurfaced in 2018, and preceded by years the conduct challenged here.

**O. 2015–2016 — Tom Field's Representation of Castro and Her Then-Boyfriend Dr. Jonathan Spero; GAL Michael Ryan; and Alleged Cross-Case Contamination (Group Exhibit 18)**

104. During the 2015–2016 litigation cycle, Field also represented Dr. Jonathan Spero, Castro's then-boyfriend, in a separate Kane County domestic-relations proceeding between Spero and his former partner, Nejla Abbed, in which Michael Ryan served as GAL. Plaintiff alleges that Kuzniar, appointed only in the Engels/Castro case, nevertheless communicated with Ryan concerning Castro and her drug-testing history, carrying information from the Cook County proceeding into a separate case involving different parents and additional children.

105. According to Plaintiff's chronology, Abbed informed Plaintiff that her effort to obtain a restraining order concerning Castro's continued conduct toward Abbed's children was unsuccessful after Kuzniar allegedly represented to Ryan that Castro had passed all her drug tests. She had passed none at that point. Field supplied the common attorney connection; Kuzniar supplied the cross-case GAL connection. Plaintiff pleads this episode as an early example of the pattern challenged here and as evidence bearing on whether Kuzniar maintained the independence required of a court-appointed representative for E.R.E.

106. Plaintiff's own counsel raised the same concern during the underlying proceedings. Attorney Jill Peters stated that Kuzniar's relationship with Field was "interfering with her decision making" and that Kuzniar "should have recused herself." The concern was not that Kuzniar reached conclusions unfavorable to Plaintiff, but that her relationship with opposing counsel affected, or reasonably appeared to affect, her independence.

107. **Castro's Written Threats Naming Kuzniar and Field.** Beginning in June 2015, Castro told Plaintiff in writing, much of it from her thehealingclinic.org account, that she would use the litigation to ruin him: "I'm taking u down in court"; "Looking forward to smoking u both in court" and "crushing u again"; "I'm going to enjoy watching u go broke"; and the case "will cost u your business and [E.R.E.]." She wrote that what would make her happy was "bleeding u dry and getting full custody," that she was "no longer fighting u alone," and: "Keep this up and you will go completely broke in court. You already have to

`pay for Pam, drug testing, supervised visitation. Tom is next."` In another message she warned: `"I will let Tom and Pam know immediately u are playing these games."` `"Pam"` is Defendant Kuzniar; `"Tom"` is Defendant Field. Plaintiff pleads these statements as evidence of motive, and of Castro's own understanding that Kuzniar and Field were the means by which she would exhaust Plaintiff financially and obtain custody.

**P. 2018 Emergency Litigation — Publicly Documented Crisis, Violence, Drug Use, Psychiatric Hospitalizations, and Extraordinary Child-Safety Concerns (Group Exhibits 19, 1)**

108. Plaintiff's verified September 6, 2018 affidavit alleged that Castro and Ross Morreale were involved in a physical and verbal domestic altercation and that, on August 24, Morreale obtained an order of protection resulting in Castro's removal from their residence by Chicago police. In the following days Castro recorded herself claiming she had been poisoned, that people were trying to kill her, and that her blood had been laced with arsenic; sought FBI assistance; and repeatedly called 911.

109. The affidavit states that Castro was admitted to St. Mary's Psychiatric Unit for five days, that after her release she recorded herself stating she `"needs a pistol next order of business,"` and that she later recorded herself using drugs before arriving at Northwestern Hospital, where she remained in a psychiatric unit until September 4. These events occurred immediately before Castro was scheduled to exercise unsupervised parenting time, and Plaintiff sought emergency relief.

110. Before the September 27, 2018 hearing, Castro told Plaintiff that Field had told her Kuzniar would be reappointed and would recommend that Plaintiff pay the expenses of Castro's supervised parenting time. On September 27, Kuzniar appeared at the courthouse before any order restored her to the case and was observed seated alongside Field. Plaintiff does not allege that courthouse proximity alone proves any particular ex parte communication; he alleges that Castro's accurate advance prediction, together with the Field/Kuzniar relationship and the Spero/Abbed events, supports an inference of advance communication concerning Kuzniar's return.

111. Castro's prediction came true. In 2015 the parties had shared Kuzniar's fees; upon her September 27, 2018 reappointment, Plaintiff alone was ordered to pay the $5,000 GAL retainer, and he was also required to bear the cost of Castro's court-ordered drug testing and

supervised parenting time—although the need for both arose from Castro's own conduct, and although Castro had recently lived in a penthouse reportedly costing about $7,000 per month.

112. That same day, Castro's hair specimen tested positive for hydrocodone, norhydrocodone, and cannabinoids/THCA. Plaintiff's test was negative. The financial burden of Castro's drug use was nonetheless shifted to Plaintiff, materially impairing his ability to continue pursuing protective relief for E.R.E.

113. Plaintiff offers this 2015–2018 history not to challenge those state-court rulings, but as context showing that the relationships and coordinated conduct underlying his federal claims did not originate in 2022 and can be traced through multiple litigation cycles.

**Q. Boarding-School Litigation And Efforts To Remove E.R.E. From Chicago (Group Exhibits 20, 20-A, 21, 22, 23, and 25)**

114. On April 9, 2024—only 35 days after the March 5, 2024 agreed order closing the case—Castro served/filed a Notice of Intent to Relocate E.R.E. from Chicago. Plaintiff alleges that the timing is significant: despite having just agreed to close the litigation, Castro initiated a new effort to fundamentally alter E.R.E.'s residence and the parties' existing parenting arrangement only five weeks later. Plaintiff alleges this sequence demonstrates that Castro did not enter into or perform the March 5 agreement in good faith and that the purported resolution did not produce the finality represented by the agreed order.

115. On March 21, 2025, Castro, through new counsel Matt Farmer of Williams, Farmer & Olechno, filed a Three-Count Motion to Modify Plaintiff's Regular Parenting Time, Summer Parenting Time, and Require Plaintiff to Participate in Individual Counseling. On the same date, Farmer also filed a Motion to Reappoint the Court's §604.10(b) Evaluator to Complete an Updated/Supplemental Report, seeking renewed involvement by Dr. David Finn.

116. These March 21 filings preceded Castro's subsequent effort to enroll E.R.E. in boarding school and sought changes to Plaintiff's existing parenting time before the boarding-school request was formally filed..

117. During the boarding-school litigation, Castro changed counsel and retained Karen Conti and Conti & Dolan LLC. On July 9, 2025, Castro, through Conti & Dolan, filed an Emergency Motion for Temporary Reassignment Regarding Emergency or Expedited Matter, seeking expedited consideration of the pending boarding-school issue..

118. On July 15, 2025, Judge Naomi H. Schuster, sitting for Judge Scannicchio, determined that Castro's request was not an emergency, allowed Plaintiff time to respond to the June 18 boarding-school motion, and maintained the July 30 status date.

119. On July 30, 2025, Plaintiff filed his response opposing Castro's Motion to Enroll E.R.E. in boarding school. On July 31, 2025, Castro, represented by Karen Conti and Conti & Dolan LLC, filed an Emergency Motion to Vacate or Reconsider the July 30, 2025 Order, continuing the effort to obtain boarding-school enrollment after the earlier request for emergency treatment had been rejected.

120. On August 4, 2025, Castro, through her counsel Karen Conti and Conti & Dolan LLC, filed an Emergency Re-Notice of her Motion to Vacate or Reconsider the July 30, 2025 Order, again seeking emergency consideration in connection with the continuing boarding-school dispute.

121. On August 6, 2025, Plaintiff filed a response opposing Castro's renewed emergency effort, entitled Petitioner's Response to Strike Respondent's Re-Notice of Motion and Third Emergency Motion to Enroll the Minor Child in Boarding School. Plaintiff challenged Castro's repeated attempts, through counsel Karen Conti and Conti & Dolan LLC, to obtain emergency boarding-school relief after the issue had previously been determined not to constitute an emergency.

122. On February 11, 2026, Judge Regina Scannicchio entered an order striking Castro's motions to enroll E.R.E. at TASIS boarding school. Plaintiff's subsequent filing specifically records that "This same Court struck Respondent's motions to enroll the minor child in Tasis boarding school on February 11, 2026."

123. On April 13, 2026, Castro, now represented by attorney Brendan Hammer, filed a Two-Count Verified Petition renewing the effort to remove E.R.E. from her existing Chicago schooling and parenting arrangement. The petition sought approval for international-school enrollment and modification of parenting time and, alternatively, relocation to the Italy/Switzerland area. The filing renewed the international-school and relocation effort approximately two months after Judge Scannicchio had struck Castro's prior TASIS boarding-school motions.

124. During the international-school negotiations, Castro offered to waive approximately $15,000 in disputed child-related expenses if Plaintiff agreed to the proposed

TASIS arrangement and related modifications to parenting time. Plaintiff relies upon Castro's written proposal to establish the terms of the offer and its connection to Plaintiff's agreement to international-school enrollment.

125. Because Castro and GAL Pamela Kuzniar attributed to E.R.E. a desire to attend international school, Plaintiff sought to have the child's actual preference heard directly by the Court. On June 10, 2026, Plaintiff filed an emergency motion requesting an in-camera interview of E.R.E. concerning the proposed international-school placement and asking that the interview occur outside the presence of the parties, counsel, and GAL Kuzniar so that E.R.E. could communicate her wishes directly to Judge Scannicchio. See 750 ILCS 5/604.10(a); 750 ILCS 5/602.7(b)(2).

126. On June 25, 2026, GAL Pamela Kuzniar issued her Supplemental GAL Report supporting the international-school proposal and expressly stated: "I would support her enrollment at TASIS boarding school or as a day school attendee if the boarding school is filled at this late date." Kuzniar made this recommendation while the international-school and relocation dispute remained pending for trial before Judge Scannicchio.

127. Kuzniar's June 25, 2026 Supplemental Report attributed to E.R.E. statements that she wanted a "fresh start" away from conflict, wanted to attend TASIS, and believed she "needs this change." Plaintiff disputes the accuracy of material statements attributed to E.R.E. concerning her desire for international schooling and alleges that E.R.E. subsequently denied making material portions of the statements attributed to her. Plaintiff therefore continued seeking an opportunity for E.R.E. to communicate her actual wishes directly to the Court rather than through the GAL.

128. Kuzniar's Supplemental Report contains an internal discrepancy concerning the date of her reported contact with E.R.E. The report's contact summary identifies a video conference on June 22, 2026, while the narrative describes a FaceTime meeting as occurring on "Monday June 23, 2026." In 2026, June 22 was Monday and June 23 was Tuesday. Plaintiff alleges that this discrepancy is material because Kuzniar relied upon the disputed contact in attributing statements and an international-school preference to E.R.E. Cf. *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012).

129. **GAL Fees Charged for Defending Herself.** Kuzniar's own invoices show that she billed for her time opposing Plaintiff's August 8, 2025 motion to remove her as GAL, charging the parties for defending her own position rather than for representing E.R.E.'s interests. See 750 ILCS 5/506(b).

130. On August 3, 2026, Plaintiff filed a further motion requesting an in-camera interview of E.R.E., identifying disputed accounts of GAL Kuzniar's reported contacts with the child—including contacts reported on January 29, June 4, and August 1, 2025, and June 22–23, 2026—and asking Judge Scannicchio to hear directly from E.R.E. concerning whether those contacts occurred and whether statements attributed to her, including statements concerning international schooling, accurately reflected her own words and wishes.

## R. Feliza Castro — Criminal And Violence History Provided To The GAL And Evaluator (Group Exhibit 24)

131. Plaintiff pleads Castro's documented record solely to establish what information was available to and provided to Kuzniar and Finn, and what their reports omitted. Plaintiff does not plead these events as independent claims or ask this Court to adjudicate any criminal matter; allegations by others are identified as allegations.

132. **Summary of the Record.** The records reflect that in 2008 Castro was arrested in Troy and Hazel Park, Michigan, including for Operating While Intoxicated; pleaded guilty to Retail Fraud – Third Degree; was the subject of a missing-persons report filed by her mother with the Southfield Police Department; and was sentenced to five days in the Oakland County Jail on a charge of resisting or obstructing a peace officer. On June 27, 2008, Southfield Police documented a physical domestic disturbance between Castro and her brother, after which she was transported to Providence Hospital. On June 23, 2018, Rosemont Police documented an incident at Allstate Arena in which Plaintiff alleges Castro bit a private security officer, and an Assistant State's Attorney approved a Class 2 felony charge of Aggravated Battery to a Private Security Officer. In August 2018, Morreale petitioned for an order of protection against Castro (No. 18OP76540), a Petition for Involuntary Commitment concerning Castro was filed, and, Plaintiff alleges, Castro and Morreale livestreamed hostile exchanges with police, fire, EMS, and 911 personnel on Facebook Live. Castro's former partners Dr. Jonathan Spero and Jim D'Ambrosio have described her violence toward them in their own written words, including Spero's May 10, 2016 text: "She was violent so I left."

133. **Notice and Omission.** Plaintiff alleges this record was provided to Kuzniar and Finn and that neither Finn's July 19, 2023 § 604.10(b) report nor Kuzniar's reports, including her June 25, 2026 Supplemental Report, addressed it, although Illinois law makes violence and abuse directed against household members factors in allocating parental responsibilities. See 750 ILCS 5/602.7(b). Finn's omission parallels the conduct a court previously criticized in his work, where he downplayed a parent's domestic-battery conviction. Plaintiff does not allege that an omission, standing alone, defeats quasi-judicial immunity; he pleads this record to establish what Kuzniar and Finn knew when they made the representations and recommendations described herein.

## S. Feliza Castro — Residence History And Relocation Proposals (Group Exhibit 25)

134. **Summary of Residence History.** Since 2012, Castro has lived at no fewer than ten residences in Chicago, Northbrook, and Miami Beach, including three that ended in eviction (643 W. Elm St. in 2014, and 24 S. Morgan St. in 2019) and one where the landlord served a 10-Day Notice to Quit citing her threatening conduct (220 W. Illinois St. in 2016). Her efforts to move E.R.E. away from Chicago long predate the boarding-school litigation described in Section N: a May 20, 2018 request to take E.R.E. to Los Angeles; her November 2, 2021 statement that she would live "Anywhere but here"; and the April 9, 2024 Notice of Intended Relocation to Los Angeles with an address listed as unknown. The supporting records are attached collectively as.

135. Plaintiff alleges that this extensive residence and relocation history was repeatedly disclosed to Kuzniar and Finn and was therefore information available to them when evaluating E.R.E.'s stability, continuity of residence, schooling, and proposed removal from Chicago. Despite repeated changes of residence, prior eviction-related proceedings, and Castro's longstanding efforts to relocate E.R.E. away from Chicago, Kuzniar's June 25, 2026 Supplemental Report supported E.R.E.'s enrollment at TASIS without meaningfully addressing that history or explaining how another major residential and educational disruption served E.R.E.'s interests. Plaintiff pleads these facts not to relitigate relocation, but as evidence of notice and of the alleged pattern of disregarding information unfavorable to Castro.

## V. STATE ACTION, JOINT PARTICIPATION, AND CONSTITUTIONAL DEPRIVATION

136. Plaintiff realleges and incorporates paragraphs 1 through 135 as though fully set forth herein.

137. Plaintiff brings the constitutional claims below pursuant to 42 U.S.C. §1983. Plaintiff alleges that the challenged deprivations were not the product of isolated private conduct, but resulted from specific acts undertaken through, together with, or under authority of the state judicial process that directly affected Plaintiff's parenting rights, access to his child, and ability to seek relief from the courts. See 42 U.S.C. § 1983; *West v. Atkins*, 487 U.S. 42, 48 (1988).

138. Plaintiff alleges that GAL Pamela Kuzniar and court-appointed evaluator Dr. David Finn exercised authority derived from their court appointments and participated directly in the events described above, including recommendations, communications, reports, and interventions that were presented to or implemented through the State Court and used in proceedings affecting Plaintiff's parental rights.

139. Plaintiff does not allege that Castro, Morreale, or the private-attorney defendants became state actors merely by participating in domestic-relations litigation, representing a party, communicating with court-appointed professionals, or obtaining favorable judicial rulings. As to each private defendant against whom a §1983 claim is asserted, Plaintiff alleges state action only to the extent that the specific facts pleaded below establish joint participation or concerted action with a person acting under color of state law in the particular constitutional deprivation at issue. *Dennis v. Sparks*, 449 U.S. 24, 27–28 (1980); *Fries v. Helsper*, 146 F.3d 452, 457 (7th Cir. 1998).

140. The challenged conduct resulted in concrete deprivations—including the complete suspension of Plaintiff's parenting time and contact with E.R.E. without a prior evidentiary hearing, restrictions on his ability to communicate with his child, and restrictions on his ability to present filings—through procedures in which material information was omitted, selectively presented, or inaccurately attributed, and in which court-appointed participants acted beyond neutral reporting or evaluative functions.

141. Plaintiff does not seek federal appellate review of the merits of any state-court custody, schooling, relocation, or parenting determination. Plaintiff instead seeks relief for independent alleged constitutional injuries caused by the individual defendants' own conduct,

including alleged deprivations of procedural due process, interference with the parent-child relationship, and interference with Plaintiff's ability to petition and obtain meaningful access to the courts. See *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284, 293 (2005); *J.B. v. Woodard*, 997 F.3d 714, 722–24 (7th Cir. 2021); *Hadzi-Tanovic v. Johnson*, 62 F.4th 394, 399–400 & n.2 (7th Cir. 2023).

## VI. CONDUCT OUTSIDE PROTECTED COURT-APPOINTED FUNCTIONS

142. Plaintiff recognizes that court-appointed professionals may be entitled to immunity for conduct that is functionally integral to the judicial process and within the scope of duties for which they were appointed. Plaintiff does not seek damages merely because GAL Kuzniar or Dr. Finn investigated facts, formed opinions, prepared reports, testified, or made recommendations within a protected court-appointed function. *Cooney v. Rossiter*, 583 F.3d 967, 970 (7th Cir. 2009).

143. Plaintiff instead alleges liability for specific conduct described above that Plaintiff contends was administrative, operational, investigatory beyond the authorized function, or otherwise outside the scope of the particular protected judicial function, including direct participation in implementing or facilitating actions affecting Plaintiff's existing parenting rights rather than merely reporting information or recommendations to the Court. See *Jones v. Brennan*, 465 F.3d 304, 308 (7th Cir. 2006).

144. As to Kuzniar, Plaintiff alleges that the challenged conduct includes specific acts identified above involving the implementation and transmission of testing protocols, participation in communications and proceedings outside Plaintiff's counsel's presence, alleged selective transmission or omission of material information, and conduct affecting Plaintiff's ability to communicate with E.R.E. and obtain meaningful judicial consideration of his filings. Plaintiff alleges immunity does not extend to such conduct to the extent it was undertaken outside a function entitled to quasi-judicial protection.

145. As to Finn, Plaintiff distinguishes Finn's preparation of his §604.10(b) report and recommendations from the separate conduct alleged above, including his direct intervention in existing parenting arrangements before completion of his report, communications concerning changes to parenting time, participation in the May 2023 events, and other conduct Plaintiff

alleges exceeded a neutral evaluative function. Plaintiff seeks liability only for conduct for which immunity does not apply.

146. Plaintiff therefore does not rely upon a defendant's title or court appointment to establish liability, nor does Plaintiff contend that every erroneous recommendation or adverse act by a court-appointed professional creates a federal claim. The Counts below concern only the specific acts alleged to constitute action under color of law, cause an independent constitutional deprivation, and fall outside any applicable immunity. See *Ashcroft v. Iqbal*, 556 U.S. 662, 676–79 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–57, 570 (2007).

## VII. COUNTS

### COUNT I — 42 U.S.C. §1983 — PROCEDURAL DUE PROCESS

147. Plaintiff realleges and incorporates paragraphs 1 through 146 as though fully set forth herein.

148. Plaintiff possessed a constitutionally protected liberty interest in the care, custody, companionship, and maintenance of his parent-child relationship with E.R.E., including the parenting time and contact established by the existing State Court orders. *Troxel v. Granville*, 530 U.S. 57, 65–66 (2000); *Brokaw v. Mercer County*, 235 F.3d 1000, 1018–20 (7th Cir. 2000); see *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).

149. On July 20, 2023, Plaintiff was deprived of that interest when his parenting time was completely suspended and all contact with E.R.E. was prohibited, one day after Dr. David Finn issued his §604.10(b) report.

150. The deprivation occurred while Plaintiff's counsel, Linda Epstein, was unable to appear, and before Plaintiff received an evidentiary hearing at which he could present evidence, examine witnesses, cross-examine Finn, obtain and examine the materials underlying Finn's opinions, or meaningfully challenge the factual basis asserted for completely terminating his contact with E.R.E.

151. Plaintiff alleges that Finn's report had not been admitted into evidence before the deprivation and that Finn did not testify or submit to cross-examination before Plaintiff's parenting time and contact were completely suspended.

152. Plaintiff, through Epstein, promptly challenged the deprivation by motion and on the record at the July 31, 2023 hearing, as alleged in Section IV.I above, where Kuzniar herself

conceded that "this isn't truly an evidentiary hearing" yet urged that the restrictions continue based on Finn's report. **(Exhibit 13)**

153. Judge Loza ultimately determined that Castro's emergency motion was "insufficient at law" because it failed to state sufficient facts, granted Plaintiff's motion to dismiss, and confirmed that Plaintiff would regain his parenting time.

154. Plaintiff alleges that the subsequent dismissal did not cure the completed constitutional deprivation: Plaintiff had already been deprived of parenting time and all contact with his child through a procedure in which the evidence supporting that deprivation had not first been subjected to an evidentiary hearing or meaningful adversarial testing.

155. Plaintiff alleges that Dr. David Finn and Pamela Kuzniar participated in the July 2023 sequence described in paragraphs 149–154 through the particular reports, communications, and actions attributed to each above. Plaintiff alleges liability against any other named defendant under this Count only to the extent the specific facts pleaded above establish that defendant's personal participation in the challenged deprivation and action under color of state law. Plaintiff seeks damages for injuries proximately caused by any proven constitutional violation, rather than for an unfavorable state-court decision standing alone.

## COUNT II — 42 U.S.C. §1983 — INTERFERENCE WITH THE PARENT-CHILD RELATIONSHIP / FAMILIAL ASSOCIATION

156. Plaintiff realleges and incorporates paragraphs 1 through 155 as though fully set forth herein.

157. Plaintiff possessed a constitutionally protected liberty interest in maintaining his relationship, association, and contact with his minor child, E.R.E. *Brokaw*, 235 F.3d at 1018–20; *Troxel*, 530 U.S. at 65–66.

158. Plaintiff alleges that the individualized conduct described above resulted in substantial interference with that relationship, including the complete suspension of parenting time and all contact, subsequent restrictions on communication, and actions that impaired Plaintiff's ability to maintain his established relationship with E.R.E.

159. Plaintiff alleges that Dr. David Finn and Pamela Kuzniar engaged in the specific conduct attributed to them above that contributed to interference with his parent-child relationship. As to Castro, Morreale, Field, and Steele, Plaintiff alleges liability under this Count only to the extent particular acts pleaded above establish personal participation and joint action

sufficient to constitute conduct under color of state law. Plaintiff does not contend that litigation participation or an adverse recommendation, without more, establishes a constitutional violation.

160. As a direct and proximate result, Plaintiff suffered loss of parenting time and contact, disruption of his relationship with E.R.E., emotional distress, litigation expense, and other compensable injury.

## COUNT III — 42 U.S.C. §1983 — EQUAL PROTECTION

161. Plaintiff realleges and incorporates paragraphs 1 through 160 as though fully set forth herein.

162. Plaintiff alleges that he was subjected to materially different treatment in the administration of the parties' parenting proceedings despite being similarly situated to Castro with respect to the procedural protections afforded when substantial restrictions on parenting rights were sought. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

163. Plaintiff specifically alleges that when Dr. O'Donnell issued findings adverse to Castro, Castro was afforded an opportunity to respond to and challenge those findings before comparable restrictions were imposed. By contrast, following Finn's report, Plaintiff's parenting time and all contact with E.R.E. were suspended before Plaintiff received an evidentiary hearing or meaningful opportunity to challenge Finn's conclusions.

164. Plaintiff further alleges disparate treatment in the operation of the litigation process, including the imposition of a pre-filing restriction upon Plaintiff but not Castro, despite both parties continuing to seek affirmative relief from the State Court.

165. Plaintiff alleges that the unequal procedural treatment described in paragraphs 162–164 was intentional and attributable to the particular defendants whose conduct is described above. Liability under this Count is asserted against Kuzniar and Finn insofar as the pleaded facts establish their personal participation and action under color of state law, and against Castro, Morreale, Field, or Steele only insofar as specific joint conduct is established. Plaintiff recognizes that different procedural outcomes, without evidence of intentional unequal treatment by an actionable defendant, do not alone establish an equal-protection violation.

166. As a direct and proximate result, Plaintiff suffered loss of parenting time and contact, impairment of his ability to seek judicial relief, litigation expense, emotional distress, and other compensable injury.

## COUNT IV — 42 U.S.C. §1983 — FIRST AMENDMENT RETALIATION FOR PETITIONING

167. Plaintiff realleges and incorporates paragraphs 1 through 166 as though fully set forth herein.

168. **Protected Activity.** Plaintiff engaged in conduct protected by the Petition Clause of the First Amendment, including his October 2 and October 11, 2024 emergency motions raising Castro's drug use and GAL Kuzniar's conduct, including the March 5, 2024 chambers meeting; his October 21, 2024 emergency motion for an in camera interview of E.R.E.; his December 11, 2024 answer opposing the requested filing restriction; his August 8, 2025 motion to remove Kuzniar; and his June 10, 2026 motion to exclude Kuzniar from any in camera interview. **(Exhibits 17, 21, 22)** See *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009); *BE&K Constr. Co. v. NLRB*, 536 U.S. 516, 524–25 (2002).

169. **Retaliation by Steele and Castro.** On October 29, 2024, eighteen days after the Sixth Emergency Motion and eight days after the in camera motion, Castro, through Steele, petitioned to require Plaintiff to obtain leave of court before filing anything further. The petition targeted those two motions by name, called the in camera request Plaintiff's "Seventh Emergency Motion," described his motions as "baseless" and "inflammatory," and stated: "In light of Edward's two most recently filed Emergency Motions, the need for relief is immediate." **(Exhibit 17)**

170. On December 17, 2024, with Kuzniar present, Judge Scannicchio entered the order Steele prepared. It denied Plaintiff's motions; ordered the exhibits in his Sixth Emergency Motion relating to Judge Loza sealed and removed from the electronic docket; required Plaintiff alone to submit every future pleading for review of legal sufficiency before filing; and ordered him to pay $5,875 to Beermann LLP. The day before, on Kuzniar's petition, Plaintiff was adjudicated in indirect civil contempt and ordered committed to the Cook County Jail until he paid Kuzniar $23,065.81. **(Exhibits 17, 22)**

171. Retaliation by Kuzniar. GAL-fee enforcement and contempt proceedings were underway before Plaintiff's August 8, 2025 motion seeking Kuzniar's removal. Plaintiff alleges that subsequent enforcement actions and billing for time opposing his removal motion were retaliatory; the earlier proceedings are not alleged to have been initiated in response to that August 2025 motion. (Exhibit 1 — GAL-fee supplemental records) On February 17, 2026,

Plaintiff was taken into custody, and on February 18, 2026 the court entered an order requiring a cash bond payable to the GAL and quashing the attachment. Fifteen days after Plaintiff's June 10, 2026 motion to exclude her, Kuzniar issued her June 25, 2026 Supplemental Report supporting the boarding-school relief the court had struck on February 11, 2026 and attributing to E.R.E. statements she denies making. (Exhibits 21, 22)

172. **Adverse Action.** Prefiling screening of only Plaintiff's filings, sealing of the evidence supporting his petitions, a fee award against him, a jail-commitment order, arrest, and a contested report used against him would deter a person of ordinary firmness from continuing to petition the courts. The restriction caused concrete harm: Kuzniar's own report lists Plaintiff's Motion to Lift Filing Restrictions and Motion to Restore Electronic Contact with the Minor Child as "served but not filed." **(Exhibit 22)** *Douglas v. Reeves*, 964 F.3d 643, 646 (7th Cir. 2020); *Bridges*, 557 F.3d at 546.

173. **Causation.** Plaintiff's petitioning was at least a motivating factor in each action. Steele's petition says so on its face: it sought the restriction "[i]n light of" Plaintiff's two most recent motions, the motions accusing Kuzniar and Judge Loza, and the order granting it disposed of those motions and sealed the evidence supporting them. Later fee-enforcement steps and Plaintiff's arrest occurred after his motion to remove Kuzniar, although the fee dispute and contempt proceedings began earlier, and her report followed fifteen days after his motion to exclude her. See *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).

174. State Action. Plaintiff alleges that Kuzniar exercised authority conferred by her court appointment and engaged in the particular conduct described above. Plaintiff recognizes that court appointment alone does not establish action under color of state law for every act. Plaintiff alleges that Steele and Castro acted under color of state law only insofar as specific facts establish willful joint participation with state officials in the challenged conduct; ordinary representation or petitioning, without more, is insufficient. See Dennis v. Sparks, 449 U.S. 24, 27–28 (1980).

175. As a direct and proximate result, Plaintiff suffered loss of liberty, the burden and expense of prefiling screening, fees assessed against him, loss of the ability to present time-sensitive requests concerning E.R.E., emotional distress, and other compensable harm. Plaintiff seeks relief under 42 U.S.C. §1983 for retaliation against his exercise of the right to petition.

## VIII. INJURIES AND DAMAGES

176. As a direct and proximate result of the constitutional deprivations alleged above, Plaintiff suffered actual injury, including loss of parenting time and contact with E.R.E., disruption of the parent-child relationship, interference with Plaintiff's ability to communicate with his child, and impairment of his ability to obtain timely judicial consideration of matters affecting his parental rights. Plaintiff further incurred financial loss, litigation expenses, and other out-of-pocket costs.

177. Plaintiff also suffered emotional distress, mental anguish, loss of companionship, and other noneconomic harm arising from the alleged unconstitutional interference with his relationship with E.R.E. *Carey v. Piphus*, 435 U.S. 247, 263–64 (1978).

178. Plaintiff seeks compensatory damages in an amount to be determined at trial and, against any individual defendant for whom the evidence satisfies the governing legal standard, punitive damages as permitted under federal law. *Smith v. Wade*, 461 U.S. 30, 56 (1983).

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against the appropriate Defendants and:

A. Award Plaintiff compensatory damages in an amount to be determined at trial for the injuries caused by the constitutional violations alleged herein;

B. Award Plaintiff nominal damages for each constitutional violation proven, whether or not actual loss is proven. *Carey v. Piphus*, 435 U.S. 247, 266 (1978);

C. Award punitive damages against any individual Defendant whose conduct satisfies the governing federal standard. See *Smith v. Wade*, 461 U.S. 30, 56 (1983);

D. Award Plaintiff his costs and such attorney's fees as may be recoverable under 42 U.S.C. §1988, to the extent permitted by law;

E. Grant appropriate declaratory relief concerning the constitutional violations established in this action, to the extent such relief is within this Court's jurisdiction;

F. Award prejudgment and post-judgment interest as permitted by law; and

G. Grant such other and further relief as this Court deems just and proper.

## X. JURY DEMAND

179. Plaintiff demands a trial by jury on all claims and issues so triable pursuant to Federal Rule of Civil Procedure 38 and the Seventh Amendment to the United States Constitution.

Respectfully submitted,

/s/ Edward Engels
Edward Engels, Plaintiff, Pro Se
509 N. Racine Ave., Suite 1S
Chicago, Illinois 60642
(312) 961-0805
eddie@e2brands.net

Dated: October 15, 2026